**No. 25-1519**

# United States Court of Appeals
## For the First Circuit

---

GINA RUSSO,

Plaintiff-Appellant,

v.

NEW HAMPSHIRE NEUROSPINE INSTITUTE, P.A.; URI M. AHN,

Defendants-Appellees.

---

*On Appeal from Orders and Judgment of the U.S. District Court for the District of New Hampshire, 1:21-cv-00703-SM-TSM*
*Rendered by Hon. Steven J. McAuliffe, U.S.D.J.*

---

# BRIEF FOR THE PLAINTIFF-APPELLANT

RESPECTFULLY SUBMITTED,

GINA RUSSO

BY HER ATTORNEYS:

***Kamee Verdrager, Esq.***
KBV LAW
P.O. Box 90
W. Nottingham, N.H. 03291
(603) 488-1473
kbv@kbvlawpc.com
CA01 #101062
*Attorney for Plaintiff-Appellant*

***Robert S. Mantell, Esq.***
LAW OFFICE OF ROBERT S. MANTELL
47 Liberty Avenue
Sommerville, MA 02110
(617) 470-1033
RMantell@TheEmploymentLawyers.com
CA01 #31754
*On the brief*

# TABLE OF CONTENTS – APPELLANT'S BRIEF


TABLE OF AUTHORITIES ........ i

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ........ 1

JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 2

1. PROCEDURAL BACKGROUND ........ 2
2. FACTUAL BACKGROUND ........ 3

SUMMARY OF THE ARGUMENT ........ 14

ARGUMENT ........ 17

I. STANDARD OF REVIEW ........ 17

II. STANDARD FOR PROVING DISCRIMINATION ........ 17

III. PROOF OF A PRIMA FACIE CASE AND PRETEXT ARE SUFFICIENT, BY THEMSELVES, TO RAISE AN INFERENCE OF DISCRIMINATION IN THE ABSENCE OF CONCLUSIVE, UNCONTROVERTED INDEPENDENT EVIDENCE THAT NO DISCRIMINATION OCCURRED ........ 19

IV. A REASONABLE JURY COULD FIND THAT RUSSO WAS SUBJECTED TO SEX DISCRIMINATION ........ 23

A. Russo has Established a Strong Prima Facie Case of Sex Discrimination ........ 23

1. Russo is in a Protected Class ........ 24
2. Russo Met the Minimum Qualifications for her Job ........ 25
3. Russo Suffered Three Adverse Actions ........ 27
4. NHNSI's Continuing Need for Russo's Services ........ 28

B. Russo has Satisfied the Third Stage of the Burden-Shifting Formula, in Multiple, Independently Sufficient Ways ........ 29

1. Russo Has Affirmative Evidence that Sex Discrimination was a But-For Reason for the March 25, 2019 Decision to Discharge ........ 29

a. Ahn Demanded Russo's Termination Because Retaining Her Would Be Incompatible with His Masculine Identity ........ 30

b. Ahn Treated Female Workers with Hostility and with an Exaggerated Need for Them to "Respect" Him, in a Way That Indicated a Desire for Dominance. ........ 33

c. Comparator Evidence Showing that Men Were Treated Better ........ 37

d. Ahn Responded Unprofessionally to Russo's Innocuous Statements and Conduct ........ 39

e. Additional Corporate Atmosphere Evidence 43

2. Russo Has Ample Evidence that One or More of NHNSI's Explanations Are Pretextual ........ 45

a. Ahn's False Claim that he Decided to Push for Russo's Termination After Learning About Russo's Statements to Talbot-Kleeman Critical of Ahn ........ 47

b. Ahn's False Statement That He Did Not Want Russo and Plamondon to be Scheduled for Surgeries With Him Due to Their Skill Level and Lack of Experience with Orthopedic/Spine Surgeries ........ 50

c. Mischaracterizing the Options Offered by Russo ........ 52

d. The District Court Misunderstood the Pretext Requirement ........ 53

C. The Exception to the *Reeves* Rule Does Not Apply .........53
D. Basis for Employer Liability .........................................56
E. Basis for Individual Liability ......................................... 61
V. A REASONABLE JURY COULD FIND THAT NHNSI RETALIATED AGAINST RUSSO ....................................... 62
A. Russo Engaged in Protected Activity .............................. 62
B. NHNSI Subjected Russo to Adverse Actions .................. 63
C. Causal Connection Between Demand Letter and Discharge ......................................................................... 67
CONCLUSION ............................................................................ 69
CERTIFICATE OF SERVICE.......................................................... 71
CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITS..72
ADDENDUM..................................................................................73

## TABLE OF AUTHORITIES

### Cases

Ahmed v. Johnson, 752 F.3d 490 (1st Cir. 2014) .............................. 31, 46

Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63 (1st Cir. 2015) 60

Ames v. Ohio Dept. of Youth Servs., 145 S. Ct. 1540 (2025) .................. 29

Artesi v. Demoulas Super Markets, Inc., 2020 U.S. Dist. Lexis 269940 (D.N.H. June 2, 2020) ........................................................ 18, 61

Bart v. Golub Corp., 96 F. 4th 566 (2d Cir. 2024) ................................ 45

Bostock v. Clayton Cnty, 590 U.S. 644 (2020) ............................ 18, 19, 59

Burns v. Johnson, 829 F.3d 1 (1st Cir. 2016) ................................ passim

Burrage v. United States, 571 U.S. 204 (2015) .................................... 58

Casella v. MBNA Mktg. Sys., 2009 U.S. Dist. Lexis 50176 (D. Me. June 9, 2009) ........................................................................... 32

Charles v. Leo, 96 Mass. App. 326 (2019) ............................................ 44

Che v. Massachusetts Bay Transp. Auth., 342 F.3d 31 (1st Cir. 2003) . 24

Clark Co. Sch. Dist. v. Breeden, 532 U.S. 268 (2001) ............................ 68

Connell v. Bank of Boston, 924 F.2d 1169 (1st Cir. 1991) ....................... 65

DeCaire v. Mukasey, 530 F.3d 1 (1st Cir. 2008) .............................. 30, 67

Forsythe v. Wayfair, Inc., 27 F. 4th 67 (1st Cir. 2022) ........................... 56

Gerner v. Chesterfield, 674 F.3d 264 (4th Cir. 2012) ............................... 65

Harrington v. Aggregate Industries-Northeast Region, Inc., 668 F.3d 25 (1st Cir. 2012) ........................................................................... 17

Henry v. Wyeth Pharm., Inc., 616 F.3d 134 (2d Cir. 2010) ............. 47, 53

Hoeppner v. Crotched Mountain Rehabilitation Ctr., 31 F.3d 9 (1st Cir. 1994) ....................................................................................... 62

Holtz v. Rockefeller & Co., 258 F.3d 62 (2d Cir. 2001) ........................... 30

Jenny v. L3Harris Techs., Inc., 2025 U.S. App. Lexis 18012 (10th Cir. July 21, 2025) .................................................................................... 23

Joseph v. Lincare, Inc., 989 F.3d 147, 161 (1st Cir. 2021) ...................... 46

Kelley v. Corr. Med. Servs., 707 F.3d 108 (1st Cir. 2013) ....................... 42

Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105 (1st Cir. 2024) . 17, 42, 55, 62

Larch v. Mansfield Mun. Elec. Dept., 272 F.3d 63 (1st Cir. 2001) .......... 33

Lipchitz v. Raytheon Co., 434 Mass. 493 (2001) ..................................... 44

Lipsett v. University of Puerto Rico, 864 F.2d 881 (1st Cir. 1988) ......... 59

Margolis v. Tektronix, Inc., 44 F. Appx. 138 (9th Cir. 2002) ................... 32

Morales-Cruz v. Univ. of P.R., 676 F.3d 220 (1st Cir. 2012) ................... 30

Patterson v. McLean Credit Union, 491 U.S. 164 (1989) ........................ 29

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) ................................ 31

Reeves v. Sanderson Plumbing Prods., 530 U.S. 133 (2000).......... passim

Richard v. Regional School Unit 57, 901 F.3d 52 (1st Cir. 2018)............ 57

Rios v. Centerra Grp. LLC, 106 F.4th 101 (1st Cir. 2024)......................... 64

Ripoli v. R.I. Dept. of Hum. Servs., 123 F.4th 565 (1st Cir. 2024) .... 22, 55

Sanders v. Madison Square Garden, L.P., 535 F. Supp. 2d 364 (S.D.N.Y. 2007) ............................................................................................ 68

Shervin v. Partners Healthcare Sys., 804 F.3d 23 (1st Cir. 2015).......... 63

Smith v. Chrysler Corp., 155 F.3d 799 (6th Cir. 1998)............................ 46

Snyder v. Louisiana, 552 U.S. 472 (2008)............................................... 45

St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993) .......................... 24

Staub v. Proctor Hosp., 562 U.S 411 (2011) ............................... 59, 60, 61

Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011 (8th Cir. 2005) ...... 45

Stroup v. United Airlines, Inc., 26 F.4th 1147 (10th Cir. 2022) ............ 45

Tejada-Batista v. Morales, 424 F.3d 97 (1st Cir. 2005)............... 57, 59, 60

Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981) ..... 24

Thomas v. Eastman Kodak Co., 183 F.3d 38 (1st Cir. 1999) ...... 30, 39, 47

Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985)................62

U.S. EEOC v. Fred Fuller Oil Co., 168 N.H. 606 (2016) ................. 18, 61

Vasquez v. Cnty. Of Los Angeles, 349 F.3d 634 (9th Cir. 2004).............58

Velazquez-Fernandez v. NCE Foods, Inc., 476 F.3d 6 (1st Cir. 2007)..23, 29

Velez v. Thermo King de P.R., Inc., 585 F.3d 441 (1st Cir. 2009).....24, 37

Warner v. DeJoy, No. 24-1414, 2025 U.S. App. LEXIS 22868 (1st Cir. Sep. 4, 2025) .........................................................................53

Weston-Smith v. Cooley Dickenson Hosp., Inc., 282 F.3d 60 (1st Cir. 2002) ...............................................................................................33

Wexler v. White's Fine Furniture, 317 F.3d 564, 571-572 (6th Cir. 2003) ..............................................................................................46

Woodman v. Haemonetics Corp., 51 F.3d 1087 (1st Cir. 1995 ...............33

Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40 (1st Cir. 2002)..47, 53

Zerveskes v. Wentworth-Douglass Hosp., 2024 U.S. Dist. Lexis 174081 (D.N.H. Sept. 26, 2024) ..................................................................18

**Statutes**

28 U.S.C. § 1291 ..........................................................................2

28 U.S.C. § 1367 .......... 1

42 U.S.C. § 2000e-2(a)(1) .......... 24

42 U.S.C. § 2000e-2(a)(1) & 3(a) .......... 17

U.S.C. § 1331 .......... 1

## Other Authorities

R. Mantell, "Pretext After Bostock – Disproving One of the Employer's Reasons is Enough," 28 Wash & Lee J. Civ. Rts. & Soc. Just. 65, 69 (2021) .......... 46

## Rules

EEOC Compliance Manual §8-II(D)(2) .......... 69

Fed. R. Evid. 801(d)(2) .......... 32

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Pursuant to L.R. 34.0(a), Plaintiff/Appellant Gina Russo requests oral argument. The questions before the Court require extensive examination of a voluminous record. The procedure leading to final judgment in the District Court was unusually complicated. Furthermore, the mistakes of law made below are intricate, require substantial explanation and impact a broad range of cases that adjudicate violations of anti-discrimination laws. Due to the importance and complexity of the issues involved, this Court will benefit from the grant of oral argument.

## JURISDICTIONAL STATEMENT

This is an appeal from memoranda and orders of the United States District Court for the District of Massachusetts (McAuliffe, D.J.) entered on November 20 and 22, 2024, February 24, 2025 and April 24, 2025, granting summary judgment to New Hampshire Neurospine Institute, P.A. ("NHNSI"/"Practice") and Dr. Uri Ahn ("Ahn"). The district court had jurisdiction over Title VII claims pursuant to 28 U.S.C. § 1331 and over parallel state claims pursuant to 28 U.S.C. § 1367. Final judgment entered on April 24, 2025. On May 23, 2025,

Plaintiff Gina Russo ("Russo") filed a timely notice of appeal. Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291, as this is an appeal from a final order.

## STATEMENT OF THE ISSUES

1. Did Russo submit evidence sufficient to raise a genuine issue of material fact that NHNSI fired her in whole or in part based on her sex and/or that Ahn aided, abetted and/or incited the discriminatory conduct?

2. Did Russo submit evidence sufficient to raise a genuine issue of material fact that NHNSI separated her from employment effective May 2, 2019, and denied her a proposed independent contractor position in retaliation for her protected complaint of gender discrimination?

## STATEMENT OF THE CASE

### 1. PROCEDURAL BACKGROUND

After exhausting administrative requirements (RA003,¶9-11), on August 22, 2021, Russo timely filed this civil action. Dkt.1.[1] Russo brought claims of gender discrimination against NHNSI based on Tite VII and NH R.S.A. 354-A (Count I); workplace retaliation against

[1] The district court assumed, erroneously and without any basis, that the NH Human Rights Commission issued a decision in Defendants' favor on the merits. AD014 at n.7.

NHNSI and Ahn, based on Title VII and NH R.S.A. 354 (Count II); gender discrimination against Ahn under the NH provision prohibiting aiding, abetting and/or inciting discrimination (Count III); common law wrongful termination against NHNSI (Count IV) and defamation against Ahn (Count V).

The court granted summary judgment on all claims against Ahn in its Memorandum Order docketed November 22, 2024. AD004-025. In a subsequent Order, the court invited NHNSI to file a summary judgment motion. AD026-027. The parties were directed to brief the effects of the summary judgment entered in Ahn's favor, and whether that would truncate the evidence admissible against NHNSI. Id.

On December 7, 2024, Russo filed a motion seeking reconsideration of the dismissal of the claims against Ahn. Dkt.78 (RA00117). On February 24, 2025, the Court denied the motion for reconsideration. AD028-46. On April 24, 2025, the Court granted summary judgment on all counts against NHNSI (AD047-80).

## 2. **FACTUAL BACKGROUND**

NHNSI is a professional association of medical doctors based in Bedford, NH. RA0002,¶3;RA0028,¶3;RA0047,¶1. NHNSI includes two

specialty practice areas – neurosurgery and orthopedic surgery. RA0004,¶18;RA0047,¶2. NHNSI has doctors that hold ownership interests and voting rights ("Partners"), as well as non-voting doctors employed by the Practice. RA0696:15-16;RA0648-0649:12-13.

In 2001, Defendant Ahn, an orthopedic surgeon, became a Partner with voting rights, and during the relevant time, served as vice-president. RA0648-49:12-14; RA0047,¶4-5. Anne Talbot-Kleeman ("Talbot-Kleeman") was the Executive Director who oversaw the functioning of NHNSI. RA0591:10-11.

On March 11, 2008, Plaintiff Gina Russo, a woman, began her employment with NHNSI as a physician's assistant, PA-C ("PA"). AD007;RA0002,¶2;RA0027,¶2;RA0047,¶3;RA0003,¶12;RA0029,¶12. A PA sees patients in office and hospital settings, assists in surgery and handles on-call responsibilities. RA0048,¶7;RA0737:16-17. Russo generally worked part-time. RA0988. Initially, Russo was assigned to the neurosurgery division. RA0533:25-26;RA0048,¶8.

Up through August 2016, the orthopedic and neurosurgery practices were informally divided, which meant that Russo and Ahn rarely interacted. RA0533:25-28; RA0048-49,¶6,11. In August 2016,

NHNSI merged its operations so that all PAs would work with both specialties. RA0534:30;RA0599:42-44.

**INCIDENT OF OCTOBER 15, 2016**

On October 15, 2016 (two and a half years before Russo's termination), Russo was on call performing rounds at Elliott Hospital in Manchester when a patient of Dr. Paul Wang ("Wang") coded with a cardiac condition. RA0542:61-64;RA0705-706:53-54;RA0989. Russo was responsible for monitoring the patient, and Russo was directed by Wang and Dr. N. Ross Jenkins ("Jenkins"), the on-call neurosurgeon supervising her, to stay with the patient and provide updates to Wang. RA0706-708:55-60,64;RA0742:35-36;RA0499;RA0989.

Ahn, the orthopedic surgeon on-call, had traveled out-of-state for his son's hockey game. RA0989;RA0661:61-62. Ahn called Russo and asked her to see an orthopedic patient in the ICU at St. Joseph's Hospital, saying that the patient was "urgent" and needed to be seen at "that moment in time." RA0542:62-63;RA1035. Russo responded that she could not leave Elliott Hospital because she was monitoring Wang's patient, and Ahn could likely get to the patient at St. Joseph's before her. RA0542:64;RA1000,¶13. Ahn instructed Russo to get to St. Joseph's

as soon as she could, and Russo went there once her work was complete. RA0543:67-68;RA0662:65-66.

Ahn immediately called Wang and Jenkins, complaining that it was "clear" that Russo did not want to do what he had asked, was rude, and that she was "avoiding work." RA1107-1108;RA1001,¶15; RA0706:57;RA0707:60-61. Ahn inquired whether the information about needing to stay with Wang's patient that Russo had given Ahn was truthful. Id.;RA0659:55;RA1090,¶8;RA1107.

Wang and Jenkins told Ahn that Russo properly stayed with the coding patient, that she followed instructions exactly, and that she did nothing wrong. RA0659:55; RA0706-707:55-57; RA0708:64; RA0718:105;RA0742-743:35-38. Ahn also spoke to Executive Director Talbot-Kleeman to complain about Russo. RA0591:10-11;RA0619:122; RA0662:68. Talbot-Kleeman chose not to discipline Russo. RA0619:123;RA1053.

**INCIDENT OF JUNE 2017**

Eight months later, in June 2017, Russo met with a patient of Ahn to obtain consent for surgery. RA0556-558:20,24-25;RA0665:78-79. NHNSI provided PAs with a script to follow when obtaining patient

consent. RA1004-1005;RA0807:62-63;RA0561:138-139. When the patient asked about alternatives to the contemplated surgery, Russo attempted to find Ahn, and when he was not available, she spoke with another NHNSI surgeon, Dr. Neil Luther ("Luther"), who confirmed a possible alternative procedure. RA0558-559:127-130;RA0051,¶36; RA0150,¶14. Russo accurately communicated to the patient the possibility of a surgical alternative, but she did not suggest the alternative as an idea she recommended. RA1004-1005,¶27; RA0559:124-129;RA0051,¶35-37; RA0071,¶35,36. Russo did suggest that the patient discuss the alternative with Ahn. Id. After acting in conformity with the script, Russo successfully obtained the patient's consent for the procedure Ahn contemplated, and that surgery was performed. RA0559:129.

Ahn informed Russo that he was unhappy with her conduct. RA0559:131-132;RA0665:80. Ahn screamed at and threatened Russo, and tried to intimidate her to act unethically by only discussing bleeding and infections during the consent process. RA0559:131-132;RA0560-561:136-138;RA667:86-87. Russo took out the script and showed Ahn that she was required to discuss all risks. RA0559:131-132.

Concerned that Ahn was improperly trying to truncate the consent process, Russo sought advice and Jenkins, Luther, and PA Georgia Plamondon ("Plamondon") all confirmed she handled the issue correctly. RA0562:141-143;RA0808:67-68.

**AHN EXCLUDED RUSSO FROM HIS OPERATING ROOM**

Around June 28, 2017, Ahn asked Talbot-Kleeman to exclude Russo from his operating room. RA0625:146-147;RA0666:81-82;RA1263;RA0959-960,¶15. This was despite the fact that Russo repeatedly stated she would be happy to operate with Ahn. RA0549:91-92. Ahn also asked that the only other female PA, Plamondon, not be assigned to operate with him. RA0655:40;RA1281;RA1477,¶5-8. Ahn has not excluded any male PAs from operating with Ahn. RA0959-960,¶15;RA0977;RA1477,¶10;RA1484,¶17-18.

**INCIDENT OF MARCH 9, 2019**

On Saturday, March 9, 2019, Russo was on-call at Catholic Medical Center when she received a phone call from Ahn at Elliott Hospital, requesting help discharging a patient. RA0052,¶47; RA0563:146-147;RA0680:137. Russo asked Ahn, "How can I help you," and provided two options: did Ahn want her to talk him through how to

discharge the patient, or did he want her to discharge the patient once she went home. RA0052,¶48;RA0563:146;RA1040. In response, Dr. Ahn yelled at Russo, "You're so fucking passive-aggressive and disrespectful." RA0568:168. In response, and just to be heard, Ms. Russo raised her voice to say, "I'm just trying to find out how I can help you." Id. Ultimately, Ahn instructed Russo to put in the orders when she got home, which she did. RA1040.

Later, on March 9, Ahn reported to Wang and others that he could no longer work with Russo and "that it was time for her to leave the Practice." RA0991-992. Ahn contacted Talbot-Kleeman, asking whether Russo could be terminated with a simple majority of votes by the Partners. RA1363. Two weeks later, on March 21, 2019, Ahn sent an email to Talbot-Kleeman with the following description of the interaction:

> When I asked [Russo] to do this, she stated, "I'm at CMC, so do you want me to go home and do this, or do you want me to walk you through it so you can do it yourself." I was taken aback, because I obviously would not want her to stop her current tasks at another hospital, and having her walk me through multiple computer tasks would have been severely inefficient. It was clear that she was framing a choice for me to make, so that she could get out of doing the task. I told her calmly that I felt she was giving me these poor choices in a passive aggressive attempt to get out of doing the task. Once I did this, she started yelling at me

> and talked over me. She basically yelled at me, "You are not telling me what you want me to do! You need to tell me what you want me to do!

RA1040. Ahn's email continued:

> I have had similar interactions with Gina in the past. When I have needed her to perform a task when she is on call, she has used another task she was performing with Neurosurgery in order to avoid performing the task for Orthopedic Surgery. It is clear that her priority is to avoid work with Orthopedic Surgery . . . This interaction went beyond her routin[e] pattern of work avoidance, and crossed a line of respect to an employer that I feel was far beyond inappropriate.

Id. Recall that with respect to the "past" on-call incident to which Ahn refers, both Wang and Jenkins informed Ahn that they instructed Russo to remain with Wang's patient and that she properly followed their directions and exercised correct judgment. (***p.6***).

## RUSSO'S TERMINATION

On March 25, 2019, a NHNSI Board Meeting was held. RA0053,¶53;RA0627:157. Prior to the meeting, Ahn contacted the Partners to solicit their support to fire Russo. RA0684:156;RA0685:158-159.

At the meeting, Ahn stated that he could no longer work with Russo, as she was disrespectful and difficult to work with. RA0629:164-165;RA0718:103-104;RA0745:47-48;RA1066-1067. Ahn asserted that he

had been with NHNSI for over twenty years, but he felt so strongly that he would leave the practice if the Partners refused to approve Russo's termination. RA1067. Ahn asserted that it was either "her-or-me". RA0745:48-49;RA0685:158;RA0629:163,165. Thus, the vote reflected "which person would stay in the practice" and not whether Russo was insubordinate or deserved to be terminated. RA0745-746:49-50;RA0753:80-81.

