No. 25-1519

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

GINA RUSSO,

*Plaintiff-Appellant*,

– v. –

NEW HAMPSHIRE NEUROSPINE INSTITUTE, P.A.; URI AHN,

*Defendants-Appellees*.

On Appeal from Orders and Judgment of the United States District Court
for the District of New Hampshire
Case No. 1:21-cv-00703-SM-TSM (Hon. Steven J. McAuliffe)

# BRIEF OF APPELLEE NEW HAMPSHIRE NEUROSPINE INSTITUTE

Amanda E. Quinlan, Bar No. 269033
Adam M. Hamel, Bar No. 17110
McLane Middleton,
Professional Association
900 Elm Street, P.O. Box 326
Manchester, NH 03105
(603) 625-6464
Amanda.quinlan@mclane.com
Adam.hamel@mclane.com

Dated: December 19, 2025

*Counsel for Appellee New Hampshire NeuroSpine Institute, P.A*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, New Hampshire NeuroSpine Institute, P.A. ("NHNSI") states that it is a wholly owned subsidiary of Elliot Health System Holding, Inc., which in turn is a wholly owned subsidiary of Elliot Health System, which is a wholly owned subsidiary of SolutionHealth. No publicly held corporation owns more than 10% of NHNSI's stock.

# TABLE OF CONTENTS

Page


CORPORATE DISCLOSURE STATEMENT ........ 2

TABLE OF AUTHORITIES ........ 5

STATEMENT OF THE CASE ........ 7

I. FACTUAL BACKGROUND ........ 7

A. Plaintiff Takes a Disrespectful Tone with Dr. Ahn in 2016 ........ 8

B. Plaintiff Goes Outside Her Role as a PA and Inappropriately Undermines Dr. Ahn's Relationship with a Patient, Betraying Dr. Ahn's Trust in Her ........ 10

C. Just Before Her Termination, Plaintiff Again Acts in an Insubordinate and Unprofessional Manner Toward Dr. Ahn ........ 13

D. Dr. Ahn Tells the Board He Can No Longer Work with Plaintiff ........ 14

E. The Practice Voluntarily Attempts to Negotiate a Transition Plan with Plaintiff ........ 15

F. The Practice Abides by Its Handbook Policy on References and Waits to Hear from Counsel on Language to Describe Plaintiff's Termination ........ 21

G. NHNSI Investigates Plaintiff's Allegations and Concludes There Was No Evidence of Gender Bias or Discrimination ........ 23

SUMMARY OF ARGUMENT ........ 23

ARGUMENT ........ 25

II. AHN SOUGHT PLAINTIFF'S TERMINATION BECAUSE SHE WAS RUDE, INSUBORDINATE AND DIFFICULT TO WORK WITH ........ 28

A. Neither Ahn Nor the Practice Wavered in the Reasons Given for Terminating Plaintiff ........ 28

B. Ahn's So-Called "Admission" Reflects the Level of Disrespect He Experienced, and Is Not Evidence of "Stereotyping" ....................31

C. Plaintiff Cannot Establish "Chain-of-Causation" or "Cat's Paw" Liability, as She Cannot Show Discriminatory Motivation by Ahn ....................34

D. Plaintiff's Arguments Concerning Other Alleged Behavior by Ahn Relies on Evidence That Is Neither Relevant Nor Admissible ....................36

III. THE PRACTICE HAD ALREADY TERMINATED PLAINTIFF AND DID NOT RETALIATE AGAINST HER WHEN ENDING ITS NEGOTIATIONS OVER HER TRANSITION OUT OF THE PRACTICE ....................39

A. There Was No Causal Connection Between Plaintiff's Accusations of Gender Discrimination and NHNSI's Decision to End Unproductive Negotiations Intended to Assist Plaintiff....................40

B. Ending Voluntary Negotiations Does Not Constitute an Adverse Employment Action for Purposes of a Retaliation Claim ....................42

C. Plaintiff Herself Rejected the Independent Contractor Agreement Proposed by NHNSI ....................46

IV. NHNSI DID NOT RETALIATE AGAINST PLAINTIFF WHEN DIRECTING SURGEONS TO FOLLOW ITS WRITTEN POLICY ON REFERENCES ....................47

CONCLUSION ....................48

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(g)(1) ....................48

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ameen v. Amphenol Printed Circuits, Inc.*,
777 F.3d 63 (1st Cir. 2015)....................34, 35

*Bickley v. CenturyLink, Inc.*,
No. CV 15-1014-JGB, 2016 WL9046910 (C.D. Cal. July 21, 2016)....................42

*Brandt v. Fitzpatrick*,
957 F.3d 67 (1st Cir. 2020)....................34

*Burns v. Johnson*,
829 F.3d 1 (1st Cir. 2016)....................37

*Cocuzzo v. Trader Joe's East Inc.*,
121 F.4th 924 (1st Cir. 2024)....................28

*David v. Winchester Med. Ctr.*,
759 Fed. Appx. 166 (4th Cir. 2019).................... 44

*Lopez-Hernandez v. Terumo Puerto Rico, LLC*,
64 F. 4th 22 (1st Cir. 2023)....................25

*Macone v. Town of Wakefield*,
277 F.3d 1 (1st Cir. 2002)....................33

*MacRae v. Mattos*,
106 F.4th 122 (1st Cir. 2024)....................25

*Majali v. United States Dept. of Labor*,
294 Fed. Appx. 562, 2008 WL 4367365 (11th Cir. 2008)....................45

*Morales-Cruz v. Univ. of P.R.*,
676 F.3d 220 (1st Cir. 2012)....................33

*Morales-Vallellanes v. Potter*,
605 F.3d 27 (1st Cir. 2010)....................42

*National Amusements v. Town of Dedham*,
43 F.3d 731 (1st Cir. 1995)....................33

*Price Waterhouse v. Hopkins*,
490 U.S. 228 (1989).....................................................................................38

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000).....................................................................................27

*Richardson v. City of Niagara Falls, New York*,
2012 WL 75771 (W.D.N.Y. Jan. 10, 2012)..............................................44, 46

*Saketkoo v. Administrators of the Tulane Educ. Fund*,
31 F.4th 990 (5th Cir. 2022) .........................................................................26

*Santiago v. Canon U.S.A.*,
138 F.3d 1 (1st Cir. 1998)......................................................................33, 37

*Serrano-Colon v. United States Dep't of Homeland Sec.*,
121 F.4th 259 (1st Cir. 2024)..................................................................26, 39

*Smith v. Bibb Cnty. Sch. Dist.*,
No. 5:16-cv-213, 2018 WL 1440213 (M.D. Ga. Mar. 22, 2018) .......................44

*Velazquez-Fernandez v. NCE Foods, Inc.*,
476 F.3d 6 (1st Cir. 2007).............................................................................26

**Rules**

Fed. R. App. P. 26.1 ........................................................................................2

Fed. R. App. P. 32(g)(1)...................................................................................48

## STATEMENT OF THE CASE

### I. FACTUAL BACKGROUND

There is no dispute that Plaintiff Gina Russo ("Plaintiff"), a physician's assistant ("PA"), disliked and did not get along with Dr. Ahn, an orthopedic surgeon at New Hampshire NeuroSpine Institute ("NHNSI" or the "Practice"). RA0381:10–12; RA 623 AT 141:18–19. During Plaintiff's employment at NHNSI, there were three incidents of friction and disagreement between her and Dr. Ahn, who is a partner at NHNSI. *See* RA0655 at 39–40; *id.* at 0005–0007; *id.* at 0010–15. None of those instances support any inference of gender discrimination. However, each incident contributed to the growing distrust between the two individuals, which caused a larger problem in a practice that depends on both surgeons and PAs to cooperate and act with precision when operating on patients undergoing spinal surgery. One incident that took place in 2016 involved a request by Dr. Ahn that Plaintiff go see a patient at St. Joseph Hospital, during which conversation Plaintiff's tone was rude, hostile, and unprofessional. RA0765 at 19:2–5. The second incident took place in 2017 when Plaintiff—without the authority to do so—suggested an alternative surgical procedure to a patient she was consenting for surgery without the authority to do so. RA0665–666. The third incident, which took place on March 9, 2019, involved the Plaintiff acting in a rude and unprofessional manner toward Dr. Ahn.