Some spoke in support of Russo. RA1066;RA1069;RA0743:38. Jenkins advised caution, "because other female NHNSI PA-C's had left employment . . . [and] that there could be a perception that the Practice was not friendly towards women." RA1066;RA1069.

The Partners voted to keep Ahn because he was a Partner, and consequently to fire Russo. RA0746:49;RA0629-630:164-166; RA0753:80-81;RA1131. Each one of the eight Partners was male. RA1066-1071. Dr. Gamble said the decision was "TOTAL BS" and promised to write Russo a recommendation. RA1306;RA0932:30-31. On March 26, 2025, Talbot-Kleeman informed Russo of the Board's decision. RA0053,¶56;RA0630:168-169;RA0633:179.

## THE TRANSITION PERIOD

Talbot-Kleeman suggested that they work out a transition schedule. RA0633:179-181;RA1299. On April 2, NHNSI prepared a transition plan that involved Russo working through June 2019, maintaining her benefits, and receiving a $15,000 severance. RA1009;RA0634:183;RA1009,¶44;RA1291,#16;RA1518;RA0634:183-185. Defendants also contemplated allowing Russo to continue to work indefinitely at the Hillsborough County Nursing Home ("HCNH") with Dr. Batlivala as an independent contractor. RA1291,#19;RA1309-1310;RA1312-1320. Russo made a counter-proposal to work until April 19 and then take her accrued leave, which would run through July 9. RA0634:184-185;RA0642:216. NHNSI proposed a revised agreement, reducing the severance to $2,500. RA0430-431;RA0635:186. Russo rejected the revised agreement. RA1323-1324.

On April 29, 2019, Russo's counsel sent a letter to NHNSI, complaining that the pending termination constituted gender discrimination. RA1323-1324. By the next morning, Talbot Kleeman had already decided that she would be firing Russo. RA1414 ("I plan to have Gina done this week"). NHNSI terminated Russo on May 2, 2019.

RA1328. Ahn thanked Talbot-Kleeman for "taking care of" Russo's termination." RA1330.

NHNSI ended the transition period and Russo's work at HCNH expressly because Russo complained of gender discrimination. Talbot-Kleeman IM'd Batlivala, "Sorry but I've had to tell Gina she is done. She is making allegations that are unacceptable . . .." RA1291,#29.

Afterward, NHNSI prevented Jenkins from providing Russo with a written letter of recommendation. RA0750:67-68. Batlivala was also precluded from responding to a reference request – even though Russo executed a Consent Agreement releasing Batlivala and NHNSI from liability for their response. RA0782:46-48;RA0783:50;RA0785:60-61. Other than Russo, NHNSI has never directed doctors to refrain from providing references for a Practice employee. RA0755-756:89-90.

**AHN'S ADMISSION**

In July 2019, NHNSI retained Elizabeth Bailey, Esq. to conduct an independent investigation into Russo's allegations of gender discrimination. RA0055,¶67;RA0643:218. Bailey interviewed certain individuals (including Ahn), took notes, and drafted a report memorializing those interviews. RA0859:22-24;RA0860:26-27;RA1087-

1098. Ahn justified his demand for Russo's termination by saying that "he couldn't look himself in the mirror as a husband and father to small children if he allowed himself to be treated with such disrespect." RA1067;RA1120.

## SUMMARY OF THE ARGUMENT

Reeves v. Sanderson Plumbing held that, generally, a plaintiff may establish discrimination to be a but-for cause and motive for an adverse action if she can satisfy the first and third stages of the burden-shifting framework. Russo has satisfied her prima facie burden that she was terminated based on her gender because she [1] is a woman (***p.4***); [2] was highly qualified for her position and performed her job well (***pp.25-27***); [3] was terminated (***p.12-13***); and [4] NHNSI immediately recruited and hired a replacement (***p.28***).

Russo has submitted ample affirmative evidence that gender discrimination was a but-for reason for the adverse actions. Ahn has a long track record of horrible interactions with female subordinates – yelling at them, refusing to work with them, being angry at them for being insufficiently "warm" to him and demanding that they "obey" him. (***pp.33-37***). Ahn treated male employees in similar situations much

better than he treated female employees. (***pp.37-38***). Likewise, Ahn became inappropriately angry, to the point of behaving unprofessionally, with respect to Russo's completely justified and required conduct in the workplace, thus demonstrating that gender bias animated his actions. (***p.6-8;39-43***). During the eighteen-year life of NHNSI, it never included a female physician in its roster of approximately eleven doctors, and by 2019, it did not have a single female physician's assistant, which had been Russo's title. (***p.43-44***)

Ahn admitted that he demanded Russo's termination, because if she was to stay, "he couldn't look himself in the mirror as a husband and father." (***pp.30-32***). Ahn's track record of hostility to Russo and other female subordinates, his sympatico relationships with male comparators, and this comment, do not make any sense other than as a male who cannot tolerate having a woman challenging him. (***pp.39-43***;***53***).

Russo also has ample evidence disproving Defendants' articulated reasons. Ahn falsely claimed that he sought Russo's termination based on her reaction to his written complaint, but in reality, he demanded her termination weeks before he submitted that complaint. (***pp.47-49***).

Ahn falsely stated that he did not want to work with Russo due to her skill level, despite the fact that he elsewhere acknowledged that her skills were good, and were not the true reason he excluded her. (***pp.25-27;50-51***). Ahn falsely accused Russo of treating a certain matter as an emergency to avoid work, which he later admitted it was not true. (***p.52***). Russo's prima facie and pretext evidence are stronger than the proof deemed sufficient in the Reeves case. (***pp.53-56***).

NHNSI is liable for the motive and conduct of Ahn, under the chain-of-events and/or cat's paw theories. Ahn was a voting Partner and officer, he initiated and was the sole advocate for Russo's termination, and NHNSI fired Russo to placate Ahn, as opposed to finding that Russo had done anything wrong or merited termination. (***pp.10-11;56-61***). Nothing about NHNSI's conduct was independent of Ahn's influence and direction, and it merely effectuated his demand for Russo's discharge, triggering individual and company liability. (**Id**.;***61***)

Russo produced prima facie evidence of retaliation because she complained of gender discrimination (***p.62***); her transition period was ended two months early, and she was denied a contemplated independent contractor role (***pp.63-67***); and there was a short three-day

gap between the two. (Id.) Negative evidence of pretext is not required because NHNSI admitted that it initiated the adverse actions expressly due to Russo's complaints of discrimination, which NHNSI deemed "unacceptable." (***p.67***).

## ARGUMENT

### I. STANDARD OF REVIEW

Review of the district court's grant of summary judgment is *de novo*. Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 108 (1st Cir. 2024). In conducting its review, this Court must view the evidence in the light most favorable to the plaintiff and draw all reasonable inferences in her favor. Id. This Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 151 (2000). "Courts should be especially cautious before granting summary judgment when pretext and retaliatory animus are at issue." Harrington v. Aggregate Industries-Northeast Region, Inc., 668 F.3d 25, 33 (1st Cir. 2012).

### II. STANDARD FOR PROVING DISCRIMINATION

Title VII prohibits discrimination because of sex and/or because of an employee's internal complaints of sex discrimination. 42 U.S.C. § 2000e-2(a)(1) & 3(a). The following analysis applies to both sex and

retaliation claims, because both are forms of unlawful "discrimination." Id. § 3(a). The discussion also applies equally to parallel claims arising under NH R.S.A. 354-A, et sq. Zerveskes v. Wentworth-Douglass Hosp., 2024 U.S. Dist. Lexis 174081 at *5 (D.N.H. Sept. 26, 2024). Likewise, Ahn is responsible for aiding, abetting or inciting NHNSI's commission of an unlawful discriminatory practice to the extent that his participation contributed materially to the adverse action, and so the following discussion applies to his personal liability, as well. U.S. EEOC v. Fred Fuller Oil Co., 168 N.H. 606, 611-612 (2016); Artesi v. Demoulas Super Markets, Inc., 2020 U.S. Dist. Lexis 269940, at *28-29 (D.N.H. June 2, 2020); NH R.S.A. 254-A:2 XV(d).

To prevail, Russo need not show that gender or retaliation was the "sole, or primary cause of the employer's adverse action." Bostock v. Clayton Cnty, 590 U.S. 644, 665 (2020). Russo need only prove that the adverse action would not have taken place "but-for" the unlawful bias. Id. at 656. But-for is a "sweeping standard," because "[o]ften, events have multiple but-for causes." Id. A defendant cannot avoid liability "just by citing some *other* factor that contributed to its challenged

employment decision. So long as [discrimination] was one but-for cause of that decision, that is enough to trigger the law." Id. at 656.

## III. PROOF OF A PRIMA FACIE CASE AND PRETEXT ARE SUFFICIENT, BY THEMSELVES, TO RAISE AN INFERENCE OF DISCRIMINATION IN THE ABSENCE OF CONCLUSIVE, UNCONTROVERTED INDEPENDENT EVIDENCE THAT NO DISCRIMINATION OCCURRED

According to the Supreme Court, Russo can satisfy her burden of proof with circumstantial evidence, made up of a prima facie case and pretext. Reeves, 530 U.S. at 146, 149. In Reeves, the Court granted certiorari:

> to resolve a conflict among the Courts of Appeals as to whether a plaintiff's prima facie case of discrimination (as defined in *McDonnell Douglas* . . .), combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision, is adequate to sustain a finding of liability for intentional discrimination.

Id. at 140. The Court answered that, as a general matter, the combination is adequate. Id. at 149.

Reeves established a prima facie case of age discrimination because he produced evidence that he was (1) over forty years old, (2) qualified, (3) fired, and (4) replaced. Id. at 142. For pretext, Reeves showed that he was blamed for issues that were not his responsibility, such as timekeeping discrepancies where the timeclock often

malfunctioned. He was also criticized for failing to discipline employees, which was not a function within his authority. Id. at 144-145. The evidence of pretext did not directly refer or relate to Reeves' age, nor did it expressly reflect hostility towards older workers. Id.

A jury found in Reeves' favor. The Court of Appeals vacated the judgment, finding that to prove unlawful discrimination, additional proof was needed beyond Reeves' prima facie case and evidence of pretext. Id. at 139, 146. The Supreme Court reviewed the case to determine whether such evidence alone was sufficient to support a finding of discrimination. Id. at 137.

The Supreme Court held that additional proof was **unnecessary** because the inference of discrimination was supported by the prima facie case and pretext evidence. Id. at 146.

> [T]he Court of Appeals proceeded from the assumption that a prima facie case of discrimination, combined with sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, non-discriminatory reason for its decision, is insufficient as a matter of law to sustain a jury's finding of intentional discrimination. **In so reasoning, the Court of Appeals misconceived the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence**.

Id. (emphasis added).

The Court of Appeals improperly "disregarded critical evidence favorable to [Reeves] – namely, the evidence supporting [Reeves'] prima facie case and undermining the respondent's nondiscriminatory explanation." Id. at 152. Pretext evidence alone is sufficient, even if it does not obviously express the employer's discriminatory bias. Id. at 147-48. That is because dishonesty about a material fact, in and of itself, can constitute "affirmative evidence of guilt." Id. at 147.

The combination of pretext with the prima facie case provides the necessary connection to protected class. Id. The Court asserted that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 148. "Once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." Id. at 147.

The Supreme Court recognized that there may be some cases where a prima facie case and pretext would be insufficient to support an inference of discrimination. This exception applies where "there was

abundant and uncontroverted independent evidence that no discrimination had occurred," along with weak prima facie or pretext evidence. Id. at 148-149 (emphasis added). The "abundant and uncontroverted" evidence must be evidence that a jury is required to believe. Id. at 151.

For purposes of this exception, the strength of pretext evidence depends on the degree to which it establishes the falsity of the employer's explanation. Id. at 148 (factors supporting the exceptional case include "the probative value of the proof that the employer's explanation is false . . . ."). Importantly, the Supreme Court has never held that the strength of pretext evidence depends on how directly it expresses discriminatory animus. The strength of pretext evidence is measured by how clearly it shows that "the employer's explanation is false." Id. at 148.

Three principles are apparent from Reeves. First, a prima facie case, along with pretext alone, is generally sufficient to generate a finding of discrimination. Id. at 149; Ripoli v. R.I. Dept. of Hum. Servs., 123 F.4th 565, 572 (1st Cir. 2024). Second, this principle is applicable even where the pretext evidence fails to overtly express hostility

towards the protected trait. Reeves, 530 U.S. at 146. Third, the few cases that correctly require more evidence do so only if there is markedly weak prima facie and/or pretext evidence, in combination with "abundant and uncontroverted independent evidence that no discrimination has occurred." Id. at 148; Jenny v. L3Harris Techs., Inc., 2025 U.S. App. Lexis 18012 at *9 (10th Cir. July 21, 2025) (cases falling within Reeves exception are "rare"). As will be shown, Russo has satisfied the prima facie and pretext burdens, and the Reeves exception does not apply.

## IV. A REASONABLE JURY COULD FIND THAT RUSSO WAS SUBJECTED TO SEX DISCRIMINATION

As will be shown, Russo has proffered sufficient evidence to support a finding that NHNSI terminated her because of her gender.

### A. Russo has Established a Strong Prima Facie Case of Sex Discrimination

A plaintiff can establish a prima facie case by producing evidence that she [1] is female; [2] met the minimal qualifications of the job; [3] was fired; and [4] there was a continuing need for her work. Velazquez-Fernandez v. NCE Foods, Inc., 476 F.3d 6, 11 (1st Cir. 2007). The prima facie case is a "small showing" that is "easily made." Che v.

Massachusetts Bay Transp. Auth., 342 F.3d 31, 38 (1st Cir. 2003). It reflects a burden of production, the sufficiency of which is evaluated in isolation and without consideration of the employer's countervailing evidence. Velez v. Thermo King de P.R., Inc., 585 F.3d 441, 448-449 (1st Cir. 2009).

The demands of the prima facie case do not rise to the ultimate burden to prove discrimination at trial. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 n.7 (1981); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993) ("Quite obviously, however, what is required to establish the *McDonnell Douglas* prima facie case is infinitely less than what a directed verdict demands"). Russo easily satisfies this burden. As will be shown, the District Court erred in holding that Russo could not satisfy her prima facie burden. A037.

1. Russo is in a Protected Class

As a woman, Russo is in a class protected by Title VII and NH law. RA0002,¶2;RA0027,¶2;RA1541,¶1;42 U.S.C. § 2000e-2(a)(1). NHNSI was expressly aware of Russo's gender at the Board meeting to vote on her termination, where Jenkins observed that Russo's discharge

could feed into the perception that NHNSI treats its female employees unfairly. RA1066;RA1068-1069.

2. Russo Met the Minimum Qualifications for her Job

A jury could find that Russo met the minimum qualifications for her job. She served as a PA at NHNSI for over eleven years. RA0002,¶2;RA0027,¶2;RA1541,¶1. Russo was never disciplined or reprimanded, nor placed on any performance-related plan. RA1541,¶4; RA0708:64, RA0003-RA0004,¶12. Russo was never told by NHNSI that she acted inappropriately with respect to anyone, including Ahn, and she never refused to complete a task or disobeyed a directive. RA1541-RA1542,¶5;RA0608:80. With respect to the incidents of 2016 and 2017, surgeons informed Russo that she properly prioritized her work and correctly fulfilled her responsibilities. RA1541-RA1542,¶5.

Russo was never rated below satisfactory in any category of evaluation in eleven years with NHNSI. RA0003-RA0004,¶12; RA0029,¶12. Russo's August 23, 2016 Performance and Salary Review states that she is "able to work effectively with others and gets along well with everyone" and that she "is flexible . . . to accommodate the needs of the office." RA1018. Russo was praised because she "often

works extra hours . . . when asked." Id. At the time of the evaluation, Russo received a raise. Id.

In 2016, Jenkins evaluated Russo as "Excellent" in nine categories and "Satisfactory" in another category, noting her flexibility and willingness to help out, and reporting "No" concerns with Russo's work. RA1527. On June 22, 2017, Ahn evaluated Russo with the highest possible rating in every category, including "ability to work well with others," and certified that she treated other physicians "in a courteous and professional manner." RA1274-RA1275;RA0678-0679:132-133. In August 2017, Ahn again rated Russo the highest possible rating in all categories, including "Interpersonal and Communication Skills." RA1277. Ahn testified that Russo had good technical skills in the OR, and acknowledged that she had always performed to his technical standards. RA0665:79.

In February 2018, NHNSI rated Russo as "Satisfactory" in three categories, and above satisfactory in seven categories, including "Interpersonal relations with patients and hospital staff" and "following directives." RA1024. Wang testified that he had never seen Russo be disrespectful to anyone, a perception Jenkins shared.

RA0708;RA1069;RA1132. No other provider had ever reported to Talbot-Kleeman that Russo was disrespectful in her communication. RA0626:152.

Russo continuously received bonuses, including in August 2016, December 2016, August 2017, December 2017, September 2018, and December 2018. RA1528-1539;RA1533 (noting Russo's "ongoing hard work and dedication to the practice"). Russo was considered to be an experienced surgical PA with strong technical abilities. RA0931:28-29;RA0665:79. After Russo left, Batilvala wrote a reference letter stating that Russo "is an extremely hard-working, intelligent and loyal individual . . . She has a very pleasant disposition and as such gets along well with staff members and is well liked by her peers." RA1326;RA0781:44. Dr. Cugali's reference letter noted Russo "has been an excellent co-worker who has been well-liked by her patients and office staff as well. She has always been willing to help and work with the team and put in extra effort." RA0019,¶87;RA0038,¶87;RA1522. A jury could find Russo to be extremely well-qualified for her position and a cooperative co-worker.

3. <u>Russo Suffered Three Adverse Actions</u>

On March 25, 2019, the NHNSI Board voted to terminate Russo. RA0627:157;RA0745-746:49-50;RA753:80-81. Nevertheless, NHNSI suggested a transition plan that involved Russo working through June 28, 2019, and serving as an independent contractor at HCNH indefinitely. RA1291,#19;RA0634:184;RA0635:189;RA1518;RA1312-1320. Immediately after Russo's counsel complained of gender discrimination in a letter, NHNSI ended negotiations, ended Russo's transition period, and the contractor position was never offered. RA0354-355;RA1323-1324;RA1414;RA1328. Thus, Russo was subjected to three adverse actions: the decision to terminate, the premature conclusion of the transition period, and the refusal to offer the independent contractor position.

4. <u>NHNSI's Continuing Need for Russo's Services</u>

The first thing NHNSI did after voting to fire Russo was to propose a lengthy transition period whereby they could retain Russo for three more months, through June 28, 2019. RA0633:179-181;RA0634:183-185;RA1099,¶44;RA1291,¶16;RA1299;RA1518. NHNSI initiated recruitment efforts to fill her role the same day Russo was notified of the decision to terminate. RA1302;RA1363;RA1525. NHNSI

quickly hired a replacement PA, Eric Velasquez, as of July 2019. RA0840:74. Consequently, a reasonable jury could find that NHNSI had a continuing need for Russo's services, and hired a replacement, strongly satisfying the prima facie burden. Velazquez-Fernandez, 476 F.3d at 11.

### B. Russo has Satisfied the Third Stage of the Burden-Shifting Formula, in Multiple, Independently Sufficient Ways

There are two ways to satisfy the third stage of the burden-shifting framework: [1] by affirmatively showing that one of the employer's reasons was discrimination and/or retaliation, or [2] by proving, in a negative fashion, that one or more reasons offered by the employer was not an actual reason that motivated the employer at the time. Ames v. Ohio Dept. of Youth Servs., 145 S. Ct. 1540, 1545 (2025).

#### 1. Russo Has Affirmative Evidence that Sex Discrimination was a But-For Reason for the March 25, 2019 Decision to Discharge

Affirmative evidence of an unlawful motive includes remarks or admissions, comparator evidence, or hostility towards the plaintiff's protected trait. Patterson v. McLean Credit Union, 491 U.S. 164, 187-188 (1989), superseded by statute on other grounds. Such evidence need

not satisfy the evidentiary threshold for so-called "direct evidence." DeCaire v. Mukasey, 530 F.3d 1, 20 (1st Cir. 2008); Holtz v. Rockefeller & Co., 258 F.3d 62, 81 (2d Cir. 2001). Russo has very ample affirmative evidence that sex discrimination was a factor in the termination decision of March 25, 2019.

a. Ahn Demanded Russo's Termination Because Retaining Her Would Be Incompatible with His Masculine Identity

Ahn explained that he demanded Russo's termination because "he couldn't look himself in the mirror as a husband and father to small children if he allowed himself to be treated with such disrespect." RA1067;RA1120. This highly revealing admission links Russo's termination with Ahn's ability to succeed in the masculine roles of husband and father as he perceives them.

Title VII prohibits employers from acting on stereotypes based on sex. Thomas v. Eastman Kodak Co., 183 F.3d 38, 59 (1st Cir. 1999). A stereotyping claim arises when the plaintiff is rejected based on her failure to conform to a stereotype. Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224-225 (1st Cir. 2012). Stereotypes warp decision-makers' perspectives and impair their ability to evaluate subjective and even

objective information. Ahmed v. Johnson, 752 F.3d 490, 503 (1st Cir. 2014). One such stereotype is that men are more natural leaders and that women should not question them, or attempt to be assertive in the workplace. Burns v. Johnson, 829 F.3d 1, 13-15 (1st Cir. 2016). The consequence of this stereotype is that an assertive woman will be considered overly aggressive and treated differently than a man with similar characteristics. Price Waterhouse v. Hopkins, 490 U.S. 228, 249 (1989).

Ahn's statement is not gender-neutral. If one asks oneself, "why would Russo's termination be necessary to permit Ahn to act as husband and father?", the answer is apparent —in Ahn's mind — Russo not acting in conformity with a proper gender role, in turn called his gender roles into question. RA1067. This is strong evidence that Ahn perceived Russo as a threat to his masculinity and that he was unlawfully motivated to preserve specific gender roles. Trombini, et al., "Self-Affirmation Increases Men's Openness to Women's Dominance Behaviors," *Negotiation and Conflict Management Research* 17(2), 106, 108-109 (2024) (hereinafter, the "Trombini Study") (males' unsuccessful negotiations or competition with women causes them to "incur losses to

their sense of gender and social status"), https://ncmr.lps.library.cmu.edu/article/id/738/.

Ahns' admission provides crucial context to explain why he labelled Russo as disrespectful and difficult to work with, while so many others were lauding her helpful, cooperative attitude. Russo's assertiveness was inconsistent with how Ahn felt a woman should act. Margolis v. Tektronix, Inc., 44 F. Appx. 138, 141-142 (9th Cir. 2002) (jury may discern sex stereotyping from description of female plaintiff as "pushy" and "aggressive"); see also Casella v. MBNA Mktg. Sys., 2009 U.S. Dist. Lexis 50176 at *80-81 (D. Me. June 9, 2009) (summary judgment denied based on sex stereotyping theory, where woman was tarred as aggressive). As we will see, this evidence is far from isolated.