RA0680. This third incident led Dr. Ahn to conclude that he could no longer work with Plaintiff and to ask for her termination. All the partners at the Practice voted unanimously to terminate Plaintiff at a partners' meeting on March 25, 2019, as not one partner could identify a way of moving forward with both Dr. Ahn and Plaintiff continuing to work at the Practice. RA0629–0630 at 165:8–166:22. Despite Plaintiff's elaborate efforts to construe certain actions and statements in this case and imbue them with gender bias and stereotyping, Plaintiff cannot overcome the fact that she was indisputably terminated for gender-neutral reasons. As a result, the Practice is entitled to judgment as a matter of law on all of Plaintiff's claims.

### A. Plaintiff Takes a Disrespectful Tone with Dr. Ahn in 2016

With respect to the first incident, Plaintiff was on call the weekend of October 15, 2016. RA0542 at 61:8-11, 61:21–22. Dr. Ahn was on practice call – not emergency room call. He was traveling to his son's hockey game that day, but was still within a reasonable distance to return to a hospital if need be. *See* RA 0658 at 49:23–50:9; RA0744 at 44:1–10; RA0764 at 17:9–17.

While Plaintiff was doing rounds at Elliot Hospital in Manchester, a patient of NHNSI neurosurgeon Dr. Wang coded with a cardiac condition unrelated to Dr. Wang's procedure. *See* RA0005. The patient did not require direct care or treatment from Plaintiff, as coding patients are treated by the hospital's code team.

RA0662 at 66:14–18; RA0620 at 127:16-128:2. Meanwhile, Dr. Ahn called Plaintiff and asked her to see a patient at St. Joseph Hospital in Nashua with a lumbar epidural abscess. RA0542 at 62:15–19 & 63:14–17. Dr. Ahn's wife, Kerri Ahn, was present with Dr. Ahn in his car when Dr. Ahn and Plaintiff had this conversation. RA0764 at 15:17–16:19. Kerri Ahn is a nurse and knew Plaintiff because they had previously worked together in a surgeon's office in 2007. RA0763–0764 at 12:18–22,13:17–14:7, 15:9–11. Kerri Ahn had a friendly co-working relationship with Plaintiff. RA0764 at 15:12–16. Plaintiff told Dr. Ahn she could not leave Elliot Hospital because she was reporting and monitoring Dr. Wang's patient. She asked Dr. Ahn if he could get to St. Joseph's before her. RA0006; RA0542 at 64:17–23; RA 0543 at 67:7–11. Plaintiff's tone and language during this telephone call was rude and confrontational. Dr. Ahn told Plaintiff to get to St. Joseph's as soon as she could, and Plaintiff ultimately went there to see the patient with the abscess. RA 0543 at 67:16–68:3; RA0662 at 65:19–66:11.

After listening to the way Plaintiff spoke with Dr. Ahn, Kerri Ahn believed Plaintiff's tone was rude, hostile, and unprofessional. RA0765 at 19:2–5. She was shocked that a professional would talk to another professional the way Plaintiff spoke to Dr. Ahn. RA0765 at 18:23–19:5; RA0766 at 24:17–20. Dr. Ahn also perceived Plaintiff's tone as disrespectful, hateful, and resentful. RA 0660 at 58:11-18; RA 0661–62 at 64:23–65:9; RA0683 at 151:13–152:1 ("It's a way of

talking to somebody that you would never imagine an employee talking to an employer, complete lack of respect, talking down to somebody. . . . hateful, lacking respect, angry, demeaning, insulting, talking in a way like that where you're trying to make somebody feel like they're small . . . .").

Dr. Ahn subsequently called Dr. Wang to confirm that Plaintiff was being truthful regarding the coding patient. RA0706 at 57:4-7. Dr. Ahn expressed to Dr. Wang – both during that call and in a subsequent one – his belief that Plaintiff was being rude and insubordinate. RA0706 at 57:14–16; RA0707 at 60:11–15.

### B. Plaintiff Goes Outside Her Role as a PA and Inappropriately Undermines Dr. Ahn's Relationship with a Patient, Betraying Dr. Ahn's Trust in Her

With respect to the second incident, during a meeting with Plaintiff and one of Dr. Ahn's patients to obtain his consent for surgery in the summer of 2017, the patient had questions about the possibility of subsequent additional surgery. RA0010 ¶ 46; RA0665 at 78:14–22. Plaintiff discussed that possibility but then raised possible alternatives to the then-scheduled procedure. RA0665 at 80:1–14. Plaintiff left the patient to check with Dr. Ahn about alternatives to the scheduled procedure, but when she could not find Dr. Ahn, she spoke to another doctor, who said the alternative Plaintiff suggested could be considered. RA0010 ¶ 46. Plaintiff told the patient about the alternative surgery. RA0665 at 80:9–14. She never said anything about this conversation to Dr. Ahn. RA0665 at 80:1–8.

After the meeting, that patient's wife contacted Dr. Ahn and told him that she and her husband had doubts about Ahn's recommended surgical plan based on what Plaintiff had told them during the surgical consent. RA0665 at 80:1–6. Dr. Ahn was taken aback by the patient's lack of confidence, particularly since Plaintiff never made any mention of the meeting to Dr. Ahn. RA0665 at 80:1–21. Dr. Ahn thought that Plaintiff's discussion with the patient was an inappropriate surgical opinion and that her actions damaged his relationship with his patient by undermining him and making an inappropriate recommendation. RA0665 at 80:1–21; RA0666 at 81:2–5, 81:17–82:6. Dr. Ahn testified:

> I felt like my trust in [Plaintiff] was betrayed and I was in a bad situation with a patient who lost confidence in me who had a lot of doubt . . . the last thing I want is a physician's assistant making my life harder or negatively affecting my physician-patient relationship which is critical in surgery. In surgery, people are putting so much trust in you, people are voluntarily being given medications that are so strong they have to sleep through those operations that we subject them to, but when that trust gets eroded because of an interaction with a physician's assistant, it's incredibly damaging.

RA0666 at 81:16–82:6.

Dr. Ahn told Plaintiff he was not happy with her actions and that her conduct was inappropriate as a PA, and that it went beyond the scope of obtaining surgical consent, which was her task.[1] RA0665 at 80:2–16; *id.* at 0667:12–15. A PA does

---

[1] Plaintiff contends that Dr. Jenkins, Dr. Luther, and PA Georgia Plamondon "all confirmed she handled the issue correctly," Plf. Br. at 8, but does not cite to

not have the authority to suggest procedures to patients or to come up with surgical plans, and Dr. Ahn's concern that Plaintiff undermined his credibility with his patient (and thus jeopardized the patient's trust) was a valid one. RA0665 at 80:15–21; 81:2–5, 81:17–82:6; Ex. 2 136:10–137:6. Even Plaintiff admitted that Dr. Ahn told her "he had to win back the patient's trust because of [her]." RA0560 at 133:10–11.

After this incident, Dr. Ahn did not feel as though he could trust Plaintiff because she had severely damaged the trust the patient had in Dr. Ahn's judgment. As a result, Dr. Ahn requested that the Executive Director at the Practice, Anne Talbot-Kleeman, no longer assign Plaintiff to any of his surgical cases. RA0666 at 81:1–9 ("[T]he way [the consent] was handled, I felt, was unprofessional. It gave a surgical opinion that was inappropriate and severely damaged the trust the patient had in my judgment, and that, I believe, is when I lost trust in [Plaintiff] and I told Anne [Talbot-Kleeman] that this is not somebody that I can trust in the operating room, and that's, I believe, when I asked that she not be in my surgical cases."); RA 0673 at 111:16–112:4; RA0625 at 146:13–14. Plaintiff had inappropriately

---

support in the record for her assertion that the two surgeons, Dr. Jenkins and Dr. Luther, believed she handled this issue correctly. Even if they did believe Plaintiff acted appropriately, that does not change the fact that Plaintiff's behavior undermined the confidence Dr. Ahn's patient had in him, and that Plaintiff never notified Dr. Ahn of the patient interaction.

undermined the patient-surgeon relationship by (1) suggesting a different procedure to the patient and (2) not telling Dr. Ahn about the conversation, thus leaving him to answer to a frustrated and distrustful patient without any advance notice. For Dr. Ahn, this is an unacceptable outcome in surgery, where people are putting a great deal of trust in their surgeons. RA0665 at 81:16–82:6. When that trust from a patient erodes, it is, in the words of Dr. Ahn, "incredibly damaging." RA0665 at 82:6.