The District Court questioned whether investigator Bailey's notes and report memorializing Ahn's admissions are admissible. AD033. However, the statements of Ahn and other Partners memorialized in Bailey's report and notes represent admissions of a party opponent, and are eminently admissible. Fed. R. Evid. 801(d)(2). Bailey testified that she was brought in to investigate Russo's allegations (RA0896:171); she interviewed a number of Partners of NHNSI, including Ahn, she took

notes of those conversations, and drafted a report based on those conversations. RA0860:26-28; RA0861:30-33; RA0891-0892:153-155.

Thus, Ahn's admissions are admissible. Weston-Smith v. Cooley Dickenson Hosp., Inc., 282 F.3d 60, 67 (1st Cir. 2002) (statement of supervisor concerning reason for plaintiff's termination was admissible, even if supervisor was not the decisionmaker); Larch v. Mansfield Mun. Elec. Dept., 272 F.3d 63, 72 (1st Cir. 2001) (statement need only concern a matter within the scope of agency). The statements of Bailey, recounting the interviews of Ahn and the partners, are clearly within the scope of her agency and are supported by sworn testimony. Woodman v. Haemonetics Corp., 51 F.3d 1087, 1094 (1st Cir. 1995). The affirmative reliance on Bailey's report by both Ahn and NHNSI as part of their defense, further supports its admissibility for Russo's purposes. RA0055;RA0063; Ahn Ex. N(RA0365-RA0368); RA0162 *citing* NHNSI Ex.15(RA0497-RA0514).

b. Ahn Treated Female Workers with Hostility and with an Exaggerated Need for Them to "Respect" Him, in a Way That Indicated a Desire for Dominance.

In mid-June 2017 and continuing, Ahn excluded NHNSI's only

two female PAs, Russo and Plamondon, from his operating room. RA0051,¶41,42;RA05RA0955-RA0956,¶6;RA0958,¶11; RA1263; RA1477,¶5-8; RA1484,¶17;RA1281;RA0670: 99-100. Both Ahn and NHNSI evaluated Plamondon and Russo in a positive fashion and never provided negative feedback about their technical performance. RA1477,¶8. (***pp.25-28;50-52***). Ahn, in particular, felt that Russo's technical skills were good, and she had always exhibited competence. RA0665:79.[2] Prior to 2017, a third female PA had been excluded from operating, upon return from maternity leave. RA0550:94; RA1477,¶13-15;RA0833:46-48. In contrast, Ahn never demanded that any male PAs be excluded from working in his OR, despite experiencing some conflicts with them. RA0959-0960,¶15;RA0976-0977,¶3;RA1484,¶17-18.

In November 2017, shortly after excluding the only female PAs, Russo and Plamondon, Ahn, without any specific reason, singled the two women out for a suggested compensation reduction. RA1283. Ahn did not suggest a reduction for any male PAs. RA1283. Ahn testified

[2] Plamondon was also well-qualified, and another doctor (Jenkins), described her to the investigator as his preferred PA, as well as "tall, thin, blonde." RA1131.

that he did not recall why he singled out the female PA's for reductions. RA0674:114.

Ahn testified that he did not like Russo because she was "warm" and "very friendly" with other doctors, and was "colder towards [him]." RA0655:38. Ahn felt that Russo's "body language" and "eye contact" were not sufficiently welcoming towards him. RA0655-0655:36-37. Ahn resented that he was not part of the "small group" with whom Russo was friendly. RA0655:38. Ahn's testimony that his difficulties working with Russo stemmed from her being insufficiently warm and inviting to him, strongly speaks to gender dynamics.

Ahn lashes out when he perceives professional women "dare" to do things, "disobey" him, or fail to exhibit appropriate deference. For example, Ahn left three voicemails yelling at Humen, a female PA, "how dare [she] not tell him it was complete." RA1343;RA0582:222. Ahn complained that a female nurse "disobeyed each time." RA1384. Russo's offer to complete a task for Ahn or help him do it was, according to him, a "passive aggressive attempt to get out of doing the task." RA1040. Ahn testified that he perceived that Russo would respond to his requests with "resistance," but could not name examples except the

October 2016 incident, in which he knew Russo's actions prioritizing a coding patient were completely justified and in compliance with his Partners' instructions. RA0654-0655:36-37;RA0706:54-57;RA0708:64; RA0742:35-36;RA1000-1001,¶14-15.

Ahn is impatient with women. A memo to Ahn, dated April 13, 2016, states, "It was reported that you hung up the phone on a nurse while she was explaining to you…that] she was in the middle of changing a wound dressing for another patient." RA1370. In 2012, Ahn had problems with various female x-ray techs, with Carol "not allowed in the room," Brandy "does not like to go into the room," Lynn experiences "a lot of screaming" and "does not want to be his team tech," and Chi, a woman, "has been thrown out twice" and "would not agree to be tech on his team." RA1374-1375. Carol reported Ahn's "combative attitude" and that he "continues to belittle her skills in front of her students without apparent cause," and stated, "Nobody not even my husband ever talked to me the way you are talking with me." RA1374-1375;RA1384. <u>See</u> <u>Burns</u>, 829 F.3d at 16 (efforts to intimidate may be a sign of sex discrimination).

Ahn experienced difficult periods with raised voices and lingering coldness with Talbot-Kleeman and Cate Brewster. RA0608-RA0609:81-84. Ahn refused to speak to Laura Humen, a female PA, for the months of May-July 2016. RA1428. Ahn had a conflict with a female nurse, Maureen Sage, based on "one person not saying hi to another," and later blocked her promotion after it had been announced. RA0687:167-168. It is clear that Ahn's dismissive, demeaning, and domineering attitude towards women bespeaks of sex stereotyping and gender bias. Burns, 829 F.3d at 13-15.

c. Comparator Evidence Showing that Men Were Treated Better.

There is no similar record of such behavior with Ahn's male subordinates. When an employer treats a comparator differently from the plaintiff, that can be evidence of discrimination. Velez, 585 F.3d at 451. A comparator is someone who is "similarly situated in material respects," such that their situations can be reasonably compared. Id. In this case, there are one or more comparators that highlight NHNSI's discriminatory practices.

When Ahn had conflicts with males, he calmly worked through those conflicts with them. When Ahn felt that Tim Miller, a male PA,

was either incompetent or actively trying to sabotage him, Ahn neither yelled at Miller, nor lost his temper. RA1482-1483. Ahn calmly pulled Miller aside, and in private the two talked their way through the issue. Id. Ahn even enlisted another male PA and a medical sales representative to find a solution for Miller. Id. Miller worked well with Ahn through 2022, despite his relative lack of experience compared to Russo. Id.,¶9. Despite times when Ahn had been angry at Miller, he never accused Miller of being disrespectful or passive-aggressive. Id.,¶11;RA0675-0676:119-121.

Another male PA, Travis Palmer was described as particularly assertive and headstrong. RA0714:87. Palmer mocked Ahn in front of others. RA0676:122. However, Ahn had no problem working with him. RA0676:121-122. There is no evidence that Ahn gave the "silent treatment" to men.

Ahn reported a harmonious working relationship with male PA Drue Lorenz, despite Lorenz's "difficulty with his personal interactions" and propensity to "talk shortly towards people," of which NHNSI received complaints. RA0674-0675:116-118.

Ahn did not trust female PAs Russo and Plamondon, but he trusted the male PAs. RA0659:56;RA0666:81;RA0670:99-100. When a male PA, Eric H, made a mistake in the OR that caused a second surgery, Ahn got upset but used the incident as "a learning point," and continued to work with him. RA0677:126-127;RA0678:129. In contrast, Ahn stopped operating with Russo despite his confidence in her skills and an absence of any technical mistakes. RA0665:79. Ahns's exclusion of and lack of faith in female PAs, and failure to treat similarly situated males the same, is compelling proof of sex discrimination.

d. Ahn Responded Unprofessionally to Russo's Innocuous Statements and Conduct.

Evidence demonstrating sex stereotypes or bias properly includes evidence that Ahn was "at times inappropriately upset or angry . . . to the point of behaving unprofessionally." Burns, 829 F.3d at 15, quoting Thomas, 183 F.3d at 64. In October 2016, Ahn became very upset with Russo because she stayed with a coding patient at the direction of Drs. Wang and Jenkins, instead of leaving to cover for Ahn at a different hospital. RA0706-0708:55-60,64;RA0742:35-36;RA1049-1050;RA1053. Ahn continued to be angry with Russo, even after he confirmed Russo's

version of the story with Wang, and even after Wang confirmed for Ahn that Russo "followed my instructions to a T." RA0620:127-128; RA0659:55-56;RA0662:67;RA0708:64-65. Two and a half years later, in March 2019, Ahn relied on this incident to advocate for Russo's termination, knowing that Russo's version of events was accurate, that she had been instructed to stay with the patient, and even after Jenkins reminded him that Russo "did the correct thing." RA0708:64-65; RA0743:38;RA1040.

In June 2017, when Russo sought to obtain consent for a surgery, a patient asked if there were possible alternatives. When Ahn was not available, Russo learned from another physician that an alternative was viable, and so suggested that the patient discuss the alternative with Ahn. Russo successfully obtained the consent. RA0150,¶14; RA0556-0559:120,124-129;RA0665:78-79;RA0051,¶35-37;RA0071,¶35-36. Ahn screamed at and threatened Russo, and tried to intimidate her to act unethically by only discussing bleeding and infections with patients, which violated Russo's obligation to discuss all risks. RA0667:86-87. Ahn was "furious" that Russo followed NHNSI's script. RA1005,¶28-29. This is all the more disturbing, given Ahn's

acknowledgement that he does not know what Russo told the patient. RA1054.

Ahn later acknowledged that he got angry and improperly asserted false descriptions of a PA's role, and that it was correct of Russo to refer the patient to Ahn about questions involving alternatives and complications. RA0667:86-88. Jenkins, Luther, and Plamondon all confirmed that Russo had handled the issue correctly. RA0532:141-143;RA0808:67-68. Ahn's admission that he was inappropriately angry permits the inference that his behavior was animated by sex stereotypes. Burns, 829 F.3d at 15.

On March 9, 2019, Ahn requested that Russo help him discharge a patient. RA0052,¶47;RA0563:146-147;RA0680:137. According to **Ahn's version of events**, he got angry at Russo because she said, "I'm at CMC, so do you want me to go home and do this, or do you want me to walk you through it so you can do it yourself." RA1040. According to Ahn, he further became livid when Russo pleaded with him "tell me what you want me to do." Id.

> Dr. Ahn explained [at the Partner's meeting] how he had told Ms. Russo he needed her help discharging the patient, and she asked him what he needed her to do, and how they kept repeating this interaction and both grew frustrated.

RA1069. Ahn admitted that he yelled and "blew up" at Russo. RA1141;RA0566-0567:161-164;RA1365-1367. Ahn told Russo, "You're so fucking passive-aggressive and disrespectful." RA0568:168; RA1061. Ultimately, Ahn instructed Russo to put in the orders when Russo got home, which was the first option that Russo suggested. RA1040. Ahn's asserted conclusion from Russo's repeated requests for direction was that Russo did not want to help him, which was the opposite of what her words were emphatically communicating. RA0655:37.

Ahn's over-wrought responses to Russo's completely appropriate conduct – his overreactions, his "blowing up", his assumption of work avoidance – help to establish pretext as they speak to discriminatory hostility. Kelley v. Corr. Med. Servs., 707 F.3d 108, 117 (1st Cir. 2013); Kinzer, 99 F.4th at 118-119. Significantly, NHNSI never disciplined Russo for any of these incidents. RA1541,¶4. NHNSI's wholly positive evaluation in February 2018, occurring after two of the incidents, rates Russo as "Excellent" in "Following directives" and "Interpersonal relations." RA1024. Indeed, after the first two incidents, on June 22, 2017, **Ahn** evaluated Russo with the highest possible rating in every category, including "ability to work well with others," and certified that

she treated other physicians "in a courteous and professional manner." RA1274-1275;RA0678-0679:132-133. In August 2017, **Ahn** again rated Russo the highest possible rating in all categories, including "Interpersonal and Communication Skills." RA1277-RA1279

The district court repeatedly gives credence to Ahn's reports that he considered Russo rude (AD037-39), and rejects the implication of gender bias even if Ahn overreacted (AD061). However, the evidence shows that Ahn's perception of rudeness is warped through stereotypes and how he believes women should act. A jury could find that Ahn's track record of hostility to Russo and other female subordinates, his positive working relationships with male comparators, and this belief that Russo's continued employment was incompatible with his ability to function as a husband and father are the outward expressions of a bias that cannot tolerate a woman refusing to act in a subservient manner. Burns, 829 F.3d at 15; Trombini Study at 107-110,122.

e. Additional Corporate Atmosphere Evidence

From the time that Ahn became a Partner of NHNSI, in 2001 (RA0648-0649:12-14), NHNSI has never employed a female surgeon or physician. RA0649:15;RA0702-0703:41-42. NHNSI generally

maintained a roster of eleven all-male physicians and physician/Partners, despite significant turnover. RA0985;RA0600:47-48;RA0648-0649:12-13;RA0702:39-40;RA1285. Talbot-Kleeman, the female Executive Director, is married to NHNSI Partner Dr. Kleeman. RA0592:16. The fact that all the physicians and physician/Partners are male "may support an inference that the particular decision was tainted by an unlawful bias." Lipchitz v. Raytheon Co., 434 Mass. 493, 508-509 (2001); see also Charles v. Leo, 96 Mass. App. 326, 335 (2019) (nine of the ten people above plaintiff were White).

Moreover, NHNSI could not retain its female employees. During the life of NHNSI, it employed a number of female PAs, including Russo, Plamondon, Humen, Marie Glisson, Kame McCauliffe, and Karen Barry. RA0955;RA0797-0798:24-25. During the same period, NHNSI employed eight male PAs. RA0955. However, in the 2018 period, there were only two female PAs employed by NHNSI: Russo and Plamondon. RA1484,¶17;RA0955. In 2019, when Plamondon, the last female PA resigned (for which, Russo's termination was the trigger), only male PAs remained. RA0798:25;RA0839:71-72. At the Partner's meeting about Russo, Dr. Jenkins advised caution, "because other

female NHNSI PA-C's had left employment . . . [and] that there could be a perception that the Practice was not friendly towards women." RA1066;RA1068-1069. NHNSI's corporate atmosphere and composition are consistent with, and support, Russo's claim of gender discrimination.

2. Russo Has Ample Evidence that One or More of NHNSI's Explanations Are Pretextual

Where, as here, there is sufficient affirmative evidence to show that one of the employer's reasons is discriminatory, the plaintiff need not also disprove the employer's articulated reasons, because a violation may still occur even if the employer's nondiscriminatory reasons played some part in the decision. Bart v. Golub Corp., 96 F. 4th 566, 570 (2d Cir. 2024); Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1021 (8th Cir. 2005); Stroup v. United Airlines, Inc., 26 F.4th 1147, 1160 (10th Cir. 2022). However, in this case, Russo has additional evidence that disproves NHNSI's reasons for discharge.

An employer's "pretextual explanation naturally gives rise to an inference of discriminatory intent." Snyder v. Louisiana, 552 U.S. 472, 484-485 (2008). The Plaintiff is not required to disprove every reason articulated by the defendant. Joseph v. Lincare, Inc., 989 F.3d 147 (1st

Cir. 2021) (proving one of three explanations pretextual is sufficient). When a plaintiff disproves just one of the employer's but-for excuses, a jury must be permitted to infer that discrimination inhabits the same causal space that the employer ascribed to its false explanation. R. Mantell, "Pretext After Bostock – Disproving One of the Employer's Reasons is Enough," 28 Wash & Lee J. Civ. Rts. & Soc. Just. 65, 69 (2021).[3]

One more point must be made about proof of pretext in the context of a stereotyping case: a decision-maker operating under the warped perceptions of a stereotype may believe the reasons given for an adverse action. Smith v. Chrysler Corp., 155 F.3d 799, 806 (6th Cir. 1998); Ahmed, 752 F.3d at 503. For example, where an employer correctly perceives a female employee as abrasive, stereotypes may lead the employer to fire the female employee, but tolerate an equally irritating male employee. Wexler v. White's Fine Furniture, 317 F.3d 564, 571-572 (6th Cir. 2003). In such cases, the plaintiff does not prove pretext in the sense that the reason given is intentionally false. Henry v. Wyeth

[3] Russo's attorney in this appeal is the author of the cited article.

Pharm., Inc., 616 F.3d 134, 155-156 (2d Cir. 2010). Rather, the plaintiff challenges the neutrality of the proffered reason itself — that it is unequally applied, or that there is some inaccuracy or omission demonstrating that the reason given is not the complete reason. Id.; Thomas, 183 F.3d at 58 (pretext shown when equivalently performing employees are evaluated differently, although based on legitimate criteria); Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 45-46 (1st Cir. 2002) (where stereotyping is at play, the employer may honestly believe in its ostensibly non-discriminatory reason for discharge, and yet, may still be engaging in discrimination). Consequently, Russo may prevail, even if we assume that Ahn was frustrated by Russo's perceived lack of deference to him.

a. Ahn's False Claim that he Decided to Push for Russo's Termination After Learning About Russo's Statements to Talbot-Kleeman Critical of Ahn

Pretext is shown in Ahn's false explanation of his decision to terminate Russo, as being based on her reported response to his written complaint. RA0680:138-139. Per Ahn, on March 9, 2019, he verbally reported his complaint about that day's incident to Talbot-Kleeman by phone. Id. Also according to Ahn, Talbot-Kleeman suggested that Ahn

send an email describing the incident to Talbot-Kleeman, and Ahn complied. RA0680:139. When Talbot-Kleeman confronted Russo with the information in the email, Russo reportedly responded that Ahn was lazy, that Russo did not respect Ahn, and she did not express remorse. RA0680:139. When Talbot-Kleeman reported Russo's response to Ahn, Ahn testified that "that's when Anne and I believed that she should be terminated." RA0680:139.

This explanation was false. In actuality, Ahn decided to initiate Russo's termination on March 9, long before hearing about Russo's response to his complaint about her. In Defendants' statement to the NH Human Rights Commission, Defendants asserted that Ahn determined that Russo should be separated from the Practice on the same day of the March 9, 2019 incident, because he believed he could no longer work with Russo and "that it was time for her to leave the Practice." RA1054. That same day, March 9, 2019, Ahn called Wang to discuss the incident, that he no longer wanted to work with Russo and request Wang's support in having the Practice get rid of Russo. RA1054-1055;RA1061. Also, on March 9, Ahn contacted Talbot-Kleeman, telling her that Russo should be terminated and asking whether Russo could

be terminated with a simple majority vote by the Partners. RA1363;RA0684:153-154. Thus, Ahn decided to initiate the termination process on March 9.

Given that Russo did not speak with Talbot-Kleeman about the incident on March 9, it would be impossible for Ahn's determination to fire Russo to be based on Russo's statements to Talbot-Kleeman about the incident. RA0571:180;RA0568:167. Ahn's emailed description of the March 9 interaction was sent to Talbot-Kleeman on March 21, 2019. RA1040. On March 26, 2019, the day <u>after</u> the Partners voted to terminate Russo, Russo met with Talbot-Kleeman in a meeting in which Talbot-Kleeman claims that Russo asserted that Ahn was lazy, that she did not respect Ahn, and that she would not apologize. RA1266. In other words, while Ahn claims to have decided to terminate Russo based on her response to his email, the evidence amply shows that he decided to terminate her long before he wrote the email. <u>Compare</u> RA1266 with RA1294;RA1061;RA1363. Consequently, it is completely pretextual for Ahn to claim that he decided to pursue Russo's termination in light of her reaction to being confronted by Ahn's emailed report of the March 9 incident.

#### b. Ahn's False Statement That He Did Not Want Russo and Plamondon to be Scheduled for Surgeries With Him Due to Their Skill Level and Lack of Experience with Orthopedic/Spine Surgeries

On June 28, 2017, Ahn excluded Russo from his operating room. RA1263-1264. Around this time, he also excluded Plamondon, the only other female PA, from his Operating Room. RA0955-RA0956;RA0976-0977,¶4. Ahn explained that the exclusions were "[d]ue to their lack of experience in orthopedic/spine surgeries and their skill level." RA0977. Ahn stated that he "requested that [Russo] and Georgia Plamondon not be scheduled for his surgeries because they were not as skilled on orthopedic/spine surgeries." RA0977.

However, this was not true. Ahn elsewhere reported that his decision to exclude Russo was based on the fact that "she didn't like me" and was not based on her technical skill. RA0669:95;RA0671:103-104;RA0608:79. Russo had years of orthopedic surgery experience at NHNSI, often covering for the ortho PAs. RA0599-0600:45-47. No one criticized Russo's skills to Talbot-Kleeman. RA603:61. Indeed, Ahn evaluated Russo's technical skills in the OR as "good," and Russo never failed to perform to Ahn's standards during surgery. RA0665:79.

Significantly, Ahn twice gave Russo the highest marks in all categories, including "performance," "competence," "technical skills" and "surgical judgment" in evaluations given soon before and a week after the exclusion. RA1274-1275 (June 22, 2017 evaluation);RA1277-1279 (August 8, 2017 evaluation). A sexist manager's negative assessment of the plaintiff may be shown to be pretextual when set against positive evaluations and directly inconsistent statements. Burns, 829 F.3d at 15. The proof of pretext is even stronger here, where the positive evaluations were generated by Ahn himself.

Moreover, the idea that Russo, an experienced PA in neurosurgery (brain and spine surgery), would not be competent in orthopedic/spine surgery is facially absurd. A PA's skills for neurosurgery overlap with what is necessary for orthopedic spine surgery. RA0713:84-85;RA0673:111. There is "not much difference" between orthopedic spine surgery and certain procedures performed by a neurosurgeon (RA0650:20), except that orthopedic spine surgeries are "more minimally invasive . . . than . . . neurosurgery." RA0713:84-85; RA0929:19-20 (neurosurgery is higher risk than orthopedic surgery). It takes just "a couple of cases" to acclimate a PA from one type of surgery

to the other, because "the skills are there." RA0713-0714:85-86. Consequently, a reasonable jury could find that Ahn's assertion that he excluded Russo because of her alleged lack of skill level or experience in orthopedic/spine surgeries is pretextual. RA0977.

c. Mischaracterizing the Options Offered by Russo

NHNSI and Ahn repeatedly defend themselves by characterizing the options offered by Russo on March 9 as having her "drop everything" and either drive over to Ahn immediately or help Ahn on the computer at that moment. RA1006;RA1057;RA0680:137-138; RA1040. Defendants assert that Russo was treating a non-emergency situation as an emergency that needed an instantaneous response, in an attempt to get out of doing the task. RA0680:138. However, Defendants admit that Russo's initial offer was to discharge the patient "when I [Russo] get home," which is the opposite of treating the matter as an emergency. RA1040;RA0563. Ahn then changed his story completely, and acknowledged that he was frustrated with Russo because she was not available immediately. RA0681:144. These are complete contradictions. Russo, in fact, completed the task once she went home, as she first proposed. RA1261;RA1040.

#### d. The District Court Misunderstood the Pretext Requirement

The district court held that there was no pretext, because NHNSI asserted that it terminated Russo as a result of Ahn's ultimatum that Russo be fired or that he would leave—and Russo does not challenge this version of events. AD066. However, in stereotyping cases, the inquiry looks not to mere falsity, but also to neutrality of the reason—as in, examining the reason why Ahn issued the ultimatum. Henry, 616 F.3d at 155-156; Zapata-Matos, 277 F.3d at 45-46. Thus, it may be true that Ahn was not willing to work with Russo, but the evidence raises a genuine issue of fact that gender was a determinative cause that led Ahn to his conclusion.