### C. Just Before Her Termination, Plaintiff Again Acts in an Insubordinate and Unprofessional Manner Toward Dr. Ahn

The third incident occurred on March 9, 2019, when both Plaintiff and Dr. Ahn were on call. RA0563 at 146:12–15, 147:15–16. Plaintiff was working at Catholic Medical Center when she received a phone call from Dr. Ahn at Elliot Hospital asking for help discharging a patient. RA0563 at 146:15–17; 147:8–10; RA0680 at 137:4–14. Plaintiff responded by asking Dr. Ahn if he needed her "to talk [Dr. Ahn] through how to discharge the patient" or if he wanted her to discharge the patient "when I [Plaintiff] go home." RA0563 at 146:17-23. Plaintiff raised her voice when speaking with Dr. Ahn. RA0568 at 168:14-169:17. Plaintiff also contends that Dr. Ahn raised his voice. *Id.* Dr. Ahn called Ms. Talbot-Kleeman following the phone conversation and reported that Plaintiff had acted in an insubordinate and unprofessional manner during the phone call. RA0680 at 138:23–139:4. He subsequently sent an email memorializing his

concerns. RA0347. Plaintiff also sent an email to Ms. Talbot-Kleeman describing her view of the interaction on March 9, 2019. RA0349. There is no question that Dr. Ahn perceived Plaintiff's behavior as disrespectful. RA 0684 at 156:14–15 ("I don't feel that I deserved to be treated that way.").

Ms. Talbot-Kleeman met with Plaintiff, who told her she believed Dr. Ahn was "lazy" and that he took "shortcuts with patient care which causes problems and safety concerns." RA0014 ¶ 62; RA0627 at 156:5-16. Plaintiff also called Dr. Ahn names to Ms. Talbot-Kleeman. RA0628 at 158:10–14.

### D. Dr. Ahn Tells the Board He Can No Longer Work with Plaintiff

A NHNSI Board Meeting was held on March 25, 2019. RA0627 at 157:3-4; RA0572 at 183:14–16. At the meeting, Dr. Ahn told his partners he could no longer work with Plaintiff because she was disrespectful, insubordinate, and difficult to work with. RA0718 at 104:12–23, 105:10–13. It is undisputed that Dr. Ahn gave examples of instances where he perceived Plaintiff to be insubordinate and unprofessional, particularly the negative interaction between him and Plaintiff that occurred on March 9, 2019. RA0718 at 104:12–23. Dr. Ahn told his partners that if Plaintiff was not terminated from the Practice, he would no longer remain at the Practice. RA0745 at 48:3–5. That is because he felt the level of disrespect from Plaintiff toward him was unacceptable, and he would no longer put himself in a position to continue experiencing it. *See* RA1067; RA 0685 at

158:18–21 ("I'm not going to stay at a practice as a partner being verbally abused. I won't tolerate that. I have enough self-esteem not to accept that.").

After Dr. Ahn stated his position, every partner at the Board meeting provided their opinion and feedback on Plaintiff and the situation at hand. RA0629 at 165:8–11. No one could come up with any alternative, workable option that would allow both Plaintiff and Dr. Ahn to remain at the Practice given the deep distrust that had developed between the two. RA0629 at 165:8–23. The Board unanimously decided to terminate Plaintiff's employment. RA0629 at 165:8–11.

### E. The Practice Voluntarily Attempts to Negotiate a Transition Plan with Plaintiff

After the Practice reached its decision to terminate Plaintiff at the partners' meeting on March 25, 2019, Anne Talbot-Kleeman, the Practice's then-Executive Director, informed Plaintiff of the decision on March 26, 2019. RA0630 at 168:19–169:11; RA0633 at 179:12-20; RA0414. Ms. Talbot-Kleeman told Plaintiff that the Practice could be flexible with her and work out an agreeable transition plan that might allow Plaintiff to remain employed while she looked for another job. RA0414. Ms. Talbot-Kleeman spoke with Plaintiff again on March 29, 2019 to discuss a potential transition plan. RA0635 at 186:14–19; RA0017 ¶ 77; RA0037 ¶ 77.

As Plaintiff herself alleges in her Complaint, it was during this March 29 conversation with Ms. Talbot-Kleeman—three days after being notified about the termination decision—that Plaintiff first raised any concerns regarding gender discrimination when she stated she believed that her termination was the result of a pattern of bias against women at the Practice:

> On March 29, 2019, [Plaintiff] expressed to Ms. Talbot-Kleeman her frustration that the move toward terminating her employment was the result of a pattern of bias against women at NHNSI, where the mistreatment of women by male doctors was regularly tolerated and openly discussed, and nobody did anything to stop it.

RA0017 ¶ 77; *see also* RA0037 ¶ 77 ("Admitted that plaintiff and Ms. Talbot-Kleeman spoke over the phone on March 29, 2019 and that plaintiff said she thought in hindsight there was gender bias at NHNSI, even though she had never previously alleged that to be the case."). At her deposition, Ms. Talbot-Kleeman described her surprise at Plaintiff raising this at the March 29 meeting:

> I had reached out to her to talk to her about what she had thought about for a transition plan and that was what she said to me that she felt that there was some gender bias and that this was really -- had nothing to do with her issue with Dr. Ahn, that it had to do with her being a female and that she was being -- this was based on gender and to be honest it took me by surprise that that was what she was telling me at this point when this had never come up in all of these years and all of these conversations and interactions I had with her . . . I was surprised that this was her take on the situation and that was the majority of the conversation where I then said, well, you don't have an idea of how you would wish to proceed. Why don't I craft something and circle back to you.

RA0635 at 186:4–187:13, 188:7–9. Despite her surprise at Plaintiff's allegations, Ms. Talbot-Kleeman nevertheless proceeded to craft a severance package and a transition plan to work with Plaintiff on how she would exit the Practice following the partners' decision to terminate her. RA0633 at 181:14–182:9.

The Practice therefore voluntarily engaged in negotiations with Plaintiff – which it was under no obligation to do – after it learned that Plaintiff believed her termination was the result of gender discrimination or bias. RA0635 at 186:4–187:13. This was also the first time that Plaintiff had ever raised allegations of gender discrimination at the Practice. RA0037 ¶ 77; RA0635 at 186:4–187:13. Several days later, on April 2, 2019, Ms. Talbot-Kleeman sent Plaintiff a proposed separation and general release agreement outlining the terms of a proposed transition arrangement. RA0415–426. That proposed agreement provided that, if Plaintiff remained employed with the Practice through the end of June 2019, she would receive a $15,000 severance payment. RA0416–417; RA0634 at 183:14–184:1.

On April 4, 2019, Plaintiff told Ms. Talbot-Kleeman she would not agree to the three-month transition plan laid out in the proposed agreement. RA0427. Plaintiff said she only wanted to work until her planned vacation, which was scheduled to begin on April 19, 2019. RA0427; RA0634 at 184:22–185:13. Then, after her vacation, Plaintiff wanted to remain an employee of the Practice while she

looked for another job. RA0427; RA0637 at 194:18–195:10. Plaintiff proposed that she be permitted to take all her accrued but unused vacation time of 280 hours from April 19 through July 9, 2019, with her employment terminating on that date. RA0427. She also wanted to continue to perform the work she had been doing for Dr. Batlivala at the Hillsborough County Nursing Home as an independent contractor. *Id.* Ms. Talbot-Kleeman said she would confer with Dr. Batlivala on this matter and get back to Plaintiff. *Id.*

The following day, April 5, 2019, Ms. Talbot-Kleeman followed up with Plaintiff to let her know she thought Plaintiff's proposal would work. RA0428. Ms. Talbot-Kleeman asked Plaintiff if she would like her to revise the separation agreement to reflect Plaintiff's proposed transition plan, and Plaintiff agreed. *Id.* There was never any discussion about what amount, if any, Plaintiff would receive for severance during either the April 4 or April 5 conversations.