Russo may satisfy her burden with a "mosaic of circumstantial evidence" that raises an inference of discrimination. Warner v. DeJoy, No. 24-1414, 2025 U.S. App. LEXIS 22868 at *16 (1st Cir. Sep. 4, 2025). The Reeves framework described above is designed to satisfy and is consistent with the "mosaic" approach. Id. at n.3.

### C. The Exception to the *Reeves* Rule Does Not Apply

Reeves held that, in general, a prima facie case and proof of pretext are sufficient to establish discrimination, even if that evidence

does not reflect overt hostility against the plaintiff's protected traits. Reeves, 530 U.S. at 146-147, 149. The exceptions identified by Reeves to this general rule are not present here. Russo's prima facie case is strong. Id. at 147-148. Instead of merely establishing herself as minimally qualified, Russo's evidence shows that she was an "excellent" part-time PA, who had to be immediately replaced by a full-time PA, Eric Velasquez. (***p.28***). RA1018;RA1527;RA1519;RA0840:74; RA0665:79.

Moreover, Russo's evidence for purposes of the third stage is especially strong and established in several independently sufficient ways. Reeves, 530 U.S. at 147-148. Ahn admitted that Russo's continuation as PA was incompatible with his roles as husband and father. RA1067. Ahn exhibited an ongoing inability to work harmoniously with female subordinates and treated men in the same roles much better. (***pp.33-39***). Ahn repeatedly reacted with undue and unprofessional outrage to Russo's conduct, characterizing her actions as work-avoidant, insubordinate and a refusal to obey, despite the fact that other doctors validated her conduct as appropriate and/or required. (***pp.10-11;56-61***). Ahn's most specific description of his reasons and

timeline for seeking Russo's termination have been shown to be completely false. (***pp.45-53***). Ahn's explanation for his refusal to operate with Russo has been shown as knowingly untrue (***pp.49-52***), and his assertion that Russo characterized a situation as requiring immediate action, in order to get out of doing it, was shown to be knowingly untrue (***p.52***). Russo's prima facie proof and evidence of pretext are much more persuasive, weighty and probative than those deemed sufficient in the Reeves case. Reeves, 530 U.S. at 142, 144-145.

Finally, NHNSI has provided absolutely no conclusive proof of a non-discriminatory motive, as each beat of narrative is shown to be tainted by Ahn's bias. Id. at 147-148. The Supreme Court defines conclusive proof as evidence that the jury is required to believe. Id. at 150-151. Therefore, the general Reeves rule applies, the exception does not, and summary judgment should have been denied based on the pretext and prima facie proof. See e.g., Ripoli, 123 F.4th at 577 (prima facie case of sex discrimination, along with evidence of pretext that challenges the employer's version of events, but does not directly implicate hostility against women, is sufficient); Kinzer, 99 F.4th at 118-19 (prima facie case and employer's unwarranted deviations from

its ordinary discipline criteria "would, in and of itself, support Kinzer's argument that the disciplinary point was pretext obscuring the company's true retaliatory motive."); Forsythe v. Wayfair, Inc., 27 F. 4th 67 (1st Cir. 2022) (plaintiff's prima facie case plus evidence that employer knew plaintiff had not resigned as it claimed was sufficient evidence to survive summary judgment).

### D. Basis for Employer Liability

In this case, NHNSI is liable, because Ahn, a vice president, part-owner, and voting Partner of the firm, **caused** Russo to be terminated because of her sex. RA0648-0649:12-14; RA0047,¶4-5. Ahn initiated the termination process and advocated for Russo's dismissal before and during the Partners meeting of March 25, 2019. RA0684-0685:156,158-159;RA1057; RA1061;RA1066-RA1067. Ahn thanked Talbot-Kleeman for terminating Russo (RA1330), and Talbot-Kleeman admitted to Russo that Ahn drove the termination decision. RA0574:190-191.

Significantly, the Partners never voted on whether Russo engaged in misconduct. RA0745:49. Rather, the vote was merely to choose who to separate from the Practice, Ahn or Russo, due to Ahn's ultimatum. RA0629:163;RA0745:49;AD065,n.14;AD066. In this choice, Ahn had the

"power" and Russo lost. RA1071;RA0745:49. Consequently, a reasonable jury could find that Ahn, as the only Partner clamoring for Russo's discharge, drove the ultimate decision, and NHNSI is responsible for the bias behind his ultimatum and its consequences. Richard v. Regional School Unit 57, 901 F.3d 52, 60 (1st Cir. 2018) (where there was a "sequence of actors" leading to an adverse decision, District Court properly "imputed each individual actor's motivations to [the defendant]); Tejada-Batista v. Morales, 424 F.3d 97, 102-103 (1st Cir. 2005) (employer is responsible where a discriminatory supervisor provides management information to initiate an adverse action, even if the information was truthful).

Here, the district court held that Russo "has not established that Dr. Ahn's alleged discriminatory animus is attributable to the Institute in the circumstances she describes…Russo has not shown that the Institute is liable for any discriminatory animus that might be attributable to Dr. Ahn." AD057-58. **If this determination is upheld, the discrimination laws will be eviscerated; employers could avoid liability for discriminatory managerial decisions by simply framing the termination of a plaintiff as a choice**

**between the plaintiff and the discriminatory manager.** It destroys workplace protections, entirely, and must be reversed.

In actuality, the employer is liable where discrimination on the part of one of its agents "set in motion the chain of events that led to . . . the adverse employment action." Vasquez v. Cnty. Of Los Angeles, 349 F.3d 634, 647 (9th Cir. 2004). The plaintiff need not show that a discriminatory act was the chronologically final cause of the adverse action; rather discrimination need only be "a determinative influence" in the chain of events leading up the termination. Reeves, 530 U.S. at 141. For example, if a baseball team wins by a score of 1 to 0, many would agree the victory was the result of the single home run at the end of the game. Burrage v. United States, 571 U.S. 204, 211 (2015) (considering but-for causation). However, the victory may be just as properly ascribed to competent pitching, fielding and coaching, or other plays which took place before the final run. Id., at 211-212. In that case, the earlier acts of excellence may be equally or more causal than the home run, and are properly considered but-for causes. Id.

This principle is also illustrated in the Supreme Court's Bostock decision, which elucidated the "but for" requirement for Title VII gender

discrimination claims. The Court stated, "Often, events have multiple but-for causes. So, for example, if a car accident occurred *both* because the defendant ran a red light and because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision." Bostock, 590 U.S. at 656. Again, both factors are but-for causes, even if one action preceded the other.

Thus, when a workplace conflict originates from illegal factors or motives, the employer bears responsibility when the conflict escalates to termination. Lipsett v. University of Puerto Rico, 864 F.2d 881, 911 (1st Cir. 1988); Tejada-Batista, 424 F.3d at 102-103 (in case involving "sequential actors having different motives," where the first actor had an unlawful motive, the first actor's bias was imputed to employer).

The Supreme Court has held that where a discriminatory supervisor sets in motion events that leads an innocent decisionmaker to fire an employee, the employer is liable, because both the supervisor's and decisionmaker's actions are proximate causes of the adverse action. Staub v. Proctor Hosp., 562 U.S 411, 419, 420 (2011). "Cat's paw liability can attach if an employee performs an act motivated by animus that is intended to cause an adverse action." Ameen v. Amphenol

Printed Circuits, Inc., 777 F.3d 63, 70 (1st Cir. 2015). That is what happened here.

The District Court found that cat's paw liability does not apply in this case, claiming that it applies only where the discriminatory actor provides the final decisionmaker with false information, and Ahn's ultimatum succeeded without requiring the Partners to believe him. AD058-59. This is an overly narrow — and incorrect — view of employer liability. Indeed, this circuit has held an employer liable where a discriminatory supervisor provided truthful information to management that led to the employee's termination. Tejada-Batista, 424 F.3d at 102-103. Moreover, the evidence demonstrates that Ahn did convey false information to the Partners. (***p.52***).

Plaintiff need only show that "the biased supervisor's action be a causal factor of the ultimate employment decision." Staub, 562 U.S. at 420. The Partners' vote can be thought of as a superseding cause only if it is a "cause of independent origin that was not foreseeable." Id. at 420. Here, the Partners' vote was not independent of Ahn, because Ahn was a voting Partner and was the sole driver and advocate for the decision. RA0648-0649:12-14;RA0685:158; RA0629:163,165; RA0745:48-49.

Moreover, the vote taken did not independently find Russo to be insubordinate, but foreseeably took Ahn's side with respect to his refusal to work for a Practice that employed Russo. RA0745-0746:49-50. Thus, Ahn's motive was NHNSI's motive. NHNSI's "[a]nimus and responsibility for the adverse action can both be attributed to the earlier agent [Ahn, given that] the adverse action [was] the intended consequence of [Ahn's] discriminatory conduct." Staub, 562 U.S. at 419. NHNSI's liability for Ahn's conduct is established with either a chain-of-causation or cat's paw theory.

### E. Basis for Individual Liability

Ahn is also personally liable, because, based on the same evidence, it is clear that he aided, abetted **or incited** NHNSI's unlawful conduct. Fred Fuller, 168 N.H. at 611-612. The law defines as unlawful practice the "Aiding, abetting, inciting, compelling or coercing another . . . to commit an unlawful discriminatory practice." NH R.S.A. 254-A:2 XV(d). Individual liability applies when the individual actor "affected" the employer's decision. Artesi, 2020 U.S. Dist. Lexis 269940 at *29. As the main driver of the discriminatory job action, Ahn is personally liable for inciting the decision.

## V. A REASONABLE JURY COULD FIND THAT NHNSI RETALIATED AGAINST RUSSO

To establish a claim of retaliatory discharge under Title VII, the plaintiff must show that [1] she engaged in protected activity; [2] she was fired; and [3] there was a causal connection between the protected conduct and the discharge. Hoeppner v. Crotched Mountain Rehabilitation Ctr., 31 F.3d 9,14 (1st Cir. 1994). No burden shifting is required where the plaintiff establishes these elements with strong or direct evidence. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111,121 (1985). Russo can raise a genuine issue of material fact, as to each of these elements.

### A. Russo Engaged in Protected Activity

A plaintiff engages in protected activity where she reasonably and in good faith opposes what she reasonably believes to be unlawful discrimination, even if she is ultimately incorrect about the presence of discrimination. Kinzer, 99 F.4th at 115. On April 29, 2019, NHNSI received a letter from Russo's counsel identifying Russo's termination as an example of "Dr. Ahn's disparate treatment of women" and describing the workplace as a "discriminatory environment." RA1324.

We know that Russo's concerns about bias were reasonable and in good faith, because at the March 25 termination meeting, Jenkins voiced concern that Russo's termination could be perceived as gender discrimination, before she raised that complaint herself. RA1066;RA1068-1069. The court below correctly held that the letter "qualified as protected conduct—a complaint of gender discrimination." AD075.

### B. NHNSI Subjected Russo to Adverse Actions

A retaliatory adverse action occurs when an employer "discharge[s] an employee" or engages in other conduct "materially adverse such that it could deter a reasonable person from complaining about discrimination." Shervin v. Partners Healthcare Sys., 804 F.3d 23, 49 (1st Cir. 2015). As of April 9, 2019, there was an expectation that Russo would continue working with NHNSI until June 28, 2019 and then continue working as an independent contractor at HCNH indefinitely thereafter. RA0637:194; RA1518;RA1290,#19; RA1312-1321;RA1323. However, NHNSI terminated Russo effective May 2, two months before the contemplated end to the transition period and simultaneously terminated Russo's HCNH role. RA0355.

It was not until late July 2019 that Russo found new employment, at a lower hourly rate. RA0579:209-210. Consequently, Russo suffered a material adverse action, because she was terminated on May 2, almost two months before the contemplated end date of June 28, did not continue in an HCNH role, and she did not have gainful employment in the intervening time. Id.

The District Court found the absence of an adverse action, based on failure to show "any loss of income or opportunity because of the May 2 end date." AD076. However, "Termination … is of course the quintessential adverse employment action," (Rios v. Centerra Grp. LLC, 106 F.4th 101, 113 (1st Cir. 2024)), and the inferences favoring the plaintiff require an assumption that a loss of job meant loss of money. RA0579:209-210 (Russo obtained job with lower hourly rate in late July 2019);RA0539:51-52 (Russo's compensation for HCNH work was separate from her regular NHNSI Compensation);RA0706:75-76[4]

[4] Russo's counter-offer to work up to April 19 was consistent with NHNSI's proposed timeline, as Russo's accrued paid leave benefits would have resulted in her continuing to receive payments as an employee to July 9 (similar to June 28). RA0634:185;RA0637:194. The counter-offer also assumed the same severance payment proposed by NHNSI and an agreement to continue work as an independent

While the actual separation of employment occurred after the Partners had voted to terminate Russo, the post-decision relationship may nevertheless be fodder for an adverse action. Connell v. Bank of Boston, 924 F.2d 1169, 1180 (1st Cir. 1991) (employer's peremptory discharge of plaintiff two weeks prior to the notified terminated date "could be found to be retaliatory"); Gerner v. Chesterfield, 674 F.3d 264, 266-267 (4th Cir. 2012) (offering reduced severance package is adverse action). Moreover, the District Court ignores the loss of the contemplated HCNH contractor position, which clearly represented a tangible loss to Russo.

Next, the District Court appears to hold that there is a lack of adverse action by assuming that Russo's rejection of NHNSI's latest proposal thereby ended negotiations, such that "she [Russo] ended the transition period." AD074-AD076. However, negotiations were ongoing, and in the meantime, despite Russo's rejection of the most recent proposal, she envisioned continuing through the contemplated transition period. RA1324 ("In the meantime, Ms. Russo does expect to

---

contractor at HCNH thereafter, all of which NHNSI rejected. RA0634:184-185; RA0642:216-217;RA0415-0426; RA0427;RA0429-0440.

be able to work in an environment free of workplace...discrimination").

Nothing Russo did signaled an end to negotiations or the stoppage of work. The District Court falsely stated that "Russo's attorney… did not offer counterproposal." AD077. But she did offer a counterproposal, suggesting resolution for $100,000. RA1234. Consequently, while negotiations were ongoing, NHNSI unilaterally ended the transition period, withdrew all severance offers, and rejected a continuing independent contractor relationship. RA1268-1269.

The District Court stated that "Russo does not dispute that she agreed to leave if that relationship did not work." AD022-23. Actually, Defendants never asserted the allegation as a statement of fact, and so, Russo was never given the opportunity to dispute it. The only support for this assertion appears to be inadmissible hearsay contained in Exhibits 36(RA1266) and 37(RA1268-1269), which purports to reflect a statement made long before the transition period, and cannot be reasonably interpreted to constitute Russo's permission to be unilaterally fired for complaining about discrimination, without legal consequence. Finally, Russo clearly rejected this assertion in her motion

for reconsideration (RA0124) —a dispute the district court ignored. Thus, a reasonable jury could find one or more adverse actions.

### C. Causal Connection Between Demand Letter and Discharge

There is strong and/or direct evidence that NHNSI terminated Russo expressly because she complained of gender discrimination. On April 30, 2019, the day after NHNSI received Russo's demand letter complaining of gender discrimination, Talbot-Kleeman IM'd Batlivala, stating, "Sorry but I've had to tell Gina she is done. **She is making allegations that are unacceptable…**" RA1291,#29 (emphasis added). The only allegations to which Talbot-Kleeman could be referring are Russo's claims of gender discrimination. RA0995;RA1010 (termination letter was sent in response to Russo's demand letter, and "[t]he Practice was shocked at the allegations raised by Complainant's counsel"). Talbot-Kleeman's statement to Batlivala constitutes direct evidence, because it constitutes the statement by a decisionmaker that directly reflects retaliatory animus and bears squarely on the adverse action. DeCaire, 530 F.3d at 17. If employers were permitted to fire employees simply because the employer believed her complaints of discrimination were unfounded or "unacceptable", the statutes' protection against

retaliation would be rendered wholly illusory. Sanders v. Madison Square Garden, L.P., 535 F. Supp. 2d 364,367 (S.D.N.Y. 2007).

The evidence is all the more sufficient given that NHNSI received the demand letter on April 29, 2019 and Talbot-Kleeman expressed on April 30 an intention to imminently end Russo's transition period. RA1323-1324;RA1413. Russo's separation was completed effective May 2, and she was prevented from pursuing the independent contractor position. RA1269. Even by itself, very close temporal proximity, such as this, can prove causation. Clark Co. Sch. Dist. v. Breeden, 532 U.S. 268,273 (2001).

Although no more evidence of retaliatory motive is required, NHNSI prevented Jenkins from providing Russo with a written letter of recommendation and directed Batlivala to not respond to a reference request, even though Russo released NHNSI parties from any liability for doing so. RA0808:67-68;RA0782:46-48;RA1337-1338;RA1340-1341. Other than Russo, NHNSI has never directed doctors to refrain from writing references for a Practice employee. RA0755-0756:89-90. Even if the District Court was correct that this denial does not constitute an adverse action, it certainly does demonstrate animus directly relating to

Russo's protected complaint. AD074; EEOC Compliance Manual §8-II(D)(2) (refusal to provide reference can be retaliation). Thus, there is sufficient evidence to demonstrate that the end of the transition period two months early, along with the failure to retain her as an independent contractor, was caused by her protected complaint of discrimination.

## CONCLUSION

For the foregoing reasons, Plaintiff Gina Russo requests that the district court's order granting summary judgment on Counts I, II and III be reversed and that the sex discrimination and retaliation claims against NHNSI and the aiding and abetting sex discrimination claim against Ahn be remanded for trial. Russo requests that she be awarded reasonable attorneys' fees and costs for work on this appeal, should she be adjudged the prevailing party after trial.

Respectfully submitted by:

GINA RUSSO
Plaintiff-Appellant,
By her attorneys,

*/s/ Kamee Verdrager*
Kamee Verdrager, Esq. (CA01 #101062)
KBV LAW
P.O. Box 90
W. Nottingham, NH 03291
(603) 488-1473 (phone)
kbv@kbvlawpc.com
Attorney for Plaintiff-Appellant

*/s/ Robert S. Mantell*
Robert S. Mantell (CA01 #31754)
Law Office of Robert S. Mantell
Somerville, MA 02144
(617) 470-1033
RMantell@TheEmploymentLawyers.com
*On the brief*

## CERTIFICATE OF SERVICE

This is to certify that on October 17, 2025 a copy of the foregoing document was served upon all parties of record via the CM/ECF system.

*/s/ Kamee Verdrager*

# Certificate of Compliance With Type-Volume Limit

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. [insert Rule citation] because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☑ this document contains 12,568 words, **or**

☐ this brief uses a monospaced typeface and contains ______ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this document has been prepared in a proportionally spaced typeface using Century Schoolbook in 14 point, **or**

☐ this document has been prepared in a monospaced typeface using ______________________________ with ____________________.

(s) Kamee Verdager

Attorney for Gina Russo

Dated: September 26, 2025

**No. 25-1519**

# United States Court of Appeals
## For the First Circuit

---

GINA RUSSO,

Plaintiff-Appellant,

v.

NEW HAMPSHIRE NEUROSPINE INSTITUTE, P.A.; URI M. AHN,

Defendants-Appellees.

---

# ADDENDUM OF COURT ORDERS

**ADDENDUM TABLE OF CONTENTS**

**#AD**

Order on Defendant New Hampshire Neurospine Institute, P.A.'s Joinder in Motion for Summary Judgment, November 15, 2024, Doc.#63 ....................001

Endorsed Order granting Defendant Ahn's Motion for Summary Judgment, November 20, 2024 (Docket Entry) ....................004

Memorandum Order on Defendant Ahn's Motion for Summary Judgment, November 22, 2024, Doc. #64 ....................005

Order, Final Pretrial Conference, November 26, 2024, Doc. #77 ....................026

Order, Plaintiff's Motion for Reconsideration of the Court's Order Granting Summary Judgment in favor of Defendant Ahn, February 24, 2025, Doc. #84 ....................028

Memorandum Order on Defendant New Hampshire Neurospine Institute, P.A.'s Motion for Summary Judgment, April 24, 2025, Doc. #93 ....................047

Judgment, April 24, 2025, Doc. #94 ....................081

**No. 25-1519**

# United States Court of Appeals
## For the First Circuit

GINA RUSSO,

Plaintiff-Appellant,

v.

NEW HAMPSHIRE NEUROSPINE INSTITUTE, P.A.; URI M. AHN,

Defendants-Appellees.

# ADDENDUM OF COURT ORDERS

## ADDENDUM TABLE OF CONTENTS

**#AD**

Order on Defendant New Hampshire Neurospine Institute, P.A.'s Joinder in Motion for Summary Judgment, November 15, 2024, Doc.#63 .......... 001

Endorsed Order granting Defendant Ahn's Motion for Summary Judgment, November 20, 2024 (Docket Entry) .......... 004

Memorandum Order on Defendant Ahn's Motion for Summary Judgment, November 22, 2024, Doc. #64 .......... 005

Order, Final Pretrial Conference, November 26, 2024, Doc. #77 .......... 026

Order, Plaintiff's Motion for Reconsideration of the Court's Order Granting Summary Judgment in favor of Defendant Ahn, February 24, 2025, Doc. #84 .......... 028

Memorandum Order on Defendant New Hampshire Neurospine Institute, P.A.'s Motion for Summary Judgment, April 24, 2025, Doc. #93 .......... 047

Judgment, April 24, 2025, Doc. #94 .......... 081

Case 1:21-cv-00703-SM-TSM Document 63 Filed 11/19/24 Page 1 of 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Gina Russo

v. Case No. 21-cv-703-SM-TSM
Opinion No. 2024 DNH 097

New Hampshire Neurospine
Institute, P.A. and
Uri M. Ahn

O R D E R

Gina Russo brings claims against her former employer, New Hampshire Neurospine Institute, P.A. ("Institute"), and a physician in that practice, Uri M. Ahn. Dr. Ahn moved for summary judgment. Doc. no. 42. The Institute filed a document styled "Joinder in Motion for Summary Judgment," without seeking leave to join the motion, and without providing any briefing or further argument to support judgment in its favor. Doc. no. 43. Dr. Ahn's motion for summary judgment and supporting memorandum address the claims brought against Dr. Ahn but do not address the claims brought against the Institute. Doc. no. 42-1, at 10. As such, the Institute's "joinder" is not effective to include the Institute as a co-movant for summary judgment, and the court will consider the motion for summary judgment only with respect to the moving party, Dr. Ahn.

The Institute filed a motion to strike, pursuant to Federal Rule of Civil Procedure 12(f), part of Russo's objection to Dr. Ahn's motion for summary judgment. Specifically, the Institute

challenges that part of Russo's statement of additional facts in her objection in which Russo alleges that the Institute fabricated evidence in the case. Doc. no. 47, at 6-7. Russo objects to the motion to strike.