In revising the separation agreement, the Practice did not include the initial offer of the $15,000 severance payment Plaintiff would have received under the prior version of the agreement proposed by the Practice, which proposal had been rejected by Plaintiff on April 4. Still willing to offer some severance, and accounting for the other terms that Plaintiff had proposed and that the Practice had agreed to, NHNSI decreased the proposed severance amount to $2,500 in the revised separation agreement. RA0429–430. Ms. Talbot-Kleeman sent Plaintiff

the revised separation agreement on or around April 11, 2019, along with a copy of an Independent Contractor Agreement for the work at the nursing home. RA0429; RA0441.

Plaintiff was on vacation from April 19 through April 25, 2019. *See* RA0642 at 216:17–21. On April 26, Plaintiff reported to work even though she had not responded to the revised separation agreement or informed Ms. Talbot-Kleeman or any of the partners whether she was going to continue working. *See id.* Based on her conversations with Ms. Talbot-Kleeman on April 4 and 5, where Plaintiff told her she did not want to continue working after her vacation, the Practice assumed she would not be returning to work after April 19, 2019. RA0642 at 215:3–16; 216:17–21. Plaintiff did not respond to the proposed agreement until April 29, 2019, when her attorney sent a letter to the Practice with Plaintiff's response. RA0448.

In that letter, Plaintiff rejected the latest proposal made by the Practice in its draft agreement sent on April 11. RA0448–449. *See* RA0054, No. 60; RA0072, No. 60 (where Plaintiff does not dispute that she "did not agree to the revised separation agreement and sent a demand letter"); RA0578 at 207:19–20 ("I sent them a demand letter when I did not feel like their terms were acceptable."). Although Plaintiff's attorney references an "Independent Contractor Agreement" that she reviewed, she also references the terms of the proposed Separation

Agreement that was circulated on the same day as the Independent Contractor Agreement, including the changed amount of severance, and rejected the terms of this Agreement, as well. RA0448 (referencing reduction in severance offer) and RA0449 (demanding payment of $100,000 instead). The letter provided:

> I cannot advise my client to consider the proposed Independent Contractor Agreement, which contains no guarantees for her benefit, in resolving this matter. She remains willing to provide those services as either an employee or as an Independent Contractor, regardless of how we resolve her employment . . . . [A] lengthy agreement which contains no commitment towards her appears to be just another self-serving calculation on the part of the Institute . . . . Ms. Russo also remains willing to reach an amicable and private resolution to the employment matter. She has authorized me to convey that she is willing to release her claims against the Institute and its partners for the amount of $100,000.00 . . . .

RA0449.

Although Ms. Talbot-Kleeman had already changed the proposed agreement so that Plaintiff would stop working at the Practice in April, Plaintiff's attorney inaptly brought up the Practice's <u>prior</u> offer in her April 29 letter (which offer had since been rejected by Plaintiff) for Plaintiff to continue working until June 2019. RA0449 ("[I]t is absurd that the Institute now seeks to penalize Ms. Russo for not wanting to continue working in this hostile and discriminatory environment, for three additional months . . . !").

In response to the April 29 letter, counsel for NHNSI sent a letter to Plaintiff's attorney on May 3, 2019, outlining the full context of the negotiations to date and explaining the Practice's decision to end the negotiations:

> [A]ssuming that [Plaintiff] would not want to lose her credentials or her income, Ms. Talbot-Kleeman proposed that [Plaintiff] continue to work until the end of June with a bonus payment to take place at the conclusion of that transition period. The initial transition/separation agreement was presented. [Plaintiff] then came back to say she would prefer to stop working at NHNSI sooner but would like to continue in her role at the Hillsborough County Nursing Home one day per week. The second proposal was then constructed after discussion and negotiation. None of this was the idea of NHNSI. . . . Since we have not been able to achieve a transition plan satisfactory to both parties, the termination is effective May 2, 2019. Ms. Russo will receive her final pay within 72 hours as required by New Hampshire law.

RA0450–451. NHNSI thus ended its negotiations with Plaintiff on a transition plan, and parted ways with Plaintiff.

### F. The Practice Abides by Its Handbook Policy on References and Waits to Hear from Counsel on Language to Describe Plaintiff's Termination

The Practice's Employee Handbook in effect at the time Plaintiff left NHNSI provided:

> The Institute will respond to all reference check inquiries from other employers. Responses to such inquiries will be limited to factual information that can be substantiated by the Institute's records. Only the **direct supervisor** of the employee or **Executive Director** is authorized to respond to requests about current or former employees. Employees are not authorized to provide references on behalf of New Hampshire NeuroSpine Institute for an employee or former employee without authorization from the Executive Director.

RA0463 § 203. Surgeons are considered employees of the Practice and are therefore not authorized to provide references on behalf of NHNSI for an employee or former employee without authorization from the Executive Director. *Id.*; RA0638 at 198:15–199:3.

After Plaintiff left the Practice, Ms. Talbot-Kleeman appreciated that NHNSI and Plaintiff's attorney would want to be on the same page about how everyone was classifying Plaintiff's termination so that Plaintiff was not disadvantaged by inconsistent narratives. *See* RA0637 at 197:7–16; RA0638 at 201:9–23. Ms. Talbot-Kleeman testified at her deposition as follows:

> [W]e, our legal counsel and you [Plaintiff's counsel], were in conversation and we simply wanted to agree on what her termination was going to be and what the nature of it was so that what she was stating on her employment application was consistent with what we were saying and not hindering her in any way moved forward. . . . It was simply let's come to an agreement what her termination details are . . . .

RA0640 at 208:9–18.

Ms. Talbot-Kleeman therefore reminded the partners that, even if they personally heard from Plaintiff for a reference, the reference had to go through the Practice and come from the Practice, as stated in the Handbook. RA0637 at 196:7–197:16. This was also so that the Practice could keep a record of what was said about Plaintiff on file, pursuant to the Practice's protocol.

RA0638 at 199:5–6.

Ultimately, Plaintiff did receive references from NHNSI partners. RA0018 ¶ 85. Plaintiff successfully obtained a new job and began working for a new employer as of July 2019. RA0407 at 209:15–17. She was therefore not harmed by any alleged delay in providing those references.

### G. NHNSI Investigates Plaintiff's Allegations and Concludes There Was No Evidence of Gender Bias or Discrimination

In July 2019, NHNSI retained Attorney Elizabeth Bailey as an independent investigator to look into Plaintiff's allegations of gender discrimination. RA0643 at 218:5–13. Attorney Bailey interviewed Plaintiff, Dr. Ahn, and numerous employees at NHNSI and drafted findings of fact and a report. RA0859–RA0860 at 25:14–26:5; RA0497. Attorney Bailey did not find any evidence of gender discrimination by Dr. Ahn or the Practice. RA0861 at 33:18-22; RA0507–508.

## SUMMARY OF ARGUMENT

Plaintiff repeatedly disrespected Dr. Ahn and acted in an unprofessional manner toward him. The level of disrespect came to a point where Dr. Ahn told the Practice it had to choose between keeping Plaintiff employed or keeping Dr. Ahn, as Dr. Ahn would not work at NHNSI if it continued to employ Plaintiff. Dr. Ahn and the Practice therefore had a legitimate, nondiscriminatory basis for the decision to terminate Plaintiff, and, in light of her own admitted disrespect for Dr. Ahn (*i.e.*, calling him names to Ms. Talbot-Kleeman and describing him as "lazy" to her), Plaintiff cannot show she performed her job satisfactorily to make a

prima facie case for discrimination. Moreover, the reasons Dr. Ahn and the Practice gave for the termination never wavered, and nothing about the decision was informed by gender stereotyping. Plaintiff, however, desperately attempts to survive summary judgment by arguing that a gender-neutral "admission" by Dr. Ahn, which references his role as a father, is an expression of a "domineering attitude" and thus illustrative of stereotyping against women and "strong evidence that Ahn perceived [Plaintiff] as a threat to his masculinity and that he was unlawfully motivated to preserve specific gender roles." Plf. Br. at 31. No reasonable factfinder could conclude that gender stereotyping motivated the decision to terminate Plaintiff, just as no reasonable factfinder could find the so-called "admission" by Ahn referencing his role as a father was indicative of any gender stereotyping.