Rule 12(f) permits parties to move to "strike from a pleading . . . redundant, immaterial, impertinent, or scandalous matter." Id. (emphasis added). Pleadings are "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer." Fed. R. Civ. P. 7(a). An objection to a motion for summary judgment is not a "pleading" as described in the rule, so it is not governed by Rule 12(f). In re T-Mobile Customer Data Security Breach Litig.¸111 F.4th 849, 857 (8th Cir. 2024); Davis v. Theriault, No. 1:22-CV-00275-JDL, 2023 WL 5628193, at *9 (D. Me. Aug. 31, 2023)

An objection to a motion for summary judgment is not a pleading. FRCP 7(a); 5C Charles Alan Wright, Arthur R. Miller, and A. Benjamin Spencer, Federal Practice and Procedure § 1380 (3d ed. 2023) ("Rule 12(f) motions only may be directed towards pleadings as defined by Rule 7(a); thus, motions, affidavits, briefs, and other documents outside of the pleadings are not subject to Rule 12(f).").

Therefore, the Institute provides no grounds to strike the challenged part of Russo's objection to Dr. Ahn's motion for summary judgment.

## Conclusion

For the foregoing reasons, the Institute's "joinder" (document no. 43) is ineffective, and the Institute's motion to strike (document no. 56) is denied.

SO ORDERED.

Steven J. McAuliffe
United States District Judge

November 15, 2024

cc: Counsel of Record

| | | |
|---|---|---|
| 10/09/2024 | | NOTICE of ECF Filing Error re: 60 Affidavit, filed by Gina Russo. Document should have been filed as an attachment to the main document (AP 2.5(a)). NO ACTION REQUIRED - FOR INFORMATIONAL PURPOSES ONLY AND MERELY INTENDED TO EDUCATE ALL PARTIES IN THE CASE. If the filing party has any questions concerning this notice, please contact the judge's case manager at 603-225-1423.(lw) (Entered: 10/09/2024) |
| 10/21/2024 | 61 | Joint Assented to MOTION to Extend Time to 14 days after rulings on pending motions issued filed by Uri M. Ahn, New Hampshire Neurospine Institute, P.A..(Hamel, Adam) (Entered: 10/21/2024) |
| 11/04/2024 | | **ENDORSED ORDER granting 61 Motion to Extend Time to 14 days after rulings on pending motions. *Text of Order: Granted.* So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 11/05/2024) |
| 11/07/2024 | 62 | Assented to MOTION Conduct Final Pretial Conference Virtually filed by Uri M. Ahn.(Feeney, Dona) (Entered: 11/07/2024) |
| 11/15/2024 | 63 | **ORDER re: 43 Joinder in Motion 42 Motion for Summary Judgment; denying 56 Motion to Strike 47 Objection to Motion. *For the foregoing reasons, the Institute's joinder (document no. 43) is ineffective, and the Institute's motion to strike (document no. 56) is denied.* So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 11/15/2024) |
| 11/15/2024 | | RESCHEDULING NOTICE of Hearing. Final Pretrial Conference reset for 11/26/2024 02:00 PM, via video conference, before Judge Steven J. McAuliffe. (lw) (Entered: 11/15/2024) |
| 11/20/2024 | | **///ENDORSED ORDER granting 42 Motion for Summary Judgment. *Text of Order: The motion for summary judgment filed by defendant Uri M. Ahn (doc. no. 42) is granted on Counts II, III, and V, which are all of the claims brought against that defendant. A memorandum order will follow. The remaining parties' final pretrial statements and related filings shall be filed by close of business on Monday, November 25, 2024. See LR 16.2. The final pretrial conference is scheduled to be held by videoconference on November 26, 2024, at 2:00 p.m. The trial is scheduled to begin on December 10, 2024, at 9:30 a.m.* So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 11/20/2024) |
| 11/22/2024 | 64 | **///MEMORANDUM ORDER re: 42 Motion for Summary Judgment. *For the foregoing reasons, Dr. Ahn's motion for summary judgment (doc. no. 42) is granted. The claims against Dr. Ahn in Counts II, III, and V are dismissed.* So Ordered by Judge Steven J. McAuliffe.(lw)** (Entered: 11/22/2024) |
| 11/25/2024 | 65 | NOTICE of Attorney Appearance by Connor Walsh Harding on behalf of New Hampshire Neurospine Institute, P.A. Attorney Connor Walsh Harding added to party New Hampshire Neurospine Institute, P.A.(pty:dft).(Harding, Connor) (Entered: 11/25/2024) |
| 11/25/2024 | 66 | Proposed Voir Dire by New Hampshire Neurospine Institute, P.A.. (Hamel, Adam) (Entered: 11/25/2024) |
| 11/25/2024 | 67 | Proposed Jury Instructions by New Hampshire Neurospine Institute, P.A.. (Hamel, Adam) (Entered: 11/25/2024) |
| 11/25/2024 | 68 | Pretrial Statement filed by New Hampshire Neurospine Institute, P.A.. (Hamel, Adam) (Entered: 11/25/2024) |
| 11/25/2024 | 69 | MOTION in Limine to Exclude Testimony Concerning Count I of Plaintiff's Complaint filed by New Hampshire Neurospine Institute, P.A..Follow up on Objection on 12/9/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Hamel, Adam) (Entered: 11/25/2024) |
| 11/25/2024 | 70 | MOTION in Limine to Exclude Testimony Concerning Count II of Plaintiff's Complaint filed by New Hampshire Neurospine Institute, P.A..Follow up on Objection on 12/9/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Hamel, Adam) (Entered: 11/25/2024) |
| 11/25/2024 | 71 | MOTION for Witness Anne Talbott-Kleeman to Testify Remotely at Trial filed by New Hampshire Neurospine Institute, P.A..Follow up on Objection on 12/9/2024. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Hamel, Adam) (Entered: 11/25/2024) |
| 11/25/2024 | 72 | Pretrial Statement filed by Gina Russo. (Attachments: # 1 Exhibit List of Trial Exhibits)(Verdrager, Kamee) (Entered: 11/25/2024) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Gina Russo

v. Case No. 21-cv-703-SM-TSM
Opinion No. 2024 DNH 101

New Hampshire Neurospine Institute, P.A. and Uri M. Ahn

**Memorandum Order**

Gina Russo brings claims against her former employer, New Hampshire Neurospine Institute, P.A. ("Institute"), and one of its partners, Uri M. Ahn. Russo alleges that the Institute discriminated against her based on her gender in violation of Title VII and RSA ch. 354-A; that the Institute and Dr. Ahn retaliated against her in violation of Title VII and RSA ch. 354-A; that Dr. Ahn aided and abetted the Institute's gender discrimination in violation of RSA ch. 354-A; that the Institute wrongfully terminated her; and that Dr. Ahn defamed her.[1] Dr. Ahn moved for summary judgment on the three claims brought against him, and Russo objected. The court granted summary

[1] The reference to Title VII is to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the reference to RSA ch. 354-A is to New Hampshire's Law Against Discrimination, New Hampshire Revised Statutes Annotated Chapter 354-A.

judgment in favor of Dr. Ahn (endorsed order, November 20, 2024), for the reasons that follow.

## Standard of Review

Under Federal Rule of Civil Procedure 56(a), the court shall grant a motion for summary judgment when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. A genuine factual dispute exists if "a reasonable jury could return a verdict for the nonmoving party," and a fact is material to that dispute if it "might affect the outcome of the of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The court reviews "the evidence in the light most favorable to the nonmoving party and giving that party the benefit of any and all reasonable inferences." Segrain v. Duffy, 118 F.4th 45, 56 (1st Cir. 2024). "In opposing a motion for summary judgment, however, a plaintiff must offer admissible evidence." Rios v. Centerra Gr. LLC, 106 F.4th 101, 114 (1st Cir. 2024). Evidence for purposes of summary judgment does not include "conclusory allegations, improbable inferences, and unsupported speculation." To-Ricos, Ltd. v. Productos Avicolas Del Sur, Inc., 118 F.4th 1, 4 (1st Cir. 2024).

## Background[2]

Gina Russo was employed by the Institute beginning on March 11, 2008, as a physician's assistant, PA-C ("PA"). Uri Ahn is an orthopedic surgeon and a vice president and partner at the Institute.[3] Russo worked part-time, three days per week, but also had on-call responsibilities on weekends and holidays. While Russo worked at the Institute, its doctors were all male, and there was only one other female physician's assistant.

---

[2] The court summarizes the properly supported material evidence provided by the parties in support of and in opposition to summary judgment. Because the motion for summary judgment pertains to the claims against Dr. Ahn, the court did not include facts provided by the parties that are not material to Russo's claims against Dr. Ahn.

[3] In the complaint, Russo identified the Institute as a professional association of doctors that is a New Hampshire corporation. Doc. no. 1, at 2. Dr. Ahn is a separate defendant whom Russo describes as a vice president of the Institute and a partner. Id. Russo attributes many actions and decisions to "defendants" collectively to include the Institute and Dr. Ahn.

Although Russo states that Dr. Ahn was "a decision-maker with respect to [Russo's] employment" (doc. no. 58, at 4), she has not shown, with a developed legal argument, that Dr. Ahn is liable for decisions and actions by the Institute. See, e.g., Delta MB LLC v. 271 S. Broadway, LLC, 2024 WL 3826113, at *4-*5 (D.N.H. Aug. 15, 2024); Centurion Networking Serv. Partners, LLC v. Dr. Wade N. Barker, P.A., 2018 WL 1972789, at *4-*5 (D. Mass. Apr. 26, 2018). She also has not shown that Dr. Ahn is liable for decisions or actions of other Institute employees.

For purposes of this motion, Dr. Ahn and the Institute are separate parties and legally separate entities. Dr. Ahn is not legally liable for the actions of the Institute or other Institute employees. Therefore, the court considers the actions taken by the Institute and its other employees separate from those taken by Dr. Ahn.

During the first eight years that Russo worked at the Institute, she had limited contact with Dr. Ahn. In 2016, the Institute changed its operations so that the PAs worked with all of the surgeons. After the Institute changed its operations, Russo had more interaction with Dr. Ahn.

Russo provides exhibits that show Dr. Ahn had a history of being impatient, unpleasant, and rude with Institute employees, hospital staff, and patients, many of whom were women.[4] His conduct generated problems and incidents that had to be addressed by administrators and his peers.

With their increased contact, Dr. Ahn concluded that Russo did not like him based on her body language toward him in contrast to her friendly demeanor toward other doctors in the practice. He noted that he was not part of the small group of doctors with whom she was friendly. Dr. Ahn had been able to resolve issues with male PAs who worked with him. Dr. Ahn did not trust Russo or another female PAs and believed that Russo avoided working with him. But, he gave Russo high performance

[4] Dr. Ahn contends that these documents should not be considered for purposes of summary judgment because they do not meet the evidentiary standard under Rule 56(c)(2). While that objection is likely correct, in the interest of a complete view of Russo's case, the court has considered the exhibits provided by Russo.

reviews. Their strained relationship resulted in several incidents of friction and disagreement between them.

The first incident occurred over the weekend of October 15, 2016, when Russo was on call. Russo was doing rounds at Elliott Hospital in Manchester when an Institute patient, Dr. Wang's patient, was "coded with a cardiac condition," and Russo was involved in that patient's care. Doc. no. 42-1, at 4. During that event, Dr. Ahn called Russo and asked her to see an urgent patient at St. Joseph's Hospital in Nashua for a lumbar epidural abscess. Russo told Dr. Ahn she could not leave because she was involved in caring for Dr. Wang's patient at Elliott Hospital and asked Dr. Ahn if he could get to St. Joseph's Hospital. Dr. Ahn told Russo to go to see the patient at St. Joseph's Hospital as soon as possible, and Russo went to St. Joseph's Hospital.

Dr. Ahn's wife, who is a nurse, had previously worked with Russo. She heard the conversation between Dr. Ahn and Russo. Mrs. Ahn thought that Russo's tone during the conversation with Dr. Ahn was rude, hostile, and unprofessional. Dr. Ahn called Dr. Wang to confirm that Russo had been involved in care for a patient who was coding and said that Russo was rude and insubordinate.[5] Russo also called Dr. Wang to say that Dr. Ahn

[5] Russo contends that Dr. Ahn never mentioned that she was insubordinate until after she claimed gender discrimination. Dr. Wang, however, testified during his deposition that Dr. Ahn

had been rude to her and that his directive for her to go to St. Joseph's Hospital was inappropriate.

Dr. Ahn complained to the Executive Director of the Institute, Anne Talbot-Kleeman, about the incident. Talbot-Kleeman talked to Russo and suggested that Russo and Dr. Ahn resolve the issue.

A second incident occurred during the summer of 2017. Russo met with Dr. Ahn's patient to obtain his consent for surgery. During the meeting, the patient had questions about the possibility of subsequent additional surgery. Russo discussed that possibility and possible alternatives to the then scheduled procedure. Russo left the patient to check with Dr. Ahn about alternatives to the scheduled procedure, but when she could not find Dr. Ahn, she spoke to Dr. Luther, who said alternatives could be plausible. Russo told the patient that another doctor said an alternative procedure was plausible but that she did not know what Dr. Ahn's feeling would be.

After that meeting, the patient's wife contacted Dr. Ahn and told him that they had doubts about his recommended surgery based on what Russo told them. Dr. Ahn thought that Russo's discussion with the patient was an inappropriate surgical

called him after the first incident in 2016 and told him that Russo had been rude and insubordinate.

opinion and that her actions damaged his relationship with his patient. Dr. Ahn told Russo he was not happy with her actions and that her conduct was inappropriate and beyond obtaining surgical consent, which was her task. Dr. Ahn asked Talbot-Kleeman not to assign Russo to any of his cases.

The third incident occurred on March 9, 2019, when Dr. Ahn and Russo were both on call. While Russo was working at Catholic Medical Center, she received a call from Dr. Ahn. He was seeking help in administratively discharging a patient. Russo responded by asking Dr. Ahn whether he needed her to talk him through a discharge or whether he wanted her to discharge the patient when she went home. Both Dr. Ahn and Russo raised their voices during the conversation and characterized their interaction as yelling, although they dispute who used a raised voice first.

Dr. Ahn called Talbot-Kleeman to report that Russo acted in a disrespectful and unprofessional manner. He also sent an email to report that concern. Russo sent an email to Talbot-Kleeman about the telephone call as well, in which she reported that Dr. Ahn became belligerent and called her passive aggressive and disrespectful. She reported that he continued to yell and that she said she was not listening. Russo met with Talbot-Kleeman and reported that Dr. Ahn was lazy and took short cuts with patient care that caused problems.

The Institute held a board meeting on March 25, 2019. Dr. Ahn told the board members that he could not work with Russo and that she had been disrespectful, insubordinate, and difficult to work with. The board members provided their opinions and discussed the situation. Following their discussion, the board unanimously voted to terminate Russo's employment.

Talbot-Kleeman met with Russo on March 26, 2019, to inform her of the board's decision to terminate her employment. When Talbot-Kleeman had a follow up call with Russo on March 29, Russo expressed her belief that her termination was not fair and that she believed the Institute was biased against women. Talbot-Kleeman suggested that they agree to a transition plan for Russo to continue to work, despite her termination. The Institute proposed that Russo would work through June and receive a $15,000 severance payment. Russo made a counter proposal to work until April 19, and the Institute changed the plan to conform to her proposal.[6]

Russo did not agree to the proposed plan, and she and Talbot-Kleeman continued to negotiate terms for the transition. On April 29, Russo's counsel sent a demand letter, alleging gender discrimination and demanding $100,000. On May 30,

[6] Russo obtained legal counsel at some point during the negotiation process.

Case 1:21-cv-00736-... Document 64 Filed 11/20/24 Page 9 of 61

Talbot-Kleeman notified Institute partners that any requests for recommendations for Russo should go through the Institute's counsel. The Institute then decided that May 2 would be Russo's last day of work. Notice was sent to Russo, through counsel, that she was terminated as of May 2.

Russo received recommendations from Institute doctors. She was hired by Concord Hospital in July of 2019 as a PA. She remains in that position.

The Institute hired an independent investigator, Elizabeth Bailey, in July of 2019, to investigate Russo's allegations of gender discrimination against the Institute and Dr. Ahn. Bailey provided her findings in a letter on September 24, 2019. She found that the three incidents involving Dr. Ahn and Russo were not the result of gender bias or discrimination and, instead, were due to Dr. Ahn's dislike of Russo as a person and her disrespectful communications with him. Bailey also found that complaints about Dr. Ahn's and another surgeon's conduct showed unprofessionalism but not gender bias. She concluded that there was not a culture of gender bias at the Institute. Russo filed a complaint against the Institute and Dr. Ahn with the New

Hampshire Human Rights Commissioner in October of 2019, and filed this action on August 22, 2021.[7]

Discussion

Dr. Ahn moved for summary judgment on the claims against him, Count II - retaliation in violation of RSA 354-A; Count III – aiding and abetting gender discrimination in violation of RSA 354-A; and Count V - defamation. Russo argued that material factual disputes preclude summary judgment.[8] For the reasons that follow, summary judgment was granted in favor of Dr. Ahn.

A. Count II – Retaliation

Russo's retaliation claim in Count II is that Dr. Ahn violated RSA ch. 354-A when Russo's employment was terminated on

[7] Although the parties do not cite the decision of the New Hampshire Human Rights Commission in the record, the court assumes that decision was not favorable to Russo.

[8] Russo asserts that the Institute fabricated evidence to justify its decision to terminate her employment, which she argues is sufficient evidence to show intentional discrimination and to avoid summary judgment. In support, she contends that "metadata" for five documents show that "defendants" fabricated them, after they received her demand letter, to show that meetings occurred years before the demand letter. Russo, however, provides only her own inferences from dates shown in the "metadata", which is insufficient to support her fabrication charge for purposes of summary judgment. Fed. R. Civ. P. 56(c) Further, she provides no evidence that Dr. Ahn was involved in the alleged fabrication. Therefore, the court will not address or resolve the issue that Russo raises about fabricated evidence for purposes of Dr. Ahn's motion.

May 2, 2019. Under New Hampshire law, the court relies on federal cases interpretating Title VII to decide analogous discrimination claims under RSA ch. 354-A. Zerveskes v. Wentworth-Douglass Hosp., No. 24-cv-025-SE-TSM, 2024 WL 4301375, at *2 (D.N.H. Sept. 26, 2024) (citing Hubbard v. Tyco Integrated Cable Sys., Inc., 985 F. Supp. 2d 207, 218 (D.N.H. 2013)). To establish retaliation, a plaintiff must prove that she engaged in protected conduct, that the defendant subjected her to an adverse employment action, and that the adverse employment action is causally linked to the plaintiff's protected conduct. Serrano-Colon v. United States Dep't of Homeland Sec., No. 22-1089, 2024 WL 4763442, at *9 (1st Cir. Nov. 13, 2024); Stratton v. Bentley Univ., 113 F.4th 25, 41-42 (1st Cir. 2024). "An employee has engaged in activity protected by Title VII if she has either (1) opposed any practice made an unlawful employment practice by Title VII or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII." Serrano-Colon, 2024 WL 4763442, at *9 (internal quotation marks omitted).

Dr. Ahn, along with the other Institute partners, voted unanimously to terminate Russo's employment on March 25, 2019. Russo, however, continued to work at the Institute while she, through counsel, and Talbot-Kleeman negotiated a transition plan. Russo's counsel sent a letter to Talbot-Kleeman on April

29, 2019, that stated Russo's termination was "the result of one practitioner who has a well-known problem working with women." Doc. no. 51-19, at 2. Counsel further stated that Russo was willing to resolve the termination of her employment and "her claims against the Institute and its partners for the amount of $100,000." Id.

In response to that letter, Talbot-Kleeman decided to finalize the termination of Russo's employment immediately without a further transition period. She sent a letter to Russo's counsel on May 2 that terminated Russo's employment. Talbot-Kleeman notified the Institute partners the next day that Russo's employment had been terminated. Dr. Ahn responded to Talbot-Kleeman's notice, stating: "Thank you for taking care of this." Doc. no. 51-22.

Russo argues that Dr. Ahn retaliated against her for claiming gender discrimination by terminating her employment on May 2. Assuming that counsel's letter to Talbot-Kleeman was protected activity and that the termination on May 2 was an adverse action, despite the vote to terminate her on March 25, the record shows that Talbot-Kleeman, not Dr. Ahn, terminated Russo's employment on May 2. Russo provides no evidence that

Dr. Ahn retaliated against Russo because of the demand letter her counsel sent to Talbot-Kleeman.[9]

Therefore, Russo did not demonstrate that a material factual dispute exists requiring trial of her retaliation claim against Dr. Ahn.

B. Count III – Aiding and Abetting

"An individual may be held liable for aiding and abetting unlawful employment discrimination under RSA 354-A:2 and :7." Artesi v. DeMoulas Super Markets, Inc., No. 19-CV-214-AJ, 2020 WL 13730262, at *11 (D.N.H. June 2, 2020) (citing U.S. Equal Emp't. Opportunity Comm'n v. Fred Fuller Oil Co., 168 N.H. 606, 611 (2016)); see also RSA 354-A:2 XV(d) (defining unlawful discriminatory practices to include "aiding, abetting, inciting, compelling or coercing another or attempting to aid, abet, incite, compel, or coerce another to commit an unlawful discriminatory practice ...."). "[F]or an individual to be liable for aiding and abetting unlawful employment discrimination under RSA 354-A:2,XV(d), it must be proven that the individual aided and abetted an unlawful discriminatory practice committed by an employer as specified in RSA 354-A:7,

[9] Dr. Ahn's after-the-fact thanks to Talbot-Kleeman establishes that he did not terminate Russo's employment. As noted above, Russo has not shown a legal basis to attribute actions taken by other Institute employees to Dr. Ahn.

I." Fred Fuller, 168 N.H. at 611. RSA 354-A:7, I describes the unlawful discriminatory practices by an employer based on gender or sex.

Russo does not specify which part of RSA 354-A, I she relies on as an unlawful discriminatory practice by the Institute that Dr. Ahn aided and abetted. In fact, Russo did not address the aiding and abetting claim at all in her objection to Dr. Ahn's motion for summary judgment. She asserts that the court may infer that her employment was terminated based on a discriminatory motive based on the actions of Institute doctors, which she argues could be interpreted to be evidence of discrimination based on female stereotyping, and that she may also rely on the burden-shifting framework to show discrimination.

1. Stereotyping

Russo contends that Dr. Ahn's reaction during the telephone call on March 9 was "over-the-top" and for that reason can be inferred to be evidence of gender discrimination.[10]

[10] Russo cites an email from another former Institute employee, sent after Russo's termination, who lists a bad experience with Dr. Ahn and bad experiences with another surgeon, and documentation of an incident between Dr. Ahn and an x-ray technician. Russo argues that the two incidents demonstrate Dr. Ahn's bias about how women should behave. The cited incidents occurred in the context of Dr. Ahn's dissatisfaction with the employee's or staff person's

Specifically, Russo argues that Dr. Ahn perceived her response to his request for help as unprofessional only because she is a woman. To make that assumption, however, the response must be, at a minimum, inappropriately upset and unprofessional. Burns v. Johnson, 829 F.3d 1, 15 (1st Cir. 2016).