Nor can Plaintiff prevail on her retaliation claim. Plaintiff was already terminated before she raised for the first time that she believed there was gender discrimination at the Practice. Although the Practice did not agree with her accusations, it continued to – voluntarily – engage in negotiations with Plaintiff concerning a transition period out of the Practice. Through her attorney, Plaintiff rejected the last proposal put forward by the Practice – which proposal consisted almost exclusively of terms Plaintiff had requested – and demanded instead payment of $100,000 in exchange for a release of Plaintiff's claims. The decision

by the Practice to end the negotiations at that point was not prompted by any protected activity, but instead by an apparent impasse at reaching any sort of resolution. Nor was ending the negotiations an adverse employment action, as the transition out of the practice was a privilege, not a right. Finally, Plaintiff's claim that reference letters were "withheld" as retaliation against her must fail, too: the Practice followed its written policy concerning references and waited to hear from Plaintiff's attorney on how to frame the reason for Plaintiff's departure, so Plaintiff was not prejudiced by any inconsistencies in that respect. Any delay Plaintiff suffered in receiving a reference letter did not harm her: Plaintiff ultimately received references from surgeons at the Practice and obtained employment shortly after her termination.

## ARGUMENT

In reviewing an order granting a motion for summary judgment, the Court reviews the decision *de novo*, meaning the Court "give[s] the arguments and the issues a fresh look without any deference to the district court's reasoning." *MacRae v. Mattos*, 106 F.4th 122, 132 (1st Cir. 2024). At the summary judgment stage, the Court "need not exclude all interested testimony," particularly where that testimony is uncontradicted. *Lopez-Hernandez v. Terumo Puerto Rico, LLC*, 64 F. 4th 22, 30 (1st Cir. 2023).

Plaintiff incorrectly argues that the elements of a prima facie case for a sex discrimination claim are that Plaintiff (1) is female; (2) met the minimal qualifications of the job; (3) was fired; and (4) there was a continuing need for her work. Plf. Br. at 23. Plaintiff cites *Velazquez-Fernandez* for this standard, but that case does not concern sex discrimination; it applies the *McDonnell Douglas* standard to age discrimination. *Velazquez-Fernandez v. NCE Foods, Inc.*, 476 F.3d 6, 11 (1st Cir. 2007) (applying *McDonnell Douglas*, which sets out the elements of a prima facie race discrimination claim, to age discrimination). The *McDonnell Douglas* elements, however, do not apply universally to all Title VII categories. *See Saketkoo v. Administrators of the Tulane Educ. Fund*, 31 F.4th 990, 998 (5th Cir. 2022) ("[T]he precise formulation for making a prima facie case can vary by circuit and, more granularly, by protected class and adverse employment action."). The correct articulation of the *McDonnell Douglas* standard by the First Circuit vis-à-vis sex discrimination is that a plaintiff must establish a prima facie case by showing that "(1) she belonged to a protected class, (2) she performed her job satisfactorily, (3) her employer took an adverse employment decision against her, and (4) her employer continued to have her duties performed by a comparably qualified person." *Serrano-Colon v. United States Dep't of Homeland Sec.*, 121 F.4th 259, 270 (1st Cir. 2024) (emphasis added) (quoting *Bonilla-Ramirez v. MVM, Inc.*, 904 .3d 88, 94 (1st Cir. 2018)).

Thus, the second factor is not that Plaintiff "met the minimal qualifications of the job," but that she "performed her job satisfactorily." In light of Plaintiff's insubordinate, rude, and unprofessional behavior to a surgeon at the Practice, she did not perform her job satisfactorily and she cannot establish a prima facie case.

Moreover, Plaintiff incorrectly relies on *Reeves v. Sanderson Plumbing Products, Inc.* for the proposition that, if she can satisfy the first and third stages of the burden-shifting framework, the Defendants' motions for summary judgment must be denied. Plf. Br. at 53–54. That is not the case. Instead, *Reeves* holds that, if the plaintiff establishes a prima facie case and combines it with "sufficient evidence to find that the employer's asserted justification is false," that "may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (emphasis added). The Court went on to say the following:

> This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.

*Id.* (emphasis added). Both Defendants are entitled to summary judgment in this case as Plaintiff has not presented sufficient evidence to refute the Defendants' explanation, and because no rational factfinder could conclude that any action taken was discriminatory.

## II. AHN SOUGHT PLAINTIFF'S TERMINATION BECAUSE SHE WAS RUDE, INSUBORDINATE AND DIFFICULT TO WORK WITH

The reasoning given by Dr. Ahn to terminate Plaintiff's employment was a legitimate, nondiscriminatory one: Plaintiff repeatedly disrespected him, and he could not stand to continue working at a Practice where that disrespect was allowed to continue. No rational factfinder could find otherwise, and Plaintiff's discrimination claims fail.

### A. Neither Ahn Nor the Practice Wavered in the Reasons Given for Terminating Plaintiff

Despite Plaintiff's best efforts to obfuscate the Practice's reasoning for terminating her, Plaintiff cannot effectively rebut that Dr. Ahn sought to terminate Plaintiff because she was disrespectful, insubordinate, and difficult to work with; nor can she effectively rebut that Ahn was consistent in his reasoning throughout the entirety of the process. *See Cocuzzo v. Trader Joe's East Inc.*, 121 F.4th 924, 935 (1st Cir. 2024) (where employer "never wavered from the core explanation for its action," various rationales identified followed "obviously" from that core reason and did not amount to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . unworthy of credence"). Directly following his negative interaction with Plaintiff in March 2019, Ahn felt disrespected by Plaintiff and decided he could no longer work at the Practice if she was to continue to be employed there. RA0745 at 48:3–5. At the partners' meeting, Ahn told his

partners he could not work with Plaintiff because she was disrespectful, insubordinate, and difficult to work with, and gave examples of that behavior – including his negative interaction in March 2019. RA0718 at 104:12–23, 105:10–13. He also told his partners that if Plaintiff was not terminated from the Practice, he would no longer remain at the Practice. RA0745 at 48:3–5. Dr. Ahn's motives in this regard remained consistent and never wavered.

The Practice, too, was consistent in its reasons for terminating Plaintiff: no one at the Practice could envision a scenario where Plaintiff and Dr. Ahn could both continue to work at NHNSI without jeopardizing patient care. RA0633 at 180:19–23. It was clear that the Practice would either lose Dr. Ahn or lose Plaintiff given that Dr. Ahn had experienced such unprofessional behavior from Plaintiff and was willing to leave the Practice as a result.

Plaintiff's own behavior in the time period between the negative interaction she had with Ahn in March 2019 and the partners' meeting further confirmed that her behavior toward Ahn had become unworkable. As Plaintiff admits in her brief, when Ms. Talbot-Kleeman confronted Plaintiff with Ahn's description of his negative interaction with Plaintiff in March 2019, Plaintiff responded that Ahn was "lazy" and that she did not respect Ahn. RA0680:139; RA0380:9–16 ("[T]here really was a lot of anger on [Plaintiff's] part about this person [Ahn] that was a provider that she needed to be able to interact with."); RA0381:10–12 ("She, you

know, was calling [Ahn] names that I didn't think were going to be things we could reconcile[.]").

Moreover, the Practice and Dr. Ahn had already explored other ways to keep Plaintiff and Ahn separated when taking Plaintiff off Dr. Ahn's surgical cases. Following the 2017 incident where Plaintiff – in Ahn's view – inappropriately gave a surgical opinion to a patient and undermined Ahn's relationship with that patient, Ahn no longer felt that he could trust Plaintiff and asked that she not be scheduled to operate with him.[2] RA0666 at 81:1–9. However, not scheduling Plaintiff on Ahn's surgeries did not entirely insulate the two from working together at the Practice given the number of interactions surgeons and PAs had outside the operating room (*i.e.*, when both are on call for the Practice). *See* RA0629–0630. Because Ahn's motive here was to remedy the disrespect he experienced from Plaintiff by either having Plaintiff terminated or leaving the Practice himself, there is no discriminatory animus to support Plaintiff's claims.