In the March 9 incident, Russo responded to Dr. Ahn's request for help with options that Dr. Ahn found to be untenable. Dr. Ahn thought Russo's response was rude and unprofessional, and he responded in a raised voice, which caused Russo to use a raised voice or to yell back at him.

Russo's interaction with Dr. Ahn could legitimately be construed to have elicited Dr. Ahn's heated response. Russo has not shown that Dr. Ahn's reaction was "over-the-top" or would otherwise support an inference that he reacted badly because of her gender. Russo also argues that Dr. Ahn was biased against Russo based on his belief that women should be submissive not assertive, but the cited evidence does not support an inference of stereotyping to show gender discrimination.[11]

---

performance of work responsibilities. While Russo demonstrates that Dr. Ahn could be unpleasant and rude to people he deemed to be working for him, these examples do not demonstrate a bias against women.

[11] Based on the record, Dr. Ahn's expressed concern with professionalism and respect seems connected with his perception of the proper role of a PA in relation to a surgeon, not on gender.

Russo points to Dr. Wang's statements. Dr. Wang was asked in his deposition whether he ever witnessed Russo being disrespectful, and he answered no. He then explained that Russo was "very assertive" and "headstrong" and that he did not think those were bad qualities. Doc. no. 48-1, at 18. Dr. Wang further explained that some of the PAs were timid and that Russo was more "actional" because if she disagreed with a surgeon she would be confident in giving her opinion. Dr. Wang testified that he usually thought that was a good quality. As such, Dr. Wang's testimony did not show that he viewed Russo negatively or that he harbored any discriminatory animus against her based on gender or that Dr. Ahn's reaction to Russo was because of a discriminatory animus against women.

2. Burden-shifting framework

It appears that Russo may intend to show an unlawful discriminatory practice through a prima facie case under the burden-shifting framework. See Serrano-Colon, 2024 WL 4763442, at *7. A court may infer discrimination from undisputed facts under the burden-shifting framework, if the plaintiff provides evidence "that: (1) she belonged to a protected class, (2) she performed her job satisfactorily, (3) her employer took an adverse employment decision against her, and (4) her employer continued to have her duties performed by a comparably qualified

person." Id. (internal quotation marks omitted). If the plaintiff makes that prima facie case, "the burden of production then shifts to the defendants to state a legitimate, nondiscriminatory reason for the adverse employment actions." Id. (internal quotation marks omitted). Then, the defendant is entitled to summary judgment unless the plaintiff "raises a genuine issue of material fact that the reasons offered by the defendants were a pretext for discrimination." Id. (internal quotation marks omitted).

Russo omits the elements of a prima facie case and moves directly to evidence of pretext. See Serrano-Colon, 2024 WL 4763442, at *7 (providing elements of prima facie case for burden-shifting analysis under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). In the absence of showing material facts to support the elements of a prima facie case, however, Russo has not carried her burden of establishing a triable issue of an unlawful discriminatory practice based on the burden-shifting framework. Even if Russo could make that minimal showing, however, she still lacks evidence of pretext.

Russo states that the Institute offered "shifting explanations" for her termination, which would support a conclusion that the explanations were pretext for discrimination. A plaintiff can establish pretext by showing that the employer gave different and inconsistent reasons for

its actions. Collazo-Rosado v. University of Puerto Rico, 765 F.3d 86, 93 (1st Cir. 2014). To demonstrate a pretext, inconsistent reasons for termination must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions that a reasonable factfinder could rationally find [that the proffered reason for termination is] unworthy of credence." Cocuzzo v. Trader Joe's E. Inc., No. 23-1695, --- F. 4th ---, 2024 WL 4799281, at *7 (1st Cir. Nov. 15, 2024)

Russo states in her objection to Dr. Ahn's motion for summary judgment that the Institute gave the following explanations for her termination: "(1) because she voluntarily agreed in advance to part company if the relationship wasn't working; (2) due to 'irreconcilable differences' with Ahn, and (3) because of her insubordinate and unprofessional behavior." Doc. no. 47, at 23. Taken in context, those reasons are neither shifting nor inconsistent.

Dr. Ahn sought termination of Russo's employment at the March 25 partners' meeting because he determined that she had been insubordinate and unprofessional in her interactions with him, which are plausibly understood as irreconcilable differences about how he expected to be treated. Then, after the vote to terminate, Russo, through counsel, began to negotiate the terms of her employment during a transition period, and Russo does not dispute that she agreed to leave if

that relationship did not work. For these reasons, the Institute's explanations for her termination that she cites are consistent and are without implausibilities, incoherence, or contradiction.

Therefore, Russo cannot show a discriminatory employment practice based on a pretextual reason for terminating her employment. Russo provides no other viable grounds to show gender discrimination by the Institute. In the absence of a discriminatory employment practice by the Institute, Russo's claim that Dr. Ahn aided and abetted the Institute in a discriminatory employment practice fails.

C. Defamation

Russo argued that Dr. Ahn defamed her by telling his partners during the meeting on March 25 that Russo avoids work.[12] In response, Dr. Ahn contends that Russo lacks evidence that he made that statement because she did not attend the meeting and her hearsay evidence of statements at the meeting do not meet the evidentiary standard under Rule 56(c). Dr. Ahn also contends that the challenged statement is not actionable as defamation because it is an opinion.

[12] In her complaint, Russo alleged that Dr. Ahn said she "was trying to get out of work." Doc. no. 1, at 24. In her objection to the motion for summary judgment, she alleges that Dr. Ahn told his partners that "Russo avoids doing work for him." Doc. no. 47, at 25.

To establish defamation under New Hampshire law, a plaintiff must "show that the defendants failed to exercise reasonable care in publishing false and defamatory statements of fact about the plaintiff to a third party." Richards v. Union Leader Corp., No. 2022-0197, --- A.3d ---, 2024 WL 4031395, at *5 (N.H. Sept. 4, 2024). The challenged statement must be a statement of fact, not an opinion, to be actionable. Id. A statement of fact may be proven true or false, while an opinion or an unflattering expression cannot be "objectively verified." Id.

The court need not address the hearsay basis of Russo's evidence because the challenged statement by Dr. Ahn is properly characterized as an opinion about the propriety of Russo's conduct, and not a statement of fact. Dr. Ahn perceived that Russo tried to get out of work or avoided doing work for him. Those perceptions were expressed as his opinions about Russo's actions or inactions.

In other words, Dr. Ahn formed an opinion about Russo's motivation for her actions, which might or might not have been her actual reasoning, but he was expressing only his opinion. In contrast, for example, if Dr. Ahn said that Russo was absent on a certain day, refused to come to work on a certain day, or left work early on a certain day, those statements could be proven to be true or false. But, "Russo tried to avoid work" is

Dr. Ahn's opinion based on his perceptions, not a statement of fact. Russo cites no evidence to show that Dr. Ahn did not actually hold that opinion.

Therefore, Russo has not shown a triable issue to avoid summary judgment on the defamation claim.

**Conclusion**

For the foregoing reasons, Dr. Ahn's motion for summary judgment (doc. no. 42) is granted. The claims against Dr. Ahn in Counts II, III, and V are dismissed.

SO ORDERED.

Steven J. McAuliffe
United States District Judge

November 22, 2024

cc: Counsel of Record

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Gina Russo

v. Case No. 21-cv-703-SM-TSM

New Hampshire Neurospine Institute, P.A., and Uri M. Ahn

**ORDER**

A final pretrial conference was held on November 26, 2024. Kamee B. Verdrager, Esq., appeared on behalf of plaintiff. Adam M. Hamel, Esq., Amanda E. Quinlan, Esq., and Connor W. Harding, Esq., appeared on behalf of Defendant New Hampshire Neurospine Institute, P.A. Dona Feeney, Esq., and David Betancourt, Esq., appeared on behalf of Defendant Uri M. Ahn.

After extensive discussion during the pretrial conference, the trial date is continued until further order of the court. The remaining defendant will file a properly supported and briefed motion for summary judgment on or before January 10, 2025. Plaintiff will file a properly supported and briefed response (including references to admissible evidence) on or before February 25, 2025. The briefing should include considered discussion of the effects, if any, of the summary judgment entered on behalf of Dr. Ahn, particularly with respect to admissible evidence at trial. Briefing should also address

Case 1:21-cv-00013-SM Document 77 Filed 11/26/24 Page 2 of 2

the viability of plaintiff's retaliation claim with respect to the negotiations relative to plaintiff's transition from the practice.

**SO ORDERED.**

Steven J. McAuliffe
United States District Judge

November 26, 2024

cc: Counsel of Record

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Gina Russo

v. Case No. 21-cv-703-SM-TSM
Opinion No. 2025 DNH 021

New Hampshire Neurospine Institute and Uri M. Ahn

O R D E R

Plaintiff Gina Russo moves for reconsideration of the court's order granting summary judgment in favor of defendant Uri M. Ahn on her aiding and abetting discrimination and defamation claims.[1] Russo argues that the court used an incorrect standard in evaluating the record evidence of gender discrimination, which led to an incorrect result. She also argues that the court erred in granting summary judgment on her defamation claim. For the reasons that follow, the motion for reconsideration is denied.

## Standard of Review

A motion for reconsideration seeks "an extraordinary remedy which should be used sparingly." Salmon v. Lang, 57 F.4th 296, 323 (1st Cir. 2022) (internal quotation marks omitted). To

[1] The court also granted summary judgment in favor of Dr. Ahn on Russo's retaliation claim, but Russo does not challenge that part of the decision.

succeed, the moving party "must demonstrate either that new and important evidence, previously unavailable, has surfaced or that the original judgment was premised on a manifest error of law or fact." Caribbean Mgmt. Grp., Inc. v. Erikon LLC, 966 F.3d 35, 44-45 (1st Cir. 2020) (internal quotation marks omitted). A motion for reconsideration is not a means for a losing party "to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." Fábrica de Muebles J.J. Álvarez, Inc. v. Inversiones Mendoza, Inc., 682 F.3d 26, 31 (1st Cir. 2012).

## Background

Gina Russo was employed as a physician's assistant by the New Hampshire Neurospine Institute beginning on March 11, 2008. Uri Ahn is an orthopedic surgeon and a vice president and partner at the Institute. Russo and Dr. Ahn had a difficult working relationship that eventually led to the termination of Russo's employment in 2019.

Russo brought claims against New Hampshire Neurospine Institute for gender discrimination under Title VII and New Hampshire RSA chapter 354-A (Count I), against the Institute and Dr. Ahn for retaliation in violation of Title VII and RSA chapter 354-A (Count II), against Dr. Ahn for aiding and

Case 1:21-cv-00017-SE Document 84 Filed 02/24/25 Page 3 of 19

abetting in gender discrimination in violation of RSA chapter 354-A (Count III), against the Institute for wrongful termination (Count IV), and against Dr. Ahn for defamation (Count V). Dr. Ahn moved for summary judgment on the claims against him (Counts II, III, and V). The Institute attempted to join Dr. Ahn's summary judgment motion, which was unsuccessful because Dr. Ahn limited the motion to the claims against him. Doc. no. 63.

The court granted Dr. Ahn's motion for summary judgment. In light of that result and its effect on claims against the Institute, the court continued trial, which was scheduled in December of 2024, and set a briefing schedule for summary judgment on Russo's claims against the Institute. Russo moved for reconsideration of the order granting summary judgment in Dr. Ahn's favor.

## Discussion

In support of reconsideration, Russo argues that the court improperly credited testimony from Dr. Ahn's witnesses, found contested facts in Dr. Ahn's favor, and ignored facts that she provided, which resulted in an erroneous decision in Dr. Ahn's

favor on her aiding and abetting discrimination claim.[2] She also argues that the court ignored her claim for defamation per se and erred in granting summary judgment on that claim. Dr. Ahn objects to reconsideration, contending that the court properly assessed the record evidence and correctly granted summary judgment on the aiding and abetting discrimination and defamation claims. In her reply, Russo points to a recent First Circuit Court of Appeals case, Ripoli v. Rhode Island Department of Human Services, 123 F.4th 565 (1st Cir. 2024), which she says demonstrates that the court misapplied the McDonnell-Douglas burden-shifting framework when it evaluated her aiding and abetting claim.[3]

A. Aiding and Abetting Discrimination - Count III

In Count III, Russo alleged that Dr. Ahn aided and abetted the Institute in discriminating against her, because of her gender, in violation of NH RSA chapter 354-A.[4] In opposition to

---

[2] Russo does not challenge summary judgment on the retaliation claim against Dr. Ahn, Count II.

[3] McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).

[4] Under New Hampshire law, the court relies on federal cases interpreting Title VII to decide analogous discrimination claims under RSA ch. 354-A. Zerveskes v. Wentworth-Douglass Hosp., No. 24-cv-025-SE-TSM, 2024 WL 4301375, at *2 (D.N.H. Sept. 26, 2024) (citing Hubbard v. Tyco Integrated Cable Sys., Inc., 985 F. Supp. 2d 207, 218 (D.N.H. 2013)).

summary judgment, Russo argued, in part, that the Institute and Dr. Ahn provided explanations for her termination that were pretexts for discrimination. The court concluded that Russo did not provide direct evidence of discrimination, and to the extent she relied on the McDonnell-Douglas framework, she did not establish a prima facie case or show that the explanations provided by the Institute and Dr. Ahn were pretextual. For purposes of reconsideration, Russo challenges the summary judgment standard used by the court and the McDonnell-Douglas analysis.

1. Evidence

Russo asserts that the court erred - in crediting evidence from witnesses whom she deems to be biased in favor of Dr. Ahn or whose testimony she deems to be unreliable, and by resolving disputed facts in favor of Dr. Ahn. She argues that the court failed to follow the summary judgment standard described in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000), and that the decision on Counts III and V must be vacated.

Under Russo's interpretation of Reeves, the court must disregard all evidence that the jury might not credit, which includes all evidence from interested witnesses. The First Circuit interprets the Reeves standard differently: "'At summary judgment we need not exclude all interested testimony,

Case 1:21-cv-00003 Document 84 Filed 02/10/2025 Page 6 of 19

specifically testimony that is uncontradicted by the nonmovant.'" Lopez-Hernandez v. Terumo Puerto Rico LLC, 64 F.4th 22, 30-31 (1st Cir. 2023) (quoting Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 856 (1st Cir. 2008)). The court, of course, follows and applies the standard set by the First Circuit Court of Appeals and finds no evidence that was improperly credited or ignored.

Many of the background facts that Russo challenges as being resolved in Dr. Ahn's favor are not material to the summary judgment result. Russo also failed in her objection to summary judgment to properly contest some of the facts she now asserts were resolved against her.[5] Of particular note, Russo relies on

[5] Russo challenges the testimony of Kerri Ahn, Dr. Ahn's wife, that Russo was rude, hostile, and unprofessional during a conversation with Dr. Ahn, which Mrs. Ahn overheard while they were traveling in a car. Russo argues that Mrs. Ahn's testimony should not be credited because she is an interested witness and because she did not recall other details about the conversation, such as the specific words used, who initiated the call, and who was in the car during the call. Russo has not shown that those details are material to the substance of Mrs. Ahn's testimony about Russo's tone during the call. Russo also does not dispute that the call occurred or that Mrs. Ahn knew Russo from prior work experiences. Mrs. Ahn explained her limited memory of the call: "The reason the conversation stood out to me, because he [Dr. Ahn] gets a lot of phone calls on the weekends, is just the tone of that conversation was rude and hostile and unprofessional and a little surprising to hear somebody talking to their coworker that way." Doc. no. 42-8, at 8-9. Mrs. Ahn's testimony about the call was not contradicted by evidence that (1) the call did not happen, (2) that she was not in the car, or (3) that she did not hear Russo's tone during the call, as she described in her deposition.

a report prepared by an independent investigator, Elizabeth Bailey, who provided her findings in a letter on September 24, 2019, and on notes taken by Bailey in the course of her investigation. Russo argues that various witnesses' statements to Bailey or their failure to include information that was in their deposition testimony contradict their deposition testimony. As Dr. Ahn points out, however, Russo has not shown that the report, Bailey's findings, or Bailey's notes are cognizable evidence for purposes of summary judgment. See Fed. R. Civ. P. 56(c)(2); see also Pena v. Honeywell Int'l, Inc., 923 F.3d 18, 30 (1st Cir. 2019) (discussing rule pertaining to creation of a factual dispute by contradicting a previous sworn statement).

The court agrees with Dr. Ahn that the record evidence properly supports the factual bases for summary judgment as determined in the order granting summary judgment. Doc. no. 64. As such, Russo has not demonstrated a manifest error of fact.

2. Proof of Discrimination

In her motion for reconsideration, Russo states that the court "chastised" her in the summary judgment order for failing to address the elements of a prima facie case. She argues that the court erred in not putting the burden on the defendants to challenge a prima facie case. In her reply, Russo relies on

Ripoli, 123 F.4th at 571-72, to argue that the court erred in its analysis of the discrimination element of her aiding and abetting claim. She argues that Ripoli requires reinstatement of that claim.

Russo contends that under the McDonnell-Douglas burden-shifting framework, as construed in Ripoli, her prima facie case of discrimination and her evidence of pretext are sufficient to establish gender discrimination by the Institute for purposes of her aiding and abetting discrimination claim against Dr. Ahn. In Ripoli, the court stated that "[w]hether summary judgment is appropriate in any given instance depends on multiple factors, including the strength of the plaintiff's prima facie case, the probative value of the proof of pretext, and any other appropriately considered evidence." Ripoli, 123 F.4th at 572. Further, generally "'a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. (quoting Reeves, 530 U.S. at 143). If a plaintiff meets that burden, "a plaintiff need not necessarily introduce 'additional, independent evidence of discrimination.'" Id. (quoting Reeves, 530 U.S. at 149).

Russo asserts that her prima facie case is strong and undisputed and that the defendants' explanations for her

Case 1:21-cv-00043-SM-TSM Document 84 Filed 02/21/2025 Page 9 of 19

termination shifted, supporting an inference of pretext. Based on that view of her evidentiary showing, Russo asserts that she need not provide any further evidence of discrimination or discriminatory intent to avoid summary judgment and that the court erred in granting summary judgment in favor of Dr. Ahn. The court disagrees.

a. Prima facie case

If a plaintiff intends to rely on the burden-shifting framework to avoid summary judgment on a discrimination claim, she "first must make a prima facie showing of discrimination." Ripoli, 123 F.4th at 571; see also Sutherland v. Peterson's Oil Serv., Inc., --- F.4th ---, 2025 WL 211897, at *4 (1st Cir. Jan. 16, 2025). As the court pointed out in the order granting summary judgment, Russo provided no evidence and made no showing to demonstrate a prima face case of discrimination in her objection to summary judgment, and in fact, she failed to address a prima facie case at all. Doc. no. 64, at 17. For that reason, Russo did not even begin, much less complete, the first step that would have shifted the burden to Dr. Ahn to "provide a legitimate, non-discriminatory reason for the adverse employment action." Ripoli, 123 F.4th at 572. In the absence of a prima facie case, summary judgment could have been granted without considering Russo's other arguments. The court,

however, continued on to consider the arguments that Russo did present, presuming she could make a prima facie case, and found she had not rebutted Dr. Ahn's reason for seeking the termination of her employment: that he could not work with Russo because she was disrespectful, insubordinate, and difficult to work with.

Russo argues that Dr. Ahn is at fault for not challenging her failure to present a prima facie case. She argues, without citation to authority, that if defendants do not challenge a plaintiff's prima facie case, then the court must assume plaintiff can make that showing. Because it was Russo's burden to establish her prima facie case, Ripoli, 123 F.4th at 571, Dr. Ahn is not responsible for her failure to do so. But the court assumed she could make the required minimal showing based on the summary judgment record: she is a member of a protected class, she may (or may not) have performed her job satisfactorily, and she was terminated from her employment. She has not shown, however, that her termination occurred under circumstances that would support an inference of discrimination rather than the non-discriminatory reason given: a personality conflict with Dr. Ahn that her conduct was said to have precipitated.[6] That is far

[6] Although Russo contends that she was terminated because she is female, the record shows that the Institute board voted to terminate Russo based on Dr. Ahn's report that he could not work

from a strong prima facie case presenting circumstances sufficient to show the employer's explanation to be false.[7]

---

with her because she was disrespectful, insubordinate, and difficult to work with. Russo argued in her objection to summary judgment that Dr. Ahn's opinion of her was the result of gender stereotyping, but in light of the incidents that occurred between Russo and Dr. Ahn, the record did not support Russo's interpretation. In her objection's statement of facts, Russo purported to show that Dr. Ahn preferred working with male staff and had a history of problems with female staff. Doc. no. 47, at 10-14. The statements provided for that purpose, however, to the extent they suggest an anti-female bias at all, are arguments, not facts, and statements that are largely unsupported by competent evidence for summary judgment. Doc. no. 55, at 6-7, see Fed. R. Civ. P. 56(c); Rios v. Centerra Grp. LLC, 106 F.4th 101, 114 (1st Cir. 2024) (holding that office gossip and other hearsay "outside the personal knowledge of a testifying witness" are not competent evidence to oppose a motion for summary judgment); Klauber v. VMware, Inc., 80 F.4th 1, 7 (1st Cir. 2023) ("When adjudicating a motion for summary judgment, a district court customarily may consider only evidence that would be admissible at trial."). For example, Timothy Miller's declaration confirms Dr. Ahn's universally difficult temperament (which he describes as explosive) and demonstrates that his methods for dealing with Dr. Ahn worked better than Russo's. To the extent Russo argues that she lacked competent evidence to support her theory of gender bias because of missing documents, those issues were addressed and decided previously. Doc. no. 37.

[7] Even if Russo could now provide competent evidence of discriminatory animus, it is too late. Russo did not ask for more time to pursue discovery with a supporting affidavit, which is required to avoid summary judgment on the record presented. Fed. R. Civ. P. 56(d); Radfar v. City of Revere, No. 20-CV-10178-IT, 2024 WL 5009072, at *1, n.3 (D. Mass. Dec. 5, 2024) ("In the absence of a Rule 56(d) affidavit, an open motion to compel, or a Rule 37(b) motion, the court finds that any argument that discovery was incomplete has been waived."). A motion for reconsideration is not an opportunity to fix procedural errors or make new arguments. Álvarez, 682 F.3d at 31.

In contrast, the plaintiff in Ripoli addressed each element of the prima facie case, and the defendant did not dispute her proof of the elements. 123 F.4th at 572. She established that she was a member of two protected groups because she is female and a lesbian, that she was qualified for her position, and she was discharged under circumstances giving rise to an inference of discrimination. Id. Specifically, the court found that plaintiff demonstrated that she

> was the only female and only gay employee on the [defendant's] executive team, and she was the only employee who was fired; there was no compelling impetus, budgetary or otherwise, to send her packing; the State had a continuing need for her work and skills; she was arguably replaced by a less-qualified heterosexual male; and the State kept her in the dark about the availability of [another employment] opportunity.