Plaintiff points to recredentialing evaluations filled out by Ahn for Plaintiff, which were submitted to hospitals where the Practice performed operations with its staff, as evidence of pretext because Ahn checked a box that Plaintiff worked well

---

[2] Plaintiff, for her part, disliked Ahn and never complained about being kept out of Ahn's operating room. RA0623 at 141:20–23; RA0625 at 147:10–14; RA0710 at 70:17–21.

with others. Plf. Br. at 42. However, Ahn explained how his evaluation on forms like this (which indisputably pre-dated the March 2019 incident), would involve different considerations and affect how he would fill out the form:

> From the medical staff perspective, for being re-credentialed and being in a medical setting and working with my colleagues, I did agree with all this stuff, but when talking about individual things that we're working on internally within our practice which I did not feel was public knowledge for Southern New Hampshire Hospital or St. Joseph's Hospital, I did not feel that those belonged on those forms, but [Plaintiff] did work very well with my colleagues. . . . [A]nd that's reflected in the way that I filled these forms out.

RA0679 at 136:12–23. That Plaintiff worked well with other colleagues is not inconsistent with the fact that Ahn felt disrespected by her conduct toward him. Plaintiff fails to meet her burden to show pretext.

### B. Ahn's So-Called "Admission" Reflects the Level of Disrespect He Experienced, and Is Not Evidence of "Stereotyping"

Unable to show discrimination by the Practice or by Ahn in the rationale for why Plaintiff was terminated, Plaintiff attempts to argue that the decision was influenced by impermissible sex stereotyping. To do so, Plaintiff relies on one statement (or, as Plaintiff terms it, an "admission") made by Ahn to the investigator after Plaintiff's termination, where he said he "couldn't look himself in the mirror as a husband and father to small children if he allowed himself to be

treated with such disrespect." RA 1067.[3] Plaintiff takes great pains to read into this statement when arguing it is "strong evidence that Ahn perceived [Plaintiff] as a threat to his masculinity and that he was unlawfully motivated to preserve specific gender roles." Plf. Br. at 31. However, Plaintiff's attempts to warp this gender-neutral "admission" by Dr. Ahn into an expression of sex-stereotyping that espouses a "domineering attitude" fall flat.

Instead, Ahn's statement expresses a sentiment that is entirely consistent with Ahn's stated reasoning for seeking Plaintiff's termination: that he was disrespected. The sentiment, too, is an entirely appropriate response to unprofessional treatment by an individual who referred to Ahn as "lazy," admitted she did not respect Ahn, and even called Ahn names to the Executive Director of the Practice. RA0680:139; RA0381:10–12. It is not, as Plaintiff contends, a sign that "Ahn cannot tolerate having a woman challenging him."

---

[3] The investigator, who included the so-called "admission" by Ahn in her report to illustrate the level of disrespect that Ahn felt from his interactions with Plaintiff, ultimately found that there was no discriminatory act by Dr. Ahn or the Practice. RA 1098; RA 1067 ("Dr. Ahn felt that there was a basic level of human respect which needed to be observed, and Ms. Russo had crossed that line of respect. Dr. Ahn could not continue to work with Ms. Russo because Dr. Ahn's greatest fear was that she would treat him like that again. Dr. Ahn explained to me that he couldn't look himself in the mirror as a husband and father to small children if he allowed himself to be treated with such disrespect. Dr. Ahn had been with NHNSI for over twenty years, but he felt so strongly about this that he had decided if his Partners did not support him concerning this disrespect issue, he would need to leave the Practice.").

The statement is also gender neutral. Ahn could have made the same statement after being disrespected by anyone, including another man. *Cf. Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 225 (1st Cir. 2012) (finding "fragile," "immature," "unable to handle complex and sensitive issues," "twisting the truth," and "lack of judgment" to all be gender neutral terms, and holding that "stray remarks, without more, cannot ground a cause of action"). Plaintiff's thesis concerning the import of gender roles in this "admission" therefore falls apart. Plaintiff does nothing but pile inference upon inference and inject her own assumptions into this statement when arguing Ahn was trying to say that Plaintiff was "not acting in conformity with a proper gender role, in turn call[ing] [Ahn's] gender roles into question." Plf. Br. at 31. Plaintiff's "subjective perception is not evidence," and her highly speculative interpretation of Ahn's words does not create a material issue of fact to save her claims from resolution on summary judgment. *See Santiago v. Canon U.S.A.*, 138 F.3d 1, 6 (1st Cir. 1998) ("Summary judgment may be warranted even as to such elusive elements as a defendant's motive or intent where the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." (internal quotations omitted)). *See National Amusements v. Town of Dedham*, 43 F.3d 731, 743 (1st Cir. 1995) (courts will not "embrace inferences that . . . rely on 'tenuous insinuation'" when ruling on summary judgment motions); *see also Macone v.*

*Town of Wakefield*, 277 F.3d 1, 5 (1st Cir. 2002) (internal quotations omitted) ("Appellants are entitled to all inferences which are fairly supported by the evidence, but are not permitted to build their case on mere opprobrious epithets of malice . . . or the gossamer threads of whimsey, speculation and conjecture.").

In relying on her own interpretation of this "admission," Plaintiff cannot effectively counter the uncontroverted evidence in the record that Plaintiff was terminated due to her unprofessionalism, insubordination, and disrespect toward Dr. Ahn. That is particularly the case where Ahn's statement matches his rationale all along, namely that he felt disrespected by Plaintiff and would not continue to work at the Practice with her.

### C. Plaintiff Cannot Establish "Chain-of-Causation" or "Cat's Paw" Liability, as She Cannot Show Discriminatory Motivation by Ahn

Plaintiff argues that the Practice is liable under a theory of either "chain of causation" or "cat's paw" liability due to the fact that Ahn set into motion events that led an innocent decisionmaker – here, the Practice – to fire Plaintiff. Plf. Br. at 61. Under cat's paw liability, an employer can be held liable when a decision-making official "relies on false information that is manipulated by another employee who harbors illegitimate animus to take an adverse employment action." *Brandt v. Fitzpatrick*, 957 F.3d 67, 79 (1st Cir. 2020) (internal quotations omitted); *see also Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 73–74 (1st Cir. 2015) (holding plaintiff's cat's paw liability theory was "effectively declawed"

absent "evidence of retaliatory animus on anyone's part sufficient to raise a disputed question of fact").

It is undisputed that the partners at the meeting listened to Ahn's concerns about Plaintiff before making their decision to terminate Plaintiff. RA0629 at 165:8–11. It is also undisputed that each partner provided their opinion and feedback on Plaintiff, and that no one could come up with any alternative, workable option that would allow both Plaintiff and Dr. Ahn to remain at the Practice. *Id.*; RA0629 at 165:8–23. Plaintiff cites to these facts as the basis for her cat's paw liability theory, contending that the Practice's vote was dependent on Ahn's representations to the partners, and that Ahn's representations were driven by discriminatory animus.

However, much as was the case in *Ameen*, the cat's paw theory here is "declawed" by the absence of any discriminatory animus whatsoever; it is also disarmed by the very truth of Ahn's statements concerning Plaintiff's disrespect. Plaintiff herself admitted to the Practice that she did not respect Ahn, and in fact called him names that the Executive Director did not think would allow Plaintiff and Ahn to have a future working relationship. Plaintiff's argument that Ahn was motivated by discrimination therefore falls apart, as do her theories for both cat's paw liability and "chain of causation."

Additionally, it is undisputed that Plaintiff and Dr. Ahn no longer had a workable relationship. Plaintiff told Ms. Talbot-Kleeman that she did not respect Dr. Ahn and found him "lazy." Dr. Ahn said that if Plaintiff was not terminated, he felt so strongly about the disrespect that was shown that he would leave the Practice. The partners spent time at the meeting trying to identify whether there was a way to keep both Plaintiff and Dr. Ahn at the Practice but were unable to come up with any solution. That is not illustrative of "cat's paw" liability where an employee manipulates information given to a decisionmaker to cause a termination; instead, it is an instance where an employer grappled with a true, intractable problem it could not fix other than to keep one employee and terminate the other.