Id. Even if Russo provided competent evidence of circumstances that would support an inference of discrimination in the context of a strong prima facie case, she still did not establish a factual dispute at the next step, pretext.

b. Evidence of pretext

Following a prima facie case of discrimination, the burden shifts to the defendant "to articulate a legitimate, non-discriminatory reason for terminating [the plaintiff's] employment." Ripoli, 123 F.4th at 573. If the defendant provides a non-discriminatory reason, the burden shifts back to

the plaintiff to show that the reason given is a pretext for discrimination, that is, to show that a genuine factual issue exists as to pretext. Id. at 574. Depending on the specific facts of the case, a plaintiff who can show that the employer's stated reason for the adverse action is false may not have to provide additional evidence of discrimination to prove that the true reason is discriminatory. Id. at 574-75. On summary judgment, the court must determine "whether the [plaintiff] has identified enough evidence to enable a rational factfinder to infer that unlawful discrimination was a determinative factor in the [defendant's] termination of her employment." Id. at 575.

In her objection to summary judgment, Russo did not argue that the Institute's reasons given for her termination were false. She stated that the Institute and Dr. Ahn provided different and shifting explanations for her termination, which were: "(1) because she voluntarily agreed in advance to part company if the relationship wasn't working; (2) due to 'irreconcilable differences' with Ahn, and (3) because of her insubordinate and unprofessional behavior." Doc. no. 47, at 23. She argued that those explanations were pretexts for discrimination. The court acknowledged that a plaintiff might demonstrate pretext by showing that the employer gave different and inconsistent explanations if she can show "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions [such] that a reasonable factfinder could rationally find [that the proffered reason for termination is] unworthy of credence." Cocuzzo v. Trader Joe's E. Inc., 121 F.4th 924, 935 (1st Cir. 2024). The court concluded, however, that Russo did not meet that standard and that the cited reasons were not shifting, different, or inconsistent.

To the extent Russo raises pretext for purposes of reconsideration, she has not shown any error. For these reasons, Russo has not provided grounds for reconsidering the order granting summary judgment on her aiding and abetting claim against Dr. Ahn.

B. Defamation

Russo asks the court to reconsider summary judgment on her defamation claim, arguing that the court did not address defamation per se and disputing that the alleged defamatory statements constitute opinion rather than statements of fact. Russo alleged in the complaint that Dr. Ahn had made false statements "that Russo was trying to get out of doing work, that she yelled at him and had been disrespectful including using profanity toward him" and that she "had a history of avoiding work-related tasks." Doc. no. 1, ¶¶ 118 & 119. In the motion for summary judgment, Dr. Ahn challenged Russo's defamation claim on grounds that she lacked any competent evidence that he

ever made the statements that she alleged were defamatory, that some alleged statements were not defamatory, and that some were statements of opinion.

In her objection to summary judgment, Russo addressed defamation in one page, asserting generally that Dr. Ahn had misstated defamation law and challenging Dr. Ahn's argument that the statement Russo alleged he made, that Russo avoids doing work for him, was opinion, not actionable defamation. She did not address the other grounds for summary judgment raised by Dr. Ahn or the other allegedly defamatory statements alleged in her complaint. The court concluded that the alleged statement about avoiding work was non-actionable opinion and granted summary judgment on the defamation claim.

In her motion for reconsideration, Russo states that the court overlooked defamation per se and improperly narrowed her allegations. To the extent Russo raises other allegations from the complaint on reconsideration, she did not address those allegations in opposition to summary judgment and cannot add new arguments for purposes of reconsideration. She also did not provide any developed argument in her motion for reconsideration to address any other allegedly defamatory statements, with the result that any such argument is waived. See, e.g., Emigrant Mortg. Co., Inc. v. Bourke, No. 24-1210, --- F.4th ---, 2025 WL 325872, at *3 (1st Cir. Jan. 29, 2025); Thornton v. Ipsen

Biopharmaceuticals, Inc., 126 F.4th 76, 85 (1st Cir. 2025); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work.")

1. Defamation Per Se

Russo argues that the alleged statements about avoiding work are defamation per se and that the court ignored that part of her claim. She states: "Because Ahn's statement, which suggests that Plaintiff both avoids work and avoids work for the orthopedic surgeons at NHNSI, is one that did, in fact, injure Plaintiff in her trade or profession, it may reasonably be understood to imply the existence of defamatory facts underlying Defendant's opinion." Doc. no. 78, at 11. Russo's theory of defamation per se is not properly before the court, because she did not raise defamation per se in her objection to summary judgment. See, e.g., United States v. Rivera-Rodríguez, 75 F.4th 1, 26 (1st Cir. 2023) (holding that government could not raise a new argument for the first time on reconsideration even "under the banner of correcting 'manifest errors' by the court"). Further, her new argument is neither clear nor persuasive.

The doctrine of defamation per se generally pertains to damages: "It is well established in New Hampshire that no proof

of specific damages is required when the jury could find that the defamatory publication charged the plaintiff with a crime or with activities which would tend to injure him in his trade or business, commonly called libel per se." MacDonald v. Jacobs, 171 N.H. 668, 674 (2019). The issue presented for summary judgment was not whether the alleged statements are defamatory or whether Russo can prove damages, but instead the issue was whether those statements were non-actionable defamatory opinion.[8] Russo has not shown that defamation per se is material to the court's disposition of the defamation claim on summary judgment.

2. Opinion

Russo argues briefly, combined with her theory of defamation per se, that Dr. Ahn's alleged statement that she avoids work is actionable, even if it is opinion, because it could reasonably be understood to imply the existence of defamatory facts as the basis for the opinion. In total, Russo states:

[8] It is unclear what relationship Russo perceives between defamation per se and non-actionable opinion. She cites no authority that opinion is actionable if it meets the requirements for defamation per se. If she intended to argue that Dr. Ahn's opinion about her avoiding work implies underlying undisclosed defamatory facts that are defamatory per se, she has not sufficiently articulated or developed that argument to allow the court to respond.

> When arguing for Plaintiff's termination, Defendant argued that Plaintiff avoided doing work for him on multiple specific occasions. Defendant made these claims even though he knew that they were not true at the time that he said them. Because Ahn's statement, which suggests that Plaintiff both avoids work and avoids work for the orthopedic surgeons at NHNSI, is one that did, in fact, injure Plaintiff in her trade or profession, it may reasonably be understood to imply the existence of defamatory facts underlying Defendant's opinion.

Doc. no. 78, at 11.

Opinion can be actionable defamation if the opinion implies underlying and undisclosed false and defamatory facts. Richards v. Union Leader Corp., 176 N.H. 789, 798 (2024). Opinion is not actionable defamation, however, if the speaker communicates the non-defamatory facts that underly his opinion. Id. at 800-01; Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015). Russo does not explain what specific underlying and undisclosed defamatory facts might be implied from Dr. Ahn's opinion about her avoiding work.

Instead, Russo asserts that Dr. Ahn did provide the underlying reasons for his opinion to the board when he argued that Russo "avoided doing work for him on multiple specific occasions." Doc. no. 78, at 11. Russo further states that Dr. Ahn knew his opinion was not true, possibly to suggest that any implied facts are false and defamatory. But Russo points to no evidence to support her speculation about what was said at the board meeting or what Dr. Ahn knew. Soto-Ocasio v. Fed. Exp.

Corp., 150 F.3d 14, 18 (1st Cir. 1998) ("The party seeking to avoid summary judgment 'must be able to point to specific, competent evidence to support his claim, mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact." (internal quotation marks omitted)).

As such, Russo has not pointed to evidence that would, at a minimum, create a genuine material factual dispute as to whether there were implied undisclosed, underlying, false, and defamatory facts for Dr. Ahn's opinion that she avoided doing work. In the absence of that evidence, Russo has not shown an actionable defamation claim that can survive summary judgment.

## Conclusion

For the foregoing reasons, the court denies the plaintiff's motion for reconsideration (doc. no. 78).

SO ORDERED.

Steven J. McAuliffe
United States District Judge

February 24, 2025

cc: Counsel of Record

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Gina Russo

v. Case No. 21-cv-703-SM-TSM
Opinion No. 2025 DNH 056

New Hampshire Neurospine Institute, P.A. and Uri M. Ahn

**Memorandum Order**

Gina Russo brought claims against her former employer, New Hampshire Neurospine Institute, P.A. ("Institute"), and a surgeon in that practice, Uri M. Ahn. After granting summary judgment in favor of Dr. Ahn, the court granted the Institute an opportunity to move for summary judgment on Russo's claims against it.[1] The Institute filed its motion, and Russo objected. For the reasons that follow, the Institute's motion for summary judgment is granted.

Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are material when they have the potential

[1] The Institute unsuccessfully attempted to join Dr. Ahn's motion for summary judgment, which was explicitly limited to the claims against him. Doc. no. 63, at 1.

to affect the outcome of the suit under the applicable law . . . [a]nd a dispute is genuine when the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." Quintana-Dieppa v. Dep't of Army, 130 F.4th 1, 7 (1st Cir. 2025). The court takes the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. Rodrique v. Hearst Commns., Inc., 126 F.4th 85, 89 (1st Cir. 2025).

## Background

Gina Russo began working at the New Hampshire Neurospine Institute as a physician's assistant ("PA") in March of 2008. Dr. Ahn is an orthopedic surgeon and a partner at the Institute. Until 2016, the orthopedic surgery and neurosurgery sections of the practice operated separately. Russo worked part-time in neurosurgery.

After the two practice sections merged, staff worked with surgeons in both sections, and, as a result, Russo began to work with Dr. Ahn.[2] The record evidence establishes that Dr. Ahn and Russo had a strained relationship. Dr. Ahn thought that Russo generally tried to avoid work and specifically tried to avoid

[2] The PAs do their own scheduling, but only full-time PAs serve as scheduler for PAs. Russo was excluded from that position because of her part-time status.

working with him. For her part, Russo thought that Dr. Ahn was lazy and cut corners.

Between 2016 and early 2019, three incidents occurred in which Dr. Ahn thought Russo acted unprofessionally and was rude and insubordinate. Russo thought that she acted appropriately under the circumstances.

(1) In October of 2016, Dr. Ahn called Russo and asked her to see a patient of his at St. Joseph's Hospital in Nashua. At the time, she was attending another surgeon's patient at Elliott Hospital in Manchester. Russo told Dr. Ahn she could not leave the patient at Elliott Hospital, which Dr. Ahn found to be unhelpful and disrespectful. Dr. Ahn also did not believe Russo's given reasons for not immediately going to St. Joseph's Hospital until he confirmed the circumstances with the surgeon involved at Elliott Hospital.

(2) During the summer of 2017, Russo was in a preoperative meeting with Dr. Ahn's patient, for the purpose of obtaining informed consent to scheduled surgery. The patient asked Russo about reducing the risk that he would need additional surgeries. Russo sought out and consulted with a different surgeon, Dr. Luther, about possible alternatives to the procedure planned and scheduled by Dr. Ahn. Russo then advised the patient that

Dr. Luther thought an alternative was plausible. The patient's wife then called Dr. Ahn and asked about changing the procedure, requiring Dr. Ahn to further explain and justify the procedure he planned. Dr. Ahn told (and may have yelled at) Russo that her interaction with the patient was not appropriate.

(3) On March 9, 2019, Dr. Ahn called Russo and asked her to help him discharge a patient at Elliott Hospital. Russo was at Catholic Medical Center. Russo asked Dr. Ahn whether he wanted her to go to Elliott Hospital or talk him (Dr. Ahn) through the discharge process. Dr. Ahn took exception to her reaction, and they engaged in a heated exchange in which both raised their voices.

After the second incident, when Russo suggested an alternative surgical procedure to Dr. Ahn's patient without first consulting him, Dr. Ahn decided that he did not want Russo to work with him in the operating room. After the third incident, Dr. Ahn decided that he would not work with Russo at all.

At a board meeting on March 25, 2019, Dr. Ahn presented his case, arguing that Russo had been disrespectful, insubordinate, and difficult to work with, and, he said, he would leave the practice unless the partners voted to terminate her employment. Faced with that choice, the partners voted unanimously to

terminate Russo’s employment, although not all the partners agreed with Dr. Ahn’s presentation or his assessment of Russo.

Anne Talbot-Kleeman, the Institute’s executive director, notified Russo of the partners’ vote the next day. Russo continued working for the Institute during a transition period, during which Russo and the Institute discussed a potential severance payment and her continued work with an Institute physician at the Hillsborough County Nursing Home as an independent contractor. That period ended on May 2, 2019, after the Institute received her attorney’s demand letter alleging gender discrimination and seeking $100,000 in damages. She began a new job in July of 2019.

Russo brought suit against Dr. Ahn and the Institute. The court granted summary judgment in favor of Dr. Ahn on the claims against him. Three claims remain against the Institute: gender discrimination in violation of Title VII and RSA ch. 354-A (Count I);[3] retaliation in violation of Title VII and RSA ch. 354-A (Count II); and common law wrongful termination (Count IV).

[3] The reference to Title VII is to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the reference to RSA ch. 354-A is to New Hampshire’s Law Against Discrimination, New Hampshire Revised Statutes Annotated Chapter 354-A.

Case 1:21-cv-00019-... Document 93 Filed 04/21/2025 Page 6 of 34

## Discussion

The Institute moves for summary judgment on the claims against it. In support, the Institute initially asserts that the court's order granting summary judgment in favor of Dr. Ahn estops Russo from opposing summary judgment on the discrimination claim. The Institute also asserts that it neither retaliated against Russo nor wrongfully terminated her and that Russo cannot show a triable factual dispute on either claim. Russo objects to summary judgment, arguing that material factual disputes preclude summary judgment in favor of the Institute.

### A. Count I - Discrimination

In Count I, Russo alleges that the Institute discriminated against her because of her gender in violation of Title VII and RSA ch. 354-A.[4] She alleges, "Ahn, her supervisor, engaged in stereotypical thinking toward women and subjected Russo to disparate treatment and hostility because of her gender and [the Institute], aware of this unlawful behavior, further caused

[4] Under New Hampshire law, the court relies on federal cases, interpreting Title VII, to decide analogous discrimination claims under RSA ch. 354-A. Zerveskes v. Wentworth-Douglass Hosp., No. 24-cv-025-SE-TSM, 2024 WL 4301375, at *2 (D.N.H. Sept. 26, 2024) (citing Hubbard v. Tyco Integrated Cable Sys., Inc., 985 F. Supp. 2d 207, 218 (D.N.H. 2013)).

Russo to experience an adverse employment action because Ahn demanded it." Doc. no. 1, at 21, ¶ 102. As such, Russo's discrimination claim is premised on Dr. Ahn's treatment of her and the Institute's decision to terminate her employment in response to Dr. Ahn's request.

1. <u>Collateral estoppel and law of the case</u>

The Institute, in support of its motion for summary judgment on the discrimination claim in Count I, argues that the court found in the prior order, granting summary judgment in favor of Dr. Ahn, that the Institute did not discriminate against Russo.[5] The Institute further argues that Russo is now collaterally estopped from asserting that the Institute discriminated against her, based on the prior summary judgment order. The Institute, however, is mistaken.

Russo alleged that Dr. Ahn aided and abetted the Institute in discriminating against her. To preclude summary judgment on that claim, Russo had to demonstrate that there was at least a material factual dispute as to whether Dr. Ahn aided and abetted

[5] The Institute also relies on the report provided by an independent investigator, Elizabeth Bailey, who investigated Russo's allegations of gender discrimination. Bailey concluded that while Dr. Ahn and other surgeons may have acted unprofessionally, their conduct did not show gender bias. The court does not consider Bailey's report or her conclusions, which are likely inadmissible hearsay on the question of gender bias by the Institute and its employees. <u>See</u> Fed. R. Evid. 801; Fed. R. Civ. P. 56(c)(2).

the Institute in discriminating against her. Doc. no. 64, at 13-19. The court concluded that based on the scant evidence presented for purposes of Dr. Ahn's motion for summary judgment, Russo did not meet that burden and granted summary judgment in Dr. Ahn's favor. Id.

The court made no finding that the Institute did not discriminate against Russo.[6] Instead, the court concluded that, based on the evidence presented for purposes of Dr. Ahn's motion, Russo failed to establish at least a genuine and material factual dispute as to whether the Institute discriminated against her, which was necessary to maintain the aiding and abetting claim against Dr. Ahn. The court's prior order does not provide the factual support that the Institute ascribes to it. The Institute's motion is separate from Dr. Ahn's motion and requires its own evidentiary support.

Further, collateral estoppel applies only when a court has determined an issue in a prior action by a valid and binding final judgment.[7] Ramallo Bros. Printing v. El Dia, Inc., 490

---

[6] "[T]he summary judgment standard requires the trial court to make a legal determination rather than to engage in factfinding. . . ." United Paperworkers Int'l Union Loc. 14, AFL-CIO-CLC v. Int'l Paper Co., 64 F.3d 28, 31 (1st Cir. 1995).

[7] The Institute cites New Hampshire cases for the collateral estoppel standard. When the decision to be given preclusive effect is federal, however, the federal standard applies. Faigin v. Kelly, 184 F.3d 67, 78 (1st Cir. 1999).

F.3d 86, 90 (1st Cir. 2007). The prior summary judgment order that the Institute relies on here is an interlocutory order addressing claims against one of two defendants in an open case, not a final judgment. See Davis v. Lehane, 89 F. Supp. 2d 142, 147 (D. Mass. 2000) (explaining that interlocutory orders are not final and are subject to revision and amendment). No valid and binding final judgment has been issued in this case, which prevents the summary judgment order from having preclusive effect at this time.[8]

The Institute also mentions the law-of-the-case doctrine as a basis for precluding further factual development of Russo's

[8] The Institute asserts that collateral estoppel can also apply between parties within the same case, but the case it cites, Merrimack St. Garage, Inc. v. Gen. Motors Corp., 667 F. Supp. 41, 44 (D.N.H. 1987), does not support that theory. Instead, the issue presented there was whether remand following appeal "opens the door for counsel to bring forth new theories of recovery, even though the cause of action is unchanged." The plaintiff argued that res judicata did not apply on remand. The court wrote:

> The fact that a case is remanded for further proceedings does not automatically render res judicata attachment inapplicable. Absent unusual circumstances, a judgment affirmed is final for res judicata purposes as to those parts of the action no longer subject to litigation; that is, determination of a cause of action is final and binding as to matters affirmed by a court of appeals regardless that litigation might continue on some limited matters directly related thereto.

Id. A case is appealed after final judgment is entered, which gives rise to res judicata. Here, no final judgment has been entered. Therefore, the reasoning in Merrimack Street Garage is inapposite to the question of whether the summary judgment order could have preclusive effect here.

discrimination claim. "The law-of-the-case doctrine generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" B.R.S. Real Est., Inc. v. Certain Underwriters at Lloyd's, London, 110 F.4th 442, 447 (1st Cir. 2024) (quoting Musacchio v. United States, 577 U.S. 237, 244-45, (2016)); Pérez-Ruiz v. Crespo-Guillén, 25 F.3d 40, 42 (1st Cir. 1994) ("Interlocutory orders, including denial of motions to dismiss, ... do not constitute law of the case."). Because the Institute appears to invoke the law-of-the-case doctrine to establish facts, not law, it has not shown the doctrine applies to preclude Russo's discrimination claim against the Institute.

Neither collateral estoppel nor law-of-the-case doctrine establishes facts pertaining to whether the Institute discriminated against Russo for purposes of the Institute's motion for summary judgment. For that reason, the court's prior summary judgment order does not establish facts for purposes of the Institute's motion for summary judgment.

2. Merits

The Institute argues that it is entitled to summary judgment on Russo's discrimination claim. It asserts that the record establishes that the partners voted to terminate Russo only to avoid Dr. Ahn's resignation from the practice. The undisputed evidence shows that, based on Dr. Ahn's presentation

at the board meeting and the partners' discussion, while some partners did not share Dr. Ahn's opinion of Russo, they concluded there was no arrangement in which Russo and Dr. Ahn could both remain in the practice.[9] Russo contends, however, that Dr. Ahn's presentation against her was false and was based on his discriminatory animus rather than on legitimate reasons to terminate her employment.

a. Dr. Ahn's discriminatory intent

Russo contends, as she did in opposing Dr. Ahn's motion for summary judgment, that the court may infer from Dr. Ahn's behavior that he "is affected by animus or bias." Doc. no. 86-1, at 26. Russo, however, has not established that Dr. Ahn's

[9] Talbot-Kleeman (the Institute's executive director) testified at her deposition as follows about the discussion and vote by the partners:

> Everyone gave their verbal opinion of the situation and whether they had further feedback about the situation and it was unanimous that there was no other alternative. These two individuals had to work together in some capacity. There was no way to pull Gina [Russo] completely away from working with Dr. Ahn and also to a degree there would be some undercurrent of there being a situation of her feeling that this doctor was, in her words, lazy, cut corners, spent five minutes with patients. Things like that that she said and along the lines of I'll never apologize and I just couldn't envision a manner in which a person with that feeling about one of our medical providers would work in the same environment with them whether she was seeing their patients directly or not.

Doc. no. 83-2, at 11.

alleged discriminatory animus is attributable to the Institute in the circumstances she describes. As part of her statement of facts, Russo asserted, without citation to any evidence or legal authority, that "because Ahn, a NHNSI Partner, is an agent of NHNSI, who acted as both a decision-maker and someone who influenced the employment decisions at issue [ ], all allegations regarding Ahn are, as a matter of law, also allegations concerning the Practice." Doc. no. 86-1, at 3. Based on the record and argument presented, Russo has not shown that the Institute is liable for any discriminatory animus that might be attributable to Dr. Ahn. Despite that omission, the court will consider Russo's discrimination theory, assuming without deciding that Russo could establish that the Institute shared or was liable for Dr. Ahn's alleged discriminatory bias.

(1) Cat's paw liability

Although she does not identify it as such, Russo may have intended to present a "cat's paw" theory of liability. Under a cat's paw theory, "an employer can be held liable when a decision-making official [like the Institute] relies on false information that is manipulated by another employee who harbors illegitimate animus to take an adverse employment action." Brandt v. Fitzpatrick, 957 F.3d 67, 79 (1st Cir. 2020); see also Donovan v. Nappi Distributors, 703 F. Supp. 3d 135, 262 (D. Me. 2023). That is, "cat's paw liability can attach if an employee

performs an act motivated by animus that is intended to cause an adverse employment action, and if that act is a proximate cause of an adverse employment action." Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 70 (1st Cir. 2015) (citing Staub v. Proctor Hosp., 562 U.S. 411 (2011)).

Here, however, as presented, the partners did not rely on the "truth" of Dr. Ahn's presentation against Russo, and did not vote to terminate her employment based on acceptance of his perception or the information he provided. Instead, whether they believed Dr. Anh's presentation to be true or not and whether they considered Russo culpable or not, they voted unanimously to terminate Russo because of the choice Dr. Ahn presented: if they did not terminate Russo's employment, he would leave the practice. As such, the Institute did not rely on false information provided by Dr. Ahn about Russo to make the decision to terminate her employment.