### D. Plaintiff's Arguments Concerning Other Alleged Behavior by Ahn Relies on Evidence That Is Neither Relevant Nor Admissible

Throughout her brief, Plaintiff attempts to paint a malicious picture of Ahn – unfairly and falsely attributing characteristics and descriptions to him that are not supported by the record. Plf. Br. at 35 (baselessly stating – without citation to the record – that Ahn "lashes out when he perceives professional women 'dare' to do things, 'disobey' him, or fail to exhibit appropriate deference"); *id.* at 41 (stating that Ahn described himself as "livid," without any record support for same); *id.* at 42 (falsely asserting that Ahn admitted he yelled and blew up, while citing to record citations that do not support Ahn admitting this); *see also* RA 0680 at 40:9–

15 (where Ahn denies ever saying he "lost it" or "blew up"). By so doing, Plaintiff attempts to superimpose over the evidence her own subjective narrative – a narrative that is "not evidence." *Santiago*, 138 F.3d at 6. Plaintiff also relies on irrelevant interactions between Ahn and individuals who were not NHNSI employees to unfairly demonize Ahn. *See* Plf. Br. at 35–36 (relying on hearsay within hearsay in Catholic Medical Center documents concerning Dr. Ahn and Catholic Medical Center employees, which alleged described events did not involve Plaintiff). These anecdotes on which Plaintiff relies are not material evidence to be considered for either Ahn's or the Practice's summary judgment motions, as they do not concern the allegations of gender discrimination Plaintiff alleges to have experienced at the Practice. Further, they are not supported by sworn testimony as is required for their consideration on summary judgment.[4]

Nor do the facts of this case otherwise support Plaintiff's contention that gender stereotyping was the cause of Plaintiff's termination. Plaintiff attempts to analogize this case to *Burns v. Johnson*, where the Court held that an example of a gender stereotype is the notion that men are better suited for positions of importance than women. 829 F.3d 1, 13–14 (1st Cir. 2016). That stereotype is

[4] Plaintiff also relies on text messages when making certain assertions regarding Ahn. *See, e.g.*, Plf. Br. at 36 (citing RA 1428). However, text messages are not appropriate evidence to consider at the summary judgment stage as they are unsworn statements.

inapposite here: there was no "position of importance" at issue in this case and no question about Plaintiff's abilities to complete her PA work. There were only concerns about her behavior and how she treated Dr. Ahn with disrespect. Nor is the stereotype that assertive women can be considered "overly aggressive" and treated differently than a man with similar characteristics one that is applicable here: Plaintiff was never described as aggressive, but as rude and hostile. *Compare Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–51 (1989). The rude, hostile conduct by Plaintiff was rude and hostile no matter her gender. Moreover, there were no male PAs that got away with similar disrespectful conduct or openly admitted to not respecting Ahn (or calling him names to the Executive Director).

Plaintiff also fails to mention that Ahn had undisputed, legitimate reasons for not operating with either Plaintiff, in whom he lost trust following the consent incident in 2017, or Georgia Plamondon, who Dr. Ahn believed lacked certain technical skills that he believed risked patient care. RA0670 at 100:3–9. Ahn also did not operate with two male PAs, Michael Smith and Russell Denysyk. RA 655 at 40:19–23. Plaintiff misleads this Court when stating that Ahn "singled [Plaintiff and Georgia] out" for a suggested compensation reduction "without any specific reason": Plaintiff and Georgia were the only part-time PAs, and Ahn testified that "they were part-time so they were working less. That's the only reason why I would have made that recommendation." RA0674 at 115:8–11.

In selecting which "facts" to tell this Court to portray Dr. Ahn as maliciously as possible, Plaintiff also neglects to tell this Court that one of the PAs with whom Ahn had the "best working relationship" was a woman: Karen Barry, née Palys, who he described as "talented technically" and "professional." RA0676 at 124:6–18. Moreover, Ahn had challenges with male employees, as well; the only other NHNSI employees that Ahn ever requested be terminated were both male (Michael Smith and Ruslan Denysyk). RA0976–77. None of these facts are disputed.

For all these reasons, Plaintiff's discrimination claims fail as a matter of law, and both Defendants are entitled to summary judgment.

## III. THE PRACTICE HAD ALREADY TERMINATED PLAINTIFF AND DID NOT RETALIATE AGAINST HER WHEN ENDING ITS NEGOTIATIONS OVER HER TRANSITION OUT OF THE PRACTICE

To prevail on her retaliation claim, Plaintiff must show that (1) she has engaged in protected conduct; (2) the defendant subjected her to an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *Serrano-Colon*, 121 F.4th 272–73. Plaintiff cannot show that there was any causal connection between any protected activity and any action by NHNSI. Further, NHNSI's decision to end negotiations regarding her transition out from the Practice did not constitute adverse employment action, such that Plaintiff's claim for retaliation must fail.

### A. There Was No Causal Connection Between Plaintiff's Accusations of Gender Discrimination and NHNSI's Decision to End Unproductive Negotiations Intended to Assist Plaintiff

In this case, there is no causal connection between any protected activity and any decision made by NHNSI, let alone any adverse employment action. Plaintiff's employment was terminated on March 25, 2019. One day later, Ms. Talbot-Kleeman informed Plaintiff that she had been terminated. RA0630 at 168:19–169:11; RA0633 at 179:12-20; RA0414. Several days later, on March 29, Plaintiff told Ms. Talbot-Kleeman she believed her termination had to do with her gender. RA0017 ¶ 77; *see also* RA0037 ¶ 77. Ms. Talbot-Kleeman, although disagreeing with Plaintiff's perspective, did not do anything to retaliate against her. On the contrary, she suggested in that same conversation that she help Plaintiff formulate a transition plan so that Plaintiff was not left without any income while she searched for a new job. RA0635 at 186:4–187:13, 188:7–9. Both parties knew and understood that Plaintiff had already been terminated, but that NHNSI was willing to work with Plaintiff on giving her some additional time to continue working until she found a new job. In this spirit, the Practice proceeded to negotiate with Plaintiff over the course of more than a month, exchanging multiple proposals in that timeframe. *See id*; RA0429; RA0441; RA0448. Therefore, even though Plaintiff raised her opinion on March 29 that she was discriminated against, the Practice nevertheless voluntarily engaged in discussions (which lasted weeks)

to help make Plaintiff's transition out of the Practice easier and smoother. RA0635 at 186:4–187:13, 188:7–9.

The Practice continued these discussions in good faith for about four weeks: the Practice discussed with Plaintiff the plan for how Plaintiff would transition out of the Practice, and Ms. Talbot-Kleeman drafted proposals and sent them to Plaintiff for her review. Then, on April 29, 2019, Plaintiff, through her counsel, rejected NHNSI's latest offer, which had included terms requested by Plaintiff herself. RA0448. Plaintiff rejected the Practice's proposal and instead demanded $100,000. It was at this juncture that the Practice decided it would not be productive to continue to explore a transition plan with Plaintiff. The Practice thus opted to end negotiations following Plaintiff's rejection of the Practice's latest offer.

The fact that the demand letter echoed Plaintiff's earlier perception (as expressed on March 29) that she had been discriminated against does not render this action by the Practice "retaliatory," particularly since the Practice had already heard Plaintiff's concerns of gender discrimination before (and nevertheless initiated a conversation to help Plaintiff and negotiate a more favorable exit strategy). The Plaintiff's demand for a large payment – a payment that was more than six times what NHNSI had initially offered – signaled to the Practice that it was no longer productive to continue negotiations with Plaintiff. Given Plaintiff's

rejection of NHNSI's latest proposal, and her unreasonable counteroffer for payment instead, the Practice withdrew its offer to work on a transition period, and the Practice told Plaintiff the earlier decision to terminate her on March 25 would be effective immediately. Importantly, the actual adverse employment action – the termination decision – was made on March 25, days before the Plaintiff ever mentioned concerns about gender discrimination the first time on March 29. RA0575 at 193:11–194:5 (where Plaintiff testifies that it was already made clear to her on March 26 that her employment was going to end). The decision to end transition negotiations was not prompted by any allegations of discrimination, either. Rather, the Practice decided that, in light of the Plaintiff's rejection of its offer and her unreasonably large demand, it was no longer productive to continue with transition discussions.