(2) Biased conduct

Russo relies on the analyses in Burns v. Johnson, 829 F.3d 1, 15-16 (1st Cir. 2016), and Thomas v. Eastman Kodak Co., 183 F.3d 38, 64 (1st Cir. 1999), to show that Dr. Ahn could be found to be biased against her based on her gender. Specifically, Russo contends that Dr. Ahn was "'inappropriately upset or angry with [Russo], to the point of behaving unprofessionally.'" Doc. no. 86-1, at 26 (quoting Burns, 829 F.3d at 15-16 (quoting

Thomas, 183 F.3d at 64)). In Burns, the plaintiff's supervisor demonstrated antipathy toward her from the time the supervisor arrived, gave her negative job performance assessments when her assessments from others were highly positive, did not recognize her noteworthy accomplishments, and wielded a baseball bat around the plaintiff in an "intimidating manner." 829 F.3d at 15-16. In Thomas, the plaintiff was the only black employee when a new white manager arrived. She then received much lower evaluations than she had previously, and the manager became inappropriately upset with the plaintiff at times. 183 F.3d at 64. The supervisors in those cases generally behaved badly toward the plaintiffs without apparent explanatory provocation or reason, other than the inferred reason of their gender or race.

Here, Russo points to the incident in October of 2016 when she was attending a patient at Elliott Hospital and Dr. Ahn called to ask her to leave in order to see an urgent patient of his at Saint Joseph's Hospital. That interaction devolved into a heated exchange between Russo and Ahn, in which raised voices were used. Russo argues that the incident shows that Dr. Ahn overreacted, which could support an inference that Dr. Ahn was biased against her because she is female.

The court disagrees. Unlike the circumstances in Burns and Thomas, where the supervisors generally and without provocation

or arguable cause behaved inappropriately and badly in interacting with an employee, here Dr. Ahn reacted to a particular situation involving his request for help from Russo for his patient. Whether he "overreacted" to Russo's reaction to his request or not, there were apparent and sufficient nondiscriminatory reasons for Dr. Ahn's reaction. Russo does not point to any evidence of pretext, and that incident does not support an inference of gender bias.

Russo also asserts, without citation to record evidence, that "Ahn's exclusion and lack of faith in female PA-Cs in his operating room, where he did not experience a similar or equivalent failure with male PA-C – even those who literally failed - is further compelling evidence from which a jury could find disparate treatment on the basis of sex." Doc. no. 86-1, at 26-27. The citations Russo provided in her factual statement demonstrate that Dr. Ahn did not want to operate with Russo as the PA, which is undisputed. But, the other referenced evidence does not support Russo's theory that Dr. Ahn excluded all female PAs from working with him in the operating room.[10] Russo's

[10] For example, several documents are excerpts of text messages that Russo's counsel identifies as exchanges between Laura Humen and Georgia Plamondon, who apparently were PAs at the Institute between 2016 and 2019. The cited pages show that Humen and Plamondon were critical of some of the conditions of their employment and of some of the surgeons, but that evidence does not show that Humen or Plamondon were excluded from operating with Dr. Ahn because of their gender.

opinion about Dr. Ahn's biases without pointing to supporting evidence does not provide a competent basis for an inference of disparate treatment. Russo has not demonstrated a factual basis for finding pretext based on disparate treatment.

b. Pretext

Russo argues that the Institute's given reasons for her termination were pretexts for discrimination. A plaintiff opposing summary judgment on a Title VII discrimination claim may rely on the McDonnell Douglas burden-shifting framework to support the claim.[11] Ripoli v. Dep't of Hum. Servs., Off. of Veterans Servs., 123 F.4th 565, 571 (1st Cir. 2024). "Under that framework, the plaintiff in a discrimination case first must make a prima facie showing of discrimination . . . [by] establish[ing] that she was a member of a protected class, that she was qualified for the job, that she suffered an adverse employment action, and that the adverse employment action transpired under circumstances giving rise to an inference of discrimination." Id. (internal quotation marks and citations omitted).

"Once the plaintiff carries her burden of showing a prima facie case, the burden of production shifts to the defendant,

[11] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, (1973).

who must provide a legitimate, non-discriminatory reason for the adverse employment action." Id. at 572. "As long as the defendant is able to put forth such an explanation, the burden then reverts to the plaintiff to show that the defendant's stated reason for the adverse action was a pretext for discrimination." Id. "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. (internal quotation marks omitted).

Russo gives her prima facie case only cursory mention, and instead focuses on whether the Institute's stated reasons were pretextual.[12] She contends that the Institute imposed a series of adverse employment actions against her and gave pretextual reasons when the real reason for those actions was that she is female.

A plaintiff may demonstrate pretext, which provides a basis for inferring unlawful discrimination, by showing that the reasons given by the employer for an adverse action are false.

---

[12] The strength of a plaintiff's prima facie case may tip the evidentiary balance in favor of the plaintiff. Ripoli, 123 F.4th at 572. Russo, however, does not rely on the strength of her prima facie case.

Ripoli, 123 F.4th at 575. "Pretext [also] can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Sutherland v. Peterson's Oil Serv., Inc., 126 F.4th 728, 741 (1st Cir. 2025) (internal quotation marks omitted); Cocuzzo v. Trader Joe's E. Inc., 121 F.4th 924, 935 (1st Cir. 2024).

Russo identifies the following adverse employment actions and lists the Institute's reasons that she believes were pretextual, as follows:

> Exclusion from Ahn's OR: Ahn (i) lost trust in Russo after speaking with Porter [a PA in the practice]; (ii) lost trust in Russo after the Consent Incident, or (iii) found it difficult to work with Russo because she was part-time and he claims she wasn't as skilled and didn't have as many chances to build those skills.
>
> Termination following the March 21, 2019 Incident: (i) Ahn and Russo had a personality conflict and could not work together, so-called "irreconcilable differences"; (ii) Russo had been disrespectful and insubordinate; (iii) the Partners could not get Ahn to agree on anything short of Russo's termination, or (iv) Russo's complaints about Ahn cutting corners and being unsafe made it clear that they could not work together.
>
> Exclusion from the PA Organizer Role: only PA-Cs who are in the office every day can hold the position due to the nature of the responsibilities.

Doc. no. 86-1, at 25.[13] Russo contends that the Institute's reasons for the adverse actions she identifies are unworthy of credence because Dr. Ahn and the Institute treated male employees more favorably than female employees, because Russo was high performing and highly regarded, and because of stereotyping.[14]

(1) Exclusion from the operating room

To the extent exclusion from working with Dr. Ahn in the operating room was an adverse employment action against Russo, the reasons that she cites and attributes to Dr. Ahn do not demonstrate pretext for gender discrimination. The cited reasons are consistent among themselves and fully plausible.

---

[13] Russo provides no citations to the summary judgment record or to her factual statement to show that the Institute gave those reasons for the listed adverse actions. Russo provided 108 paragraphs in her factual statement and filed 100 exhibits. The court generally would decline to search through the factual statement and exhibits to find evidence that Russo does not specifically cite in support of her arguments. See Tutor Perini Corp. v. Banc of Am. Sec. LLC, 842 F.3d 71, 85 (1st Cir. 2016) ("Judges, after all, are not like pigs, hunting for truffles buried in the record.") (internal quotation marks omitted). Nevertheless, the court will assume that Russo has presented or could present evidence to support these assertions.

[14] In her surreply, Russo cites evidence to show that she was not terminated because of unprofessional and insubordinate conduct. She is correct, and it appears to be undisputed that the Institute terminated her employment because Dr. Ahn told the partners that he would leave the practice if Russo stayed. Russo has not cited evidence to demonstrate that the Institute's reason was pretextual.

Russo's different view of her conduct and performance does not make the nondiscriminatory reasons given by (or attributed to) the Institute either false or so weak as to support an inference of pretext.

(2) Termination

The reasons Russo attributes to the Institute for her termination are also not weak or false. Dr. Ahn gave his reasons to the partners explaining why he would no longer work with Russo. Whether those reasons are weak, true, or false, it is undisputed that those were the reasons he gave. It is also undisputed that Dr. Ahn would not agree to an arrangement other than Russo's termination, and the partners and Talbot-Kleeman were unable to devise another plan that would allow both Russo and Dr. Ahn to remain in the practice. Russo's complaints about Dr. Ahn further support the Institute's explanation that she was terminated because her continued employment was untenable, given the unworkable relationship between her and Dr. Ahn, and his refusal to work with her. Russo has not shown that the attributed reasons support an inference of pretext.

(3) PA scheduling

Russo also asserts that her exclusion from the role of organizing the schedule for the PAs was an adverse employment action. She contends that the Institute's stated reason for excluding her from that role, because she worked part-time, was

not clear and was a pretext for discrimination based on her gender. In response, the Institute demonstrated that a full-time female PA held the scheduling position at one time and that the part-time restriction was not gender-based. Russo fails to point to evidence to show a factual dispute as to whether the restriction of the scheduling position to full-time PAs was a pretext for discrimination against female PAs.[15]

d. Performance

Russo contends that her record of high performance and her history of bonuses and raises support her argument that Dr. Ahn was biased against her because of her gender and not because of her performance. There is no dispute that Russo was a valued employee who received excellent performance evaluations and commensurate bonuses and raises. The Institute has not suggested that Russo's employment was terminated because of her skill level or her performance evaluations. She was terminated because Dr. Ahn told his partners that, given his interaction with Russo, the friction between them, and his disapproval of

[15] Russo inappropriately includes argument in her factual statement. See LR 56.1. Her arguments and theories about discriminatory treatment of female PAs in the factual statement are not cited in support of the relevant part of her memorandum. Compare doc. no. 86-1, at 16-20 with doc. no. 86-1, at 24-28. In any event, she simply does not point to evidence of pretext or discriminatory animus with respect to her discharge or her work assignments or conditions.

her behavior toward him, he would not work with her and he would leave the practice if she were not terminated. Nothing about Russo's skill and performance as a PA shows that the reason for terminating her employment was a pretext for gender discrimination, rather than the poor working relationship she had with Dr. Ahn, and his unwillingness to remain within the practice if she continued.

e. Stereotyping

Russo asserts, again without pointing to record evidence or to particular paragraphs or parts of her factual statement, that Dr. Ahn's "assumptions about Russo, endorsed and adopted by [the Institute] even though the rest of the Partnership almost universally disagrees, are so subjective in nature that they invite stereotyping and are difficult to challenge." Doc. no. 86-1, at 27. She further asserts that the Institute lacked any objective evidence to support the reason for firing her and instead relied only on Dr. Ahn's subjective factors. She speculates that Dr. Ahn had a stereotyped expectation of how women in general should behave toward him, that is, that women should not be assertive. Because Russo was assertive and that conflicted with stereotypical assumptions attributed to Dr. Ahn, Dr. Ahn was necessarily biased against her because of her gender.

Case 1:21-cv-00311-JJM-AEM Document 93 Filed 04/21/25 Page 23 of 34

Russo points to no evidence of Dr. Ahn's alleged stereotypical views of women in general, but the proffered evidence suggests that the Institute's decision to terminate Russo's employment was based on the choice Dr. Ahn presented at the board meeting, based on his perceptions of Russo's rudeness, unprofessionalism, and insubordination. Russo does not dispute that Dr. Ahn presented his reasons for not wanting to work with Russo to his partners at the meeting or that he stated he would leave the Institute unless she was terminated. Even if Dr. Ahn misunderstood or misperceived the incidents that lead to his conclusions about Russo and, even if he was utterly wrong about Russo having been insubordinate, the partners were not asked to vote based on those given reasons. Instead, the record shows that the partners voted to terminate Russo's employment so that Dr. Ahn would stay in the practice. Russo's theory about Dr. Ahn's stereotypical view of women in general does not demonstrate that the Institute's reason for terminating her employment was pretextual, or that Dr. Ahn could be found to harbor such views (on the evidence presented) and manipulated the practice into firing Russo because of his discriminatory views.

Because Russo has not pointed to record evidence giving rise to a factual dispute that requires trial on the

discrimination claim, the Institute is entitled to summary judgment on Count I.

B. Retaliation – Count II

Russo argues briefly that the Institute retaliated against her after receiving her attorney's demand letter on April 29, 2019. The undisputed evidence shows that the following events occurred after the partners voted to terminate Russo's employment at the Institute. Talbot-Kleeman notified Russo of the partner's vote to terminate her employment the day after the vote, on March 26, 2019. On March 29, Talbot-Kleeman spoke with Russo about a post-termination transition and severance plan. During that conversation, Russo said she believed that the vote to terminate her employment was due to a pattern of gender bias against women at the Institute, in which male doctors regularly mistreated women.[16] Russo continued to work after the termination vote and after her conversation with Talbot-Kleeman.

The Institute and Russo began a process of negotiating the terms of her transition and a severance package. In addition to

[16] Although Russo disputed this particular statement from the Institute's statement of facts, her only ground was that the statement was unsupported by the record. That statement, however, was quoted from Russo's complaint. See, e.g., Fed. R. Civ. P. 11. She does not dispute the next statement based on Talbot-Kleeman's deposition testimony that Russo raised gender bias during that conversation.

Case 1:21-cv-00793 Document 93 Filed 04/24/25 Page 25 of 34

the transition period, Russo hoped to be able to continue working as an independent contractor with one of the Institute physicians at the Hillsborough County Nursing Home. Russo and Talbot-Kleeman exchanged potential transition plans, but Russo never agreed to a plan.

On April 29, 2019, about a month after the partners voted to terminate her employment, Russo's attorney sent a letter to Talbot-Kleeman following up on previous discussions about the terms of Russo's proposed transition and a proposed independent contractor agreement. Doc. no. 83-11. In that letter, Russo's attorney made observations about the decision to terminate Russo, about perceived gender issues in the practice, and about Russo's best interests. She stated that she could not advise Russo to accept the Institute's independent contractor agreement (which she apparently expected would include the proposed transition and severance plans). With respect to the lower severance pay amount offered by the Institute for a shorter transition period, Russo's attorney wrote: "it is absurd that the Institute now seeks to penalize Ms. Russo for not wanting to continue working in this hostile and discriminatory environment, for three additional months." Id. at 2. The attorney further stated:

> Ms. Russo also remains willing to reach an amicable and private resolution to the employment matter. She has authorized me to convey that she is willing to

> release her claims against the Institute and its partners for the amount of $100,000.00 (one hundred thousand dollars), which represents less than one year of compensation. Given the duration of her employment the facts surrounding her termination¡ and the Institute's long-standing knowledge of and refusal to address the issues with the partner demanding her termination, we feel this is an appropriate figure.

Id. The Institute's attorney responded to Russo's attorney's demand letter on May 3, 2019, ending the transition period and making Russo's employment termination effective as of May 2, 2019.

Talbot-Kleeman interpreted Russo's demand letter as a threat of litigation for wrongful termination. The Institute's attorney notified Russo's attorney that all requests for references from physicians in the practice for Russo would have to go through the Institute's attorneys. Talbot-Kleeman notified physicians in the practice of that policy. Russo's attorney did not respond to the communication from the Institute's attorney about physician references, and Talbot-Kleeman told Drs. Luther and Jenkins that their references for Russo could not be sent until Russo's attorney sent an "acknowledgment" of that communication. Doc. no. 88-8. Eventually, Russo did obtain references from physicians in the practice, and she was hired and began a new job in July 2019.

It is a violation of Title VII, 42 U.S.C. § 2000e-3(a), for an employer to retaliate against an employee "who has complained

about discriminatory employment practices." Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 115 (1st Cir. 2024). Courts use the McDonnell Douglas framework to evaluate a Title VII retaliation claim. Serrano-Colon v. United States Dep't of Homeland Sec., 121 F.4th 259, 272 (1st Cir. 2024). "To establish a prima facie case of retaliation, [the plaintiff] must prove: (1) she engaged in protected conduct; (2) she was subjected to an adverse employment action; and (3) the adverse employment action is causally linked to the protected conduct." Id. at 272-73 (internal quotation marks omitted). "'An employee has engaged in activity protected by Title VII if she has either (1) opposed any practice made an unlawful employment practice by Title VII[17] or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

---

[17] Title VII, 42 U.S.C. § 2000e-2, provides as follows:

It shall be an unlawful employment practice for an employer--

**(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

**(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

hearing under Title VII.'" Id. at 273 (quoting Fantini v. Salem State College, 557 F.3d 22, 32 (1st Cir. 2009)).

Russo contends that her attorney's April 29 demand letter qualified as protected conduct and that the Institute retaliated against her with an adverse employment action by terminating her employment as of May 2, without a further transition period or the possibility of an independent contractor relationship to work at the Hillsborough County Nursing Home. She also contends that the Institute retaliated against her by preventing individual physicians in the practice from providing references to support her applications for employment. The Institute responds that Russo's employment under the transition period ended on May 2 because her attorney's April 29 letter rejected the Institute's proposals and that the processing restriction on references was consistent with the Institute's policies and intended to prevent inconsistency between the Institute's statements and Russo's statements on her employment applications.

As presented, Russo's attorney's April 29 demand letter notified the Institute of her claims of gender discrimination. Although she had previously raised the issue of gender discrimination in passing during a conversation with Talbot-Kleeman, the letter explicitly made a claim of gender discrimination, suggested litigation, and made a demand for

compensation. In that context, the demand letter qualified as protected conduct - a complaint of gender discrimination.

The disputed issue is whether the Institute imposed an adverse employment action on Russo in retaliation for her claims of gender discrimination. "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006); accord Rodríguez-Severino v. UTC Aerospace Sys., 52 F.4th 448, 464 (1st Cir. 2022). That is, to be actionable, the retaliation must be such "that a reasonable employee would have found the challenged action materially adverse . . . [meaning] it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68. Context is important when assessing the materiality of the adversity to the employee. Id.

Russo contends that the Institute retaliated against her by preventing the surgeons in the practice from giving her employment references. The evidence shows, however, that Talbot-Kleeman directed physicians to pass their references through the Institute's attorney.[18] The process that Talbot-

[18] Whether or not the process directed by Talbot-Kleeman was consistent with an Institute policy or handbook seems beside the point. For that reason, the court will not pursue the issues of whether such a policy applied in these circumstances and whether it had been applied uniformly in the past.

Kleeman imposed may have caused some minor delay in Russo obtaining references, but she provides no evidence that the process caused her any harm or injury.[19]

The undisputed evidence shows that individual physicians provided references for Russo. The evidence also shows that she accepted a new job about two months after she stopped working at the Institute. Taken in context, Russo has not shown that the reference process constituted a materially adverse employment action sufficient to support a retaliation claim.

To the extent Russo may also claim that the Institute imposed a materially adverse action by ending her transition employment in retaliation for the demand letter, a theory which is not developed in Russo's objection, the evidence does not show any materially adverse action. Russo does not argue or present evidence to show that the Institute caused her any loss of income or opportunity because of the May 2 end date. In fact, the undisputed evidence shows that she ended the transition period and that the Institute imposed no materially adverse action.

[19] An employer's decision to withhold entirely a letter of recommendation may be an adverse employment action for purposes of a retaliation claims. See Noonan v. Consol. Shoe Co., Inc., 84 F.4th 566, 576 n.8 (4th Cir. 2023).

At the time of the demand letter, Russo's employment had already been unequivocally terminated by the partners' vote. She was working in a transition period while a plan for her departure and possible severance pay, along with a potential independent contractor agreement, were being negotiated. In her April 29 letter, Russo's attorney plainly rejected the Institute's proposals for the transition period and did not offer a counter proposal for transition and severance or for an independent contractor position at the Hillsborough County Nursing Home. As such, Russo's attorney effectively ended the transition negotiations, leaving only a date for Russo's departure, which the Institute's attorney set as May 2.

In short, then, Russo's employment was terminated by the partners' vote on March 25. The transition period ended on May 2 in response to Russo's decision expressed in the April 29 letter not to accept the Institute's transition and severance proposals. Russo does not describe any factual dispute as to whether the Institute caused her harm or injury by ending the transition period when she effectively rejected the transition and severance proposals.

Because Russo has not shown a factual dispute as to whether the reference process or the end date of the transition period were materially adverse employment actions, the Institute is entitled to summary judgment on the retaliation claim.

C. Wrongful Discharge – Count IV

Russo brings a wrongful termination claim under New Hampshire common law, alleging that she was terminated for "properly advising patients of the risks of medical procedures and reporting Ahn's activities that deviate from best practices in medicine, which are protected by public policy." Doc. no. 1, at 23. The Institute moves for summary judgment on that claim on the ground that she lacks evidence to prove its elements. In response to the motion for summary judgment, Russo states that her wrongful discharge claim also includes her assertion that she was terminated for the protected activity of reporting that Dr. Ahn's patient care was substandard and that his behavior posed a threat to public safety.

"A wrongful termination claim under New Hampshire law contains two elements: '(1) the employer terminated the [plaintiff's] employment out of bad faith, malice, or retaliation; and (2) the employer terminated the employment because the employee performed acts that public policy would encourage or because she refused to perform acts that public policy would condemn.'" Vera v. F.W. Webb Co., No. 23-CV-0198-SE, 2025 WL 603808, at *8 (D.N.H. Feb. 25, 2025) (quoting Donovan v. S. New Hampshire Univ., 175 N.H. 489, 492 (2022)). "Under New Hampshire law, an 'employer's bad faith or malice may be established where (i) an employee is discharged for pursuing

policies condoned by the employer, (ii) the record does not support the stated reason for the discharge, or (iii) disparate treatment was administered to a similarly situated employee.'" Yvars v. AstraZeneca Pharms. LP, No. 24-CV-237-SE, 2025 WL 607962, at *2 (D.N.H. Feb. 19, 2025) (quoting Hidalgo-Semlek v. Hansa Med., Inc., 498 F. Supp. 3d 236, 268 (D.N.H. 2020)). "Bad faith can also be discerned from the course of events surrounding an employee's discharge, the manner in which the plaintiff was discharged, or shifting reasons for an employee's termination." Id. (internal quotation marks omitted).

Russo proffers no evidence that the Institute acted in bad faith or with malice when the partners voted to terminate her employment. Again, the undisputed evidence establishes that the partners voted to terminate Russo's employment to retain Dr. Ahn in the practice, even though some of the partners disagreed with Dr. Ahn's assessment of Russo and his reasons for seeking her termination. Despite that vote, the Institute retained Russo's services while attempting to come to a mutually acceptable agreement about a transition period and a severance package. In the absence of evidence of bad faith or malice, the court need not consider the public policy element of the claim.

The Institute is entitled to summary judgment on Russo's wrongful discharge claim.

Conclusion

For these reasons, the Institute's motion for summary judgment (doc. no. 82) is granted.

The other pending motions (doc. nos. 62, 69, 70, 71, and 76) are terminated as moot.

The clerk of court shall enter judgment in accordance with this order and the previous summary judgment order (doc. no. 64) and close the case.

SO ORDERED.

Steven J. McAuliffe
United States District Judge

April 24, 2025

cc: Counsel of Record

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Gina Russo

v. Case No. 21-cv-703-SM

New Hampshire Neurospine Institute, P.A. et al

JUDGMENT

Judgment is hereby entered in accordance with the following:

1. The Endorsed Order by Judge Steven J. McAuliffe dated November 20, 2024;
2. The Memorandum Order by Judge Steven J. McAuliffe dated November 22, 2024; and
3. The Memorandum Order by Judge Steven J. McAuliffe dated April 24, 2025.

The prevailing party may recover costs consistent with Fed. R. Civ. P. 54(d) and 28 U.S.C. § 1920.

By the Court:

Tracy A. Uhrin
Clerk of Court

Date: April 24, 2025

cc: Counsel of Record