### B. Ending Voluntary Negotiations Does Not Constitute an Adverse Employment Action for Purposes of a Retaliation Claim

An "adverse employment action" is one that "affect[s] employment or alter[s] the conditions of the workplace and typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010) (internal quotations omitted). *See also Bickley v. CenturyLink, Inc.*, No. CV 15-1014-JGB, 2016 WL9046910, at *6 (C.D. Cal. July 21, 2016) (granting defendant

employer's motion for summary judgment and holding refusal of employer to pay amount demanded by Plaintiff in demand letter was not adverse employment action, as conduct "that is merely contrary to the employee's interests or not to the employee's liking is insufficient to state a claim for retaliation" (internal quotations omitted)). The only adverse employment action in this case occurred on March 25, 2019, before Plaintiff ever made any allegation of discrimination or sent a demand letter to NHNSI. That was the day the partners voted to terminate Plaintiff's employment. Plaintiff had already been told of the decision to terminate her employment before she made any allegations of discrimination (which allegations were made before the Practice offered to work on a transition period with her, and over a month before the Practice withdrew from those negotiations). Plaintiff and NHNSI had not agreed to any transition plan yet for her to have been denied any benefits to which she was entitled when she was asked to leave – in fact, NHNSI was not even expecting Plaintiff to return to work following her vacation given the then-status of negotiations.

The Practice's decision to end the negotiations was not prompted by any protected activity, as the allegations of gender discrimination had been made before the Practice elected to engage in voluntary negotiations with Plaintiff. Moreover, ending such voluntary negotiations does not constitute an adverse employment action for purposes of a retaliation claim. The Fourth Circuit Court of

Appeals addressed this very issue in *David v. Winchester Med. Ctr.*, 759 Fed. Appx. 166, 169 (4th Cir. 2019). In *David*, a nursing director, who was terminated by her medical center employer, alleged that the employer retaliated against her by withdrawing its offer of severance and classifying the termination as involuntary (resulting in a loss of payment for accrued paid time off) after she asserted her rights under various antidiscrimination statutes. *Id*. However, the Court found that the employer did not withdraw its severance offer, but that the employee rejected it, thus concluding that the employer "took no adverse action against [the plaintiff] when it simply accepted [her] rejection [of the employer's severance offer] and declined to initiate further negotiations." *Id*. at 169. The Court went on to state that "[t]here is no adverse employment action when an employer declines to pay discretionary severance benefits because a terminated employee 'refused to sign' a separation agreement." *Id*. (citing *EEOC v. SunDance Rehab Corp*., 466 F.3d 490, 501 (6th Cir. 2006) and *EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 452 (3d Cir. 2015)). *See also Smith v. Bibb Cnty. Sch. Dist.*, No. 5:16-cv-213, 2018 WL 1440213 at *9, n.11 (M.D. Ga. Mar. 22, 2018) (employer's participation in settlement negotiations in which plaintiff agreed to engage was not "adverse action"); *Richardson v. City of Niagara Falls, New York*, 2012 WL 75771, at *6 (W.D.N.Y. Jan. 10, 2012) ("[T]he law is clear that a plaintiff alleging discriminatory treatment in the negotiation of a severance payment cannot claim to

have suffered an adverse employment action where the award of severance pay was a privilege rather than a right." (internal quotations omitted)); *Majali v. United States Dept. of Labor*, 294 Fed. Appx. 562, 2008 WL 4367365, at *5–6 (11th Cir. 2008) (concluding record evidence supported Board's decision that Petitioner's unreasonable and excessive demands for a severance package led to a deterioration of the parties' relationship and Petitioner's termination, thus affirming decision that there was no retaliation against Petitioner for his protected whistleblowing activity).

Here, too, the Practice did not do anything adverse when it accepted Plaintiff's rejection of its latest proposal and declined to engage further in negotiating a transition period. If such a decision to withdraw from negotiations is protected activity, then every employer would be at the mercy of employees who make demands the employer is unwilling to entertain: the employer would then be faced with the decision to either capitulate to those demands, waste time on unproductive negotiations, or face a retaliation claim. Here, Plaintiff's demand of $100,000 was unreasonable to NHNSI. NHNSI simply accepted Plaintiff's rejection of its latest offer and withdrew from negotiations. For these reasons, and because she had no entitlement to severance, the decision to end settlement negotiations and treat the termination as immediately effective (only after Plaintiff rejected the Practice's severance offer and made what the Practice deemed to be an

unreasonable counterdemand) does not constitute an adverse employment action that can give rise to a retaliation claim.

### C. Plaintiff Herself Rejected the Independent Contractor Agreement Proposed by NHNSI

In her April 29, 2019 letter, Plaintiff's attorney plainly rejected the Practice's proposals for the transition period and did not offer a counter proposal for transition and severance or for an independent contractor position at the Hillsborough County Nursing Home. RA0448–449. Plaintiff's attorney wrote the following in the April 29 letter:

> I cannot advise my client to consider the proposed Independent Contractor Agreement, which contains no guarantees for her benefit, in resolving this matter.

RA0449 (emphasis added). As such, it was Plaintiff who ended the transition negotiations: NHNSI did not "prevent" her from working as an independent contractor at the nursing home as Plaintiff contends. Plf. Br. at 68. Nor was there any "expectation," as Plaintiff argues, that Plaintiff would continue to work as an independent contractor at the nursing home following Plaintiff's rejection of the Independent Contractor Agreement. Plf. Br. at 63. In any event, any expectation that Plaintiff had in continuing to work as an independent contractor and to make that work a part of a transition plan with the Practice constituted a privilege rather than a right and cannot form the basis for an adverse employment action. *See Richardson v*, 2012 WL 75771, at *6.

## IV. NHNSI DID NOT RETALIATE AGAINST PLAINTIFF WHEN DIRECTING SURGEONS TO FOLLOW ITS WRITTEN POLICY ON REFERENCES

Plaintiff also alleges that NHNSI retaliated against her by withholding reference letters. Plf. Br. at 13, 68–69; *see* Compl. ¶ 90. Plaintiff cannot meet her burden of proof on these allegations, as NHNSI simply directed surgeons to follow its written policy and its protocol on references. Under that policy, all reference letters are to go through NHNSI and be approved by the Executive Director. RA 0637 at 197:7–23; RA 0638 at 198:15–199:3; RA0463 § 203. That is in part because anything that NHNSI wrote for Plaintiff would be a part of her file. *Id*. at 197:12–16. More importantly, Ms. Talbot-Kleeman wanted to make sure that NHNSI and Plaintiff were being consistent in the way in which they were classifying Plaintiff's termination so that Plaintiff was not disadvantaged by inconsistent narratives. Ms. Talbot-Kleeman asked the surgeons to hold off on sending recommendations because she was waiting to hear from Plaintiff's attorney on that issue before she cleared any references to be sent. RA0637 at 197:1–16; 201:9–13. In the end, Plaintiff received positive references from NHNSI doctors, RA0018–19 ¶¶ 85–87, and she obtained employment beginning in July 2019, approximately two months after her last day at NHNSI. There is no evidence that Plaintiff suffered any harm or injury from any minor delay Plaintiff experienced in ultimately obtaining references.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's decision to grant NHNSI's motion for summary judgment.

Respectfully submitted,

NEW HAMPSHIRE NEUROSPINE INSTITUTE, P.A.

By its Attorneys,

McLANE MIDDLETON, PROFESSIONAL ASSOCIATION

Date: December 19, 2025

By: */s/ Amanda E. Quinlan*

Amanda E. Quinlan, Bar No. 1207875
Adam M. Hamel, Bar No. 11710
900 Elm Street, P.O. Box 326
Manchester, NH 03105
(603) 625-6464
amanda.quinlan@mclane.com
adam.hamel@mclane.com

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(g)(1)

I certify that the foregoing brief complies with Fed. R. App. P. 32(g)(1), as it contains 10,244 words.

*/s/ Amanda E. Quinlan*
Amanda E. Quinlan

**CERTIFICATE OF SERVICE**

I certify that on December 19, 2025, I served the foregoing brief on all counsel of record by filing through this Court's electronic filing system.

/s/ Amanda E. Quinlan
Amanda E. Quinlan