**No. 25-1519**

# United States Court of Appeals
**For the First Circuit**

---

GINA RUSSO,

Plaintiff-Appellant,

v.

NEW HAMPSHIRE NEUROSPINE INSTITUTE, P.A.; URI M. AHN,

Defendants-Appellees.

---

*On Appeal from Orders and Judgment of the U.S. District Court for the District of New Hampshire, 1:21-cv-00703-SM-TSM*
*Rendered by Hon. Steven J. McAuliffe, U.S.D.J.*

---

# REPLY BRIEF FOR THE PLAINTIFF-APPELLANT

RESPECTFULLY SUBMITTED,

GINA RUSSO

BY HER ATTORNEYS:

***Kamee Verdrager, Esq.***
KBV LAW
P.O. Box 90
W. Nottingham, N.H. 03291
(603) 488-1473
kbv@kbvlawpc.com
CA01 #101062
*Attorney for Plaintiff-Appellant*

***Robert S. Mantell, Esq.***
LAW OFFICE OF ROBERT S. MANTELL
47 Liberty Avenue
Somerville, MA 02144
(617) 470-1033
RMantell@TheEmploymentLawyers.com
CA01 #31754
*Attorney for Plaintiff-Appellant*

# Table of Contents

**TABLE OF AUTHORITIES** .................... i

**ARGUMENT** .................... 1

I. **SUMMARY JUDGMENT SHOULD BE REVERSED ON THE CLAIMS FOR SEX DISCRIMINATION** .................... 1

A. Defendants Improperly Recount the Record in the Light Most Favorable to Them .................... 1

B. Russo Has Established a *Prima Facie* Case of Gender Discrimination .................... 2

C. A Jury May Find the "Husband and Father" Comment to Reflect a Mindset Based on Gender Stereotypes .................... 5

D. Defendants Misapply the Pretext Stage .................... 9

E. Ahn's Discriminatory Mindset Caused Russo's Termination .................... 13

F. Ahn was Hostile Toward Russo and Other Women .................... 16

G. Investigator Bailey's Report and Findings do Not Establish the Absence of Discrimination .................... 21

H. Defendants Use an Overly Restrictive Comparator Standard .................... 22

II. **SUMMARY JUDGMENT SHOULD BE REVERSED ON RUSSO'S CLAIM FOR RETALIATION** .................... 24

A. A Jury Could Find That the Accelerated Termination of the Transition Period was Motivated by Retaliation .................... 25

B. The Accelerated Cessation of Employment was an Adverse Action .................... 30

III. **THERE IS AMPLE BASIS FOR INDIVIDUAL LIABILITY** .................... 34

**CONCLUSION** .................... 35

**CERTIFICATE OF SERVICE** .................... 36

Certificate of Compliance with Type-Volume Limit .................... 37

# TABLE OF AUTHORITIES

**Cases**

Alvarez v. Royal Atl. Dev., Inc., 610 F.3d 1253, 1258 (11th Cir. 2010)..30, 31, 36

Ames v. Ohio Dept. of Youth Services, 605 U.S. 303 (2025) .................... 3

Artesi v. Demoulas Super Markets, Inc., 2020 U.S. Dist. Lexis 269940 (D.N.H. June 2, 2020)............................................................. 40

Ash v. Tyson Foods, Inc., 546 U.S. 454 (2006)........................................ 10

Bostock v. Clayton Cnty., 590 U.S. 644 (2020) ...................................... 36

Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53 (2006) ...... 39

Byrnes v. St. Catherine Hosp., 2025 U.S. App. Lexis 28451 (10th Cir.). 14

Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77 (1st Cir. 2004)........ 18

Casella v. MBNA Mktg. Sys., 2009 U.S. Dist. Lexis 50176 (D. Me) ...... 10

Chadwick v. WellPoint, Inc., 561 F.3d 38 (1st Cir. 2009) ......................... 9

Conway v. Electro Switch, 825 F.2d 593 (1st Cir. 1987) ......................... 21

Cummings v. Std. Register Co., 265 F.3d 56 (1st Cir. 2001)................... 21

David v. Winchester Med. Ctr., 759 Fed. Appx. 166 (4th Cir. 2019)....... 37

Gilbrook v. City of Westminster, 177 F.3d 839 (9th Cir. 1999)............. 17

Hishon v. King & Spalding, 467 U.S. 69 (1984) .................................... 38

Holsum de Puerto Rico, Inc. v. NLRB, 456 F.3d 265 (1st Cir. 2006) ..... 20

Joseph v. Lincare, Inc., 989 F.3d 147 (1st Cir. 2021) ............................. 24

Kachmar v. Sungard Data Sys., 109 F.3d 173 (3rd Cir. 1997)................ 34

Lipsett v. University of Puerto Rico, 864 F.2d 881 (1st Cir. 1988) ......... 16

Margolis v. Tektronix, Inc., 44 F. Appx. 138 (9th Cir. 2002)............ 10, 13

Melendez-Arroyo v. Cutler-Hammer de P.R. Co., 273 F.3d 30 (1st Cir. 2001) ........ 13

Mercado v. Hyannis Air. Serv., 156 F.4th 18 (1st Cir. 2025) ........ 2, 15

Miller-El v. Dretke, 545 U.S. 231 (2005) ........ 27

Pape v. Dircksen & Talleyrand Inc., 2019 U.S. Dist. Lexis 17717 (E.D.N.Y. 2019) ........ 33

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) ........ 9, 13, 17

Ripoli v. R.I. Dept. of Hum. Servs., 123 F.4th 565 (1st Cir. 2024) ........ 3

Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52 (1st Cir. 2005) ........ 3

Russo v. N.H. Neurospine Inst., P.A., 2025 U.S. Dist. Lexis 77870 (D.N.H.) ........ 25

Smith v. Chrysler Corp., 155 F.3d 799 (6th Cir. 1998) ........ 11

Smith v. Stratus Computer, 40 F.3d 11 (1st Cir. 1994) ........ 26

Tejada-Batista v. Morales, 424 F.3d 97 (1st Cir. 2005) ........ 17, 18

Thomas v. Eastman Kodak Co., 183 F.3d 38 (1st Cir. 1999) ........ 12

Velez v. Thermo King de P.R., 585 F.3d 441 (1st Cir. 2009) ........ 4, 26

Verdrager v. Mintz, Levin, 474 Mass. 382 (2016) ........ 20

Watkins v. Schriver, 52 F.3d 769 (8th Cir. 1995) ........ 25

Wexler v. White's Fine Furniture, 317 F.3d 564 (6th Cir. 2003) ........ 8, 12, 18

Young v. United Parcel Service, 575 U.S. 206 (2015) ........ 27

**Other Authorities**

Etherington, et al, "How gender shapes interprofessional teamwork in the operating room: a qualitative secondary analysis", BMC Health Services Research (2021) 21:1357, https://bmchealthservres.biomedcentral.com/articles/10.1186/s12913-021-07403-2 ........ 7

R. Mantell, "All Relevant Respects: The Impossible Standard for Comparator Evidence in Discrimination Cases," July/August 2020 Mass. Bar Assoc. Section Review 17, https://www.massbar.org/publications/section-review/section-review-article/section-review-2020-july-august-2020/all-relevant-respects-the-impossible-standard-for-comparator-evidence-in-discrimination-cases ........ 28

Trombini, et al., "Self-Affirmation Increases Men's Openness to Women's Dominance Behaviors," *Negotiation and Conflict Management Research* 17(2), 106, 108-109 (2024) ........ 8

Williams, et al., Beyond Implicit Bias: Litigating Race and Gender Employment Discrimination Using Data from the Workplace Experiences Survey, 72 Hastings L.J. 337, 368 (2020) ........ 6, 10

**Rules**

Fed. R. Evid. 404(b)(2) ........ 20

Fed. R. Evid. 801 ........ 25

Fed. R. Evid. 803(6) ........ 24

Plaintiff-Appellant Gina Russo (Russo) hereby submits her Reply Brief in response to the Opposition Briefs of New Hampshire Neurospine Institute, PA (NHNSI) and Dr. Uri Ahn (Ahn).

## ARGUMENT

### I. SUMMARY JUDGMENT SHOULD BE REVERSED ON THE CLAIMS FOR SEX DISCRIMINATION

#### A. Defendants Improperly Recount the Record in the Light Most Favorable to Them

NHNSI's assertion that Russo did not get along with Ahn is dispute. NHNSI Opp. at 7. Ms. Talbot-Kleeman's deposition testimony (RA623:141:18-19), is contradicted by multiple evaluations in which Ahn gave Russo high marks for "ability to work well with others" and "Interpersonal and Communication Skills." RA1275;RA127.

Ahn claims that Russo felt, in 2017, that it was inappropriate for Ahn to ask her to travel to St. Joseph's. Ahn Opp. at 7. Actually, Russo believed that Ahn was inappropriately rude during that call, and furthermore, that it was inappropriate that Ahn demanded she travel elsewhere immediately when she had been instructed by a different

doctor to stay with a different patient. RA330:61:1-5;RA542:64;RA1000:13.

NHNSI faults Russo for failing to alert Ahn about the 2017 conversation with the patient, asserting that this failure of notice deprived Ahn of the ability to prepare himself for the patient's questions. NHNSI Opp. 10-11, 13. However, neither NHNSI nor Ahn identified this alleged failure as a miscue by Russo in the depositions or court papers below. RA51; RA150-151;RA665:80:1-21. Adding criticisms post hoc can be seen as evidence of pretext. Mercado v. Hyannis Air. Serv., 156 F.4th 18 (1st Cir. 2025).

## B. Russo Has Established a *Prima Facie* Case of Gender Discrimination

NHNSI asserts that, for gender discrimination claims, it is insufficient at the fourth stage of the prima facie case to show that "there was a continuing need for [Russo's] work." NHNSI Opp. 26. However, the First Circuit has held, *in a gender discrimination case*, that it is sufficient to show that the employer "had a continuing need for the work [plaintiff] was performing prior to her termination." Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 59 (1st Cir. 2005). In another gender discrimination case, the First Circuit held that

the plaintiff could establish her *prima facie* case with evidence "that [the employer] had a continuing need for the [plaintiff's] services. Ripoli v. R.I. Dept. of Hum. Servs., 123 F.4th 565, 573 (1st Cir. 2024). Thus, Russo has asserted a correct *prima facie* standard.

Ahn and NHNSI assert that Russo is confined to a single iteration of the prima facie case. Ahn Opp. 16-17; NHNSI Opp. 26. However, the Supreme Court "has long rejected such inflexible formulation[s] of the prima facie standard in disparate-treatment cases." Ames v. Ohio Dept. of Youth Services, 605 U.S. 303, 311 (2025). The Circuit Courts have been instructed "to avoid inflexible applications" of the *prima facie* case. Id. at 310. NHNSI asserts that Russo must show that she "performed her job satisfactorily" as part of the *prima facie* case. NHNSI Opp. 27. Russo directly addressed this burden and satisfied it, with proof of Russo's eleven-year tenure, many positive evaluations, record of bonuses over a course of years, additional praise for her workplace demeanor and technical competence, and positive reference letters. Russo Bri. at 25-27.

While NHNSI asserts that Russo's alleged rudeness precludes a finding of satisfactory performance (NHNSI Opp. 27), the sufficiency of

the produced evidence in support of a *prima facie* case is evaluated in isolation and without consideration of the employer's countervailing evidence. Velez v. Thermo King de P.R., 585 F.3d 441, 448-449 (1st Cir. 2009). Moreover, not even NHNSI found Russo to be rude or unprofessional, as it neither disciplined nor counseled her for any reason. RA1541-42¶5;RA608:80. NHNSI terminated Russo based on Ahn's ultimatum, and not because the Board found her to be disrespectful. RA745-746:49-50.

Defendants assert that Russo called Ahn "names," said he was lazy, and did not respect Ahn. NHNSI Opp. 14,29-30,35-36; Ahn Opp. 20. Even if we knew which names were called (we have no idea), these comments are irrelevant. These alleged statements were uttered after the vote to fire Russo, and therefore could not have factored into the decision. RA1266. There is a complete absence of evidence that such comments were considered in the Board's vote to terminate Russo. Moreover, even Defendants' (disputed) version of events places the timing of these comments well after Ahn demanded Russo's termination, and therefore, could not have been a motivating factor. RA628:158:10-14;RA627:157:12-13. The Board's vote never found Russo

to be disrespectful, and merely passed upon Ahn's ultimatum that it was either "her or me." RA745:48:3-5.

NHNSI elsewhere explains that Ahn's "husband and father" comments were based on his refusal to work with someone who called him "lazy" and other "names." NHNSI Opp. 32. However, the record is clear that Ahn had not heard of the "lazy" and "names" until after his March 9 demands that Russo be fired. RA628:158:10-14;RA627:157:12-13.

### C. A Jury May Find the "Husband and Father" Comment to Reflect a Mindset Based on Gender Stereotypes

Historically, the roles of husband and father positioned men as providers and protectors, while women were expected to be deferential and nurturing. Even as family structures have evolved, the title of "father" and "husband" can carry with it an undertone of "final authority." Men are expected to have an assertive, leadership bearing. Williams, et al., Beyond Implicit Bias: Litigating Race and Gender Employment Discrimination Using Data from the Workplace Experiences Survey, 72 Hastings L.J. 337, 368 (2020). When a man carries these traditional roles into the workplace, especially a

hierarchical field like medicine, such a role carries with it an expectation of deference from female colleagues, the violation of which can be experienced as a violation of one's masculine identity.

Many studies confirm that women demonstrating an assertive bearing pay an "agentic penalty" of being labelled "aggressive," "shrill" and faulted for personality problems. Id. at 368-369. One study of tech companies found that 66% of women experienced criticisms about their personalities in performance reviews, while the same applied to only 1% of men. Id. at 369. In operating room settings, qualitative studies show that female professionals are often penalized for displaying leadership behaviors, as compared to men. Etherington, et al, "How gender shapes interprofessional teamwork in the operating room: a qualitative secondary analysis", BMC Health Services Research (2021) 21:1357, https://bmchealthservres.biomedcentral.com/articles/10.1186/s12913-021-07403-2. "[W]omen are routinely…perceived negatively for being assertive, as was the case for participants in this study." Id. at 12.

A jury could determine that Ahn was operating under the thrall of a sex stereotype. While everyone, including Ahn, evaluated Russo as being cooperative and pleasant, Ahn characterized her as "abrasive."

RA708:63:11-12; Wexler v. White's Fine Furniture, 317 F.3d 564, 571 (6th Cir. 2003) (characterization of woman as "abrasive" can indicate stereotyped thinking). In combination with other evidence, Ahn's invocation of his familial role—husband and father—as justification for his demand for Russo's termination, suggests that Russo's behavior was not evaluated on professional merit, but through a lens of gender role enforcement, where female assertiveness is treated as an unforgivable breach. Trombini, et al., "Self-Affirmation Increases Men's Openness to Women's Dominance Behaviors," *Negotiation and Conflict Management Research* 17(2), 106, 108-109 (2024) (males' unsuccessful negotiations or competition with women causes them to "incur losses to their sense of gender and social status"), https://ncmr.lps.library.cmu.edu/article/id/738/. Ahn could only maintain his traditional roles by enforcing one on Russo. We know this is a valid interpretation because other doctors understood Russo's behavior as professional and, indeed, required. RA0659:55; RA0706-707:55-57; RA0708:64; RA0718:105;RA0742-743:35-38.

Expert testimony is not necessary to establish that biased remarks invoke a stereotyped mindset.[1] It takes no special training to discern the operation of sex stereotyping from Ahn's treatment of Russo's assertiveness (i.e. her insistence on compliance with objectively correct principles that conflicted with Ahn's short-term desires) and his treatment of other women, as compared to his interactions with men. Price Waterhouse, 490 U.S. at 256; Margolis v. Tektronix, Inc., 44 F. Appx. 138, 141-142 (9th Cir. 2002); Casella v. MBNA Mktg. Sys., 2009 U.S. Dist. Lexis 50176 (D. Me) at 80-81.

Given that stereotypes represent a culture-wide phenomenon, a jury may employ its common sense to determine whether a decisionmaker was motivated by a stereotype. Williams, et al., Beyond Implicit Bias, 72 Hastings L.J. at 341-342, 431-434 (in research study involving thousands, participants readily accepted and recognized the phenomenon of assertive women being labelled as "difficult", and this pattern of bias has been well-recognized in literature and media sources).

[1] Price Waterhouse v. Hopkins, 490 U.S. 228, 256 (1989); Chadwick v. WellPoint, Inc., 561 F.3d 38, 48-49 (1st Cir. 2009).

NHNSI argues that Ahn's admission is gender-neutral, and could have been made in response to the conduct of a man. NHNSI Opp. 33. The Supreme Court rejected a similar argument in Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006), which held that while the term "boy" *could* be used in a race-neutral manner, the context and usage of the word permitted the inference that the term indicated a racial bias. Russo denies that Ahn's admission is gender-neutral. However, even if it could be perceived as such, it could also reasonably be interpreted as evidencing a biased mindset, especially in light of all the other evidence, including Ahn's negative treatment of women in the workplace. All reasonable inferences must be engaged to support Russo at the Rule 56 stage. Consequently, a jury may reasonably find unlawful bias, where Ahn has identified protection of his masculine roles as the reason why he was forced to push for Russo's termination.

**D. Defendants Misapply the Pretext Stage**

Defendants assert that Russo must successfully rebut Ahn's assertion that he found Russo to be disrespectful. Ahn Opp. 18. That misstates Russo's burden. In a stereotyping case, an actor operating under the warped perceptions of a stereotype may actually believe those

perceptions are valid. Smith v. Chrysler Corp., 155 F.3d 799, 806 (6th Cir. 1998). In this case, Ahn considered Russo to be "abrasive." RA708:63:11-12. Caselaw establishes that such characterization may indicate that stereotypes influenced Ahn's perceptions. Wexler, 317 F.3d at 571-572 (declaring female employee "abrasive" could be indicative of gender stereotype).

In a stereotyping case, at the pretext stage, the plaintiff may prevail by challenging the neutrality of Ahn's judgment, or by showing that the gender-neutral complaints he had about Russo do not completely explain his conduct. Thomas v. Eastman Kodak Co., 183 F.3d 38, 58 (1st Cir. 1999). As shown above, Ahn's admission about his husband and father role being the lynchpin in Russo's termination, as well as Ahn's record of attempting to assert dominance over female subordinates, without treating male comparators so negatively, establish that a jury could find his conduct to be the product of sex stereotyping.

Defendants' narrative denies that the three incidents had anything to do with a discriminatory mindset. Ahn Opp. 5,17-18; NHNSI Opp. 14, 28. Defendants ignore the fact that tension in the

workplace may well be caused by discriminatory attitudes, even if the subject matter of that tension does not directly touch upon gender. Price Waterhouse, 490 U.S. at 249 (women perceived to be overly aggressive); Margolis., 44 F. Appx. at 141-42 (same).

That said, Russo can also establish pretext in the more usual way. While Defendants claim that Russo was rude to Ahn in 2016 (NHNSI Opp. 8-9), this is disputed, as NHNSI never counselled or disciplined Russo for this alleged incident. RA0619:123;RA1053. Subsequent evaluations occurring soon afterward praised Russo's "ability to work well with others" and "ability to work well in teams," as well as her "interpersonal relations with…hospital staff" and "following directives." RA1275, 1277;RA1024. A reasonable jury may find reliance on an incident so remote in time from the termination (two and a half years), to be pretextual. Melendez-Arroyo v. Cutler-Hammer de P.R. Co., 273 F.3d 30, 34 (1st Cir. 2001) (pretext where employee was purportedly terminated for conduct occurring two years in the past, for which the employee was never counselled). Finally, Ahn insisted on relying on this incident to terminate Russo, even after being informed by two doctors that Russo had followed directions when she stayed with Wang's

patient and that she had done nothing wrong. RA659:55;RA706-707:55-57;RA708:64;RA718:105:RA742-43:35-38.

NHNSI claims, with respect to the 2017 incident, that Ahn felt that Russo had offered "an inappropriate surgical opinion" to his patient. NHNSI Opp. 11. Ahn likewise asserts that Russo "suggested an alternative surgical procedure" and "had given an inappropriate surgical opinion." Ahn Opp. 7,18. These accusations are ungrounded. Ahn acknowledged that he "does not know what Ms. Russo said to his patient." RA1054. Moreover, NHNSI did not discipline Russo for this incident and subsequently praised her work and demeanor highly. RA1274-75, 1277, 1024. Ahn's ungrounded accusations are a reliable indicator of a biased mind. Byrnes v. St. Catherine Hosp., 2025 U.S. App. Lexis 28451 (10th Cir.) at 24 (failure to extend the benefit of the doubt indicates unlawful bias).

NHNSI and Ahn claim that Ahn asked that Russo no longer be assigned to his operating room, on the grounds that she "gave a surgical opinion" to the patient. NHNSI Opp. 12; Ahn Opp. 9. Again, Ahn did not know what Russo said to the patient, so this explanation is pretext. RA1054. This assertion is also shown to be pretextual, given that Ahn

elsewhere asserted the equally false reason that he refused to operate with Russo because she was not "skilled on orthopedic/spine surgeries." RA977; Russo Bri. at 50-52 (showing this explanation to be knowingly false). These changing, inconsistent explanations can be deemed to be pretextual and not reflective of the real reason for Ahn's aversion to working with Russo. Mercado, 156 F.4th at 28-29.

The March 9, 2019 incident can also be shown to be an ungrounded basis for demanding Russo's termination. In that call, in response to Ahn's request for help in discharging a patient, Russo immediately proposed solutions and pleaded with Ahn to tell her what he wanted her to do. Ahn refused to respond constructively until he finally agreed to Russo's first proposal. RA1040;RA568:168. Even in Ahn's own version of events, Russo acted properly. RA1040. Thus, pretext has been established in the most basic sense, as well as through a stereotyping frame.

### E. Ahn's Discriminatory Mindset Caused Russo's Termination

NHNSI denies that Ahn's bias led to Russo's termination under the chain-of-causation theory. NHNSI Opp. 34. However, where a work relationship becomes damaged based on a discriminatory mindset, the

employer is responsible where the damaged relationship leads to a termination.

An instructive case is Lipsett v. University of Puerto Rico, 864 F.2d 881 (1st Cir. 1988), which involved a claim of gender discrimination in which the employer stated that it fired Lipsett based on a "personality conflict" that "had gotten out of hand." Id. at 911. However, because the "personality conflict" originated in the sexist attitudes and actions of Lipsett's co-workers and her resulting frustration, the court ruled that "she is a victim of discrimination and her dismissal, even where the work environment has degenerated completely, is in violation of Title VII." Id.

Lipsett stands for the proposition that when a conflict originates from illegal factors or motives, the employer is responsible when that conflict spins out of control. Id.; see also Tejada-Batista v. Morales, 424 F.3d 97, 102-103 (1st Cir. 2005) (in case involving "sequential actors having different motives," where the first actor had an unlawful motive, the first actor's bias was imputed to employer); Gilbrook v. City of Westminster, 177 F.3d 839, 854 (9th Cir. 1999) ("[A]lthough the ultimate decision-maker, Huntley, had a legitimate motive to impose

discipline, the retaliatory motives of two subordinates, Demonaco and Anderson, set in motion the chain of events that led to Huntley's review and to the adverse employment action."). Again, even if we assume that Ahn genuinely felt frustrated with Russo, that emotion is consistent with an actor that harbors a biased state-of-mind. Price Waterhouse, 490 U.S. at 249.

Switching to the cat's paw theory, NHNSI incorrectly asserts that this type of liability theory is limited to instances in which the nefarious actor provides the innocent actor with false information. NHNSI Opp. 34. Instead, we know that liability may be established even when the nefarious actor identifies truthful information about the plaintiff which leads to termination. Tejeda-Batista, 424 F.3d at 102-103. Indeed, gender stereotypes may lead employers to fire an abrasive female employee, who is actually abrasive, but tolerate an equally irritating male employee. Wexler, 317 F.3d at 571-572. Thus, Russo need not assert that the information Ahn communicated to the Partners was false. The limitation suggested by NHNSI is simply not valid.

Finally, we know that Ahn directed and controlled Russo's termination, as the Board did not even attempt to hear her side of the

story, as it was irrelevant for them in their consideration of Ahn's ultimatum. In this way, the Board vote was a rubber stamp of Ahn's desires. Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 87 n.4 (1st Cir. 2004) (where senior managers relied on evidence of biased actor, based on that report and without hearing the employee's side, that can be seen as constituting a rubber stamp for purposes of the cat's paw theory, and not an independent determination that breaks the causal connection with unlawful bias).

### F. Ahn was Hostile Toward Russo and Other Women

There was ample evidence that Ahn became extremely angry at Russo and lashed out unprofessionally. RA1000:14 ("Ahn responded angrily to my suggestion"); RA1005:28 ("He was furious"); RA1005:29 ("Dr. Ahn screamed at me"); RA1006:33 ("He began yelling at me that I was passive aggressive and disrespectful. He continued to yell at me…and slammed the phone down").

Defendants deny that Ahn admitted to "blowing up" at Russo. NHNSI Opp. at 36; Ahn Opp. 21. In actuality, NHNSI's investigator, Bailey, memorialized the fact that, according to Ahn, things "progressed to the pt. he felt she crossed line & **he blew up**." RA1149 (emphasis

added). Elsewhere, Ahn acknowledged providing Russo with incorrect restrictions on her functions because he was "reacting out of anger" and "speaking out of anger." RA667:86:9-15,87:3-7. Talbot-Kleeman testified that Ahn acknowledged "yelling" at Russo. RA629:164:16-17. To the extent that Ahn denies yelling at Russo, that is a disputed fact to be resolved in Russo's favor at this point.

Defendants dismiss Ahn's hostile behavior towards other female subordinates (Russo Bri. at 33-37) as "irrelevant" and "anecdotes." NHNSI Opp. 37; Ahn Opp. 22. It is well-understood that a finder of fact may consider evidence of discrimination against others to discern whether the plaintiff was a victim of discrimination. Holsum de Puerto Rico, Inc. v. NLRB, 456 F.3d 265, 271 (1st Cir. 2006) (considering discrimination against a different union organizer); Verdrager v. Mintz, Levin, 474 Mass. 382, 400 (2016) ("there is evidence that women at the firm [other than the plaintiff], and in the ELB section in particular, were subject to discriminatory treatment"); Fed. R. Evid. 404(b)(2) (evidence of other wrongs admissible to prove motive or intent).

Evidence of a discriminatory mindset "is not rendered irrelevant by its failure to coincide precisely with the particular actors or

timeframe involved in the specific events that generated a claim of discriminatory treatment." Conway v. Electro Switch, 825 F.2d 593, 597 (1st Cir. 1987). Such evidence of discrimination against others telegraphs "the influences behind the actions taken with respect to the individual plaintiff." Cummings v. Std. Register Co., 265 F.3d 56, 63 (1st Cir. 2001). The probative value of Russo's evidence of hostility towards women is buttressed by the fact that Ahn treated male comparators far better. Russo Bri. at 37-39.

Ahn excluded the only two female PAs from his operating room – Russo and Plamadon. Russo Bri. at 33-34. While NHNSI asserts that there are legitimate reasons for this, Ahn and NHNSI evaluated both PAs in a positive fashion and never provided negative feedback about their technical performance. RA1477:8;RA1275;RA1277-78;RA665:79.

While NHNSI and Ahn claim that Ahn also refused to operate with two male PAs (NHNSI Opp. 38; Ahn Opp. 9, 23), that assertion is disputed, as it is contradicted by their answer to interrogatory 15. The interrogatory requests "every NHNSI employee that Ahn has refused to work with [or] demanded be terminated…". RA959:15. In response to this interrogatory, it was acknowledging that Ahn asked that Russo and

Plamadon "not be scheduled for his surgeries." RA960:15. While Ahn claims he suggested termination of two male PAs due to incompetence, the interrogatory answer *does not* indicate any refusal on Ahn's part to operate with them. Id. Thus, the jury could conclude that Ahn only refused to operate with the two female PAs. Id.

Ahn denies that he singled out Plaintiff and Georgia Plamondon for compensation reductions without any specific reason. Ahn Opp. 22. Ahn's deposition testimony stated:

> Q. So you don't recall anything about why you came to the conclusion that you wanted to reduce Gina and Georgia's pay?
>
> Ahn: I don't know why I said that. I don't recall…

RA674:114:17-21. While Ahn now claims that it was because the two women were part-time, that was just a guess, since he could not remember why he advocated lower salaries for them. Id.;RA675:115:8-11.

Ahn now claims that he had the "best working relationship" with another female PA, Karen Barry nee Palys. NHNSI Opp. at 39; Ahn Opp. 23. It is significant that there is no confirmation of this relationship from her. In 2016, Barry left NHNSI, contributing to the fact that by 2019, NHNSI employed no female PAs. RA955. On top of all

the other evidence of Ahn having difficulties working with female subordinates, Investigator Bailey writes about how "Ahn did not get along well with a Nurse named Maureen S[]age," and how Sage later resigned.[2] RA1079.

Ahn complains that some of the evidence of his difficulties with female subordinates is supported by documents from the Catholic Medical Center. Ahn Opp. 21-22. Importantly, Ahn does not deny the truth of the descriptions contained in the documents, which were obtained by subpoena. Id. Moreover, Ahn does not dispute their authenticity, and by every appearance, they are reliable. Id. The documents clearly fall within the business records exception to the hearsay rule, as there is every indication that they were written in good faith, in the regular course of business, long before Russo's civil action, and that the assertions made were the type that would regularly be documented once they arose. Fed. R. Evid. 803(6). It is enough at this stage that the documents are potentially admissible and that their

[2] Notably, Investigator Bailey did not interview Georgia Plamondon, the only other female PA employed by NHNSI at the time, even though she was aware that Ahn had excluded Ms. Plamondon from his OR. RA0893:159:7-160:3.

contents certainly are. Joseph v. Lincare, Inc., 989 F.3d 147, 156-157 (1st Cir. 2021) (documents produced in discovery that appear to be business records may "help push [the plaintiff's] case over the summary judgment hurdle").

### G. Investigator Bailey's Report and Findings do Not Establish the Absence of Discrimination

NHNSI hired an investigator, Attorney Bailey, who ultimately found an absence of sex discrimination. This finding of the investigator, which NHNSI paid for and which was generated while Defendants faced the prospect of litigation, does not preclude a jury from finding the discrimination, and is not itself evidence of their innocence. See Ahn Opp. 12, 19, 23; NHNSI Opp. 23. As the court below found, the Bailey report is inadmissible hearsay on the question of gender bias. Russo v. N.H. Neurospine Inst., P.A., 2025 U.S. Dist. Lexis 77870 (D.N.H.), at 7 n.5; Fed. R. Evid. 801.

To be clear, bedrock facts found by Bailey might be admissible. Her report included Ahn's "husband and father" admission, found that Ahn may have acted unprofessionally, and documented the fact that he had difficult relationships with female subordinates, such as a Nurse

named Maureen Sage, who ultimately resigned. RA1079; Russo, 2025 U.S. Dist. Lexis 77870 (D.N.H.), at 7 n.5. However, Bailey's conclusion – mirroring the ultimate issue in this case – that there was no gender discrimination, was inadmissible hearsay and properly excluded. Watkins v. Schriver, 52 F.3d 769, 772 (8th Cir. 1995) (expert witnesses excluded where the jury is adequately equipped to draw a conclusion from the evidence at hand).

### H. Defendants Use an Overly Restrictive Comparator Standard

Russo compares her treatment and that of other women with male comparators that Ahn treated better. Russo Bri. at 37-39. The male comparators were PAs, like Russo, who worked under Ahn – they were extremely similarly situated to Russo. According to the First Circuit, a comparator is someone "who is similarly situated in material respects" such that their situations can be reasonably compared. Velez v. Thermo King de P.R., Inc., 585 F.3d 441, 451 (1st Cir. 2009).

Ahn relies on more restrictive gloss on the comparator standard, which requires a showing that she was treated differently from person similarly situated "in all relevant aspects." Ahn Opp. 23, quoting Smith v. Stratus Computer, 40 F.3d 11, 17 (1st Cir. 1994). It is true that the

First Circuit maintains both versions of the comparator standard, despite the fact that the Velez standard is less restrictive than the Smith standard.

The Smith standard, requiring similarity in "all material respects" is simply too restrictive, and inconsistent with Supreme Court precedent. The Supreme Court has clarified that proof of discrimination does not "require the plaintiff to show that those whom the employer favored and those whom the employer disfavored were similar in all but the protected ways." Young v. United Parcel Service, 575 U.S. 206, 228 (2015). Requiring too restrictive standards make the anti-discrimination laws "inoperable." Miller-El v. Dretke, 545 U.S. 231, 247 n.6 (2005).

The flaw in the "all relevant respects" standard is fleshed out more completely in R. Mantell, "All Relevant Respects: The Impossible Standard for Comparator Evidence in Discrimination Cases," July/August 2020 Mass. Bar Assoc. Section Review 17, https://www.massbar.org/publications/section-review/section-review-article/section-review-2020-july-august-2020/all-relevant-respects-the-

impossible-standard-for-comparator-evidence-in-discrimination-cases[3] The more restrictive gloss fails to track the statute or bedrock evidentiary standards. Id.

However, even if the incorrectly restrictive gloss is used, the male and female PAs working under Ahn are sufficiently similar to fairly compare them. Defendants do not even attempt to show why the male PAs circumstances are so different that they should not be considered comparators.

## II. SUMMARY JUDGMENT SHOULD BE REVERSED ON RUSSO'S CLAIM FOR RETALIATION

NHNSI's Board voted to fire Russo on March 25, 2019. Soon thereafter, NHNSI offered Russo a transition plan, which contemplated that Russo work for NHNSI for three months through June 2019 and that she continue as an independent contractor at HCNH for an indefinite period. RA1009;RA637:194;RA1518;RA1290:19;RA1312-21;RA1323. On April 29, 2019, NHNSI received a letter from Russo's attorney formally complaining of gender discrimination, *and for that reason*, NHNSI decided to abruptly end all compensable work involving

[3] The article's author is one of Russo's attorneys.

Russo as of May 2, 2019, two months before the end of the transition period. RA1323-24;RA1291:29;RA1010;RA1328.

NHNSI argues that since the general decision to terminate Russo was made on March 25, 2019 and Russo's attorney complained thereafter, it was free to truncate the transition period two months early. NHNSI Opp. 40-41. It argues that because a general decision to terminate was finalized before the complaint, that the subsequent termination of the transition period was neither an adverse job action, nor could it have been caused by retaliation. As will be shown, both of these arguments fail.

### A. A Jury Could Find That the Accelerated Termination of the Transition Period was Motivated by Retaliation

A jury could determine on this record that Russo's transition period was terminated prematurely because of NHNSI's retaliatory motive. Where there is an initial decision to fire an employee, along with a contemplated transition period, it is illegal to accelerate the end of the transition period because of retaliation. Alvarez v. Royal Atl. Dev., Inc., 610 F.3d 1253, 1258 (11th Cir. 2010).

In the Alvarez case, the plaintiff was fired because she could not meet performance standards. Id. at 1258. However, the plaintiff was not

fired immediately and was retained during a transition period until a replacement could be found. Id. In response to the planned termination, Alvarez submitted a letter complaining that the contemplated job action was discriminatory. Id. at 1258, 1261. In response to that letter, one day later, the employer terminated the plaintiff instead of letting her serve out the transition period. Id. at 1258, 1262. The process of terminating Alvarez was "accelerated." Id. at 1262.

In the district court, the employer argued that there was no causal connection between the discrimination complaint and the premature end date, because the decision had previously been made to fire Alvarez. Id. at 1263. Summary judgment was granted. Subsequently, the Eleventh Circuit reversed. The Eleventh Circuit found that the accelerated firing was caused by a retaliatory motive, stating, "the evidence establishes that the letter did cause Alvarez to be fired the day after she emailed it, which is sooner than she otherwise would have been." Id. at 1268. The Eleventh Circuit reversed summary judgment on the grounds that it is possible for a retaliatory motive to cause the employer to accelerate the planned termination. Id.

The Alvarez case is completely on-point and dispositive. The decision to accelerate Russo's end date was made one day after receipt of her lawyer's demand letter. RA1291:29. The actual end date was May 2, only three days after receipt of the letter. RA1328. The letter, along with its allegations of gender discrimination, was clearly the motive for the accelerated demise of the transition period.

NHNSI asserts that the end of the transition period "was not prompted by any allegations of discrimination." NHNSI Opp. 42. That assertion is clearly in dispute. On April 30, 2019, the day after NHNSI received the lawyer's letter, Talbot-Kleeman wrote, "Sorry but I've had to tell Gina **she is done**. **She is making allegations that are unacceptable…**" RA1291:29 (emphasis added). Thus, there is extremely strong evidence that the transition period ended precisely because of the allegations of gender discrimination. The only allegations Talbot-Kleeman could be referring to are the claims of gender discrimination. RA995;RA1010.

NHNSI next asserts that it actually terminated Russo because of her "unreasonable" suggestion that the parties part ways and that she be paid $100,000 to release her claims. NHNSI Opp. 41-42; see RA1324.

However, Talbot-Kleeman's message describing her reason for the accelerated end date, did not mention Russo's demand as the reason end the transition period. RA1291:29. Again, that message says that the reason Russo "is done" is because she was making "unacceptable" allegations. Id. Those allegations are the claims of gender discrimination. RA995;RA1010. Moreover, even if the settlement demand were a consideration (which is denied), that is part and parcel of Russo's protected opposition to discrimination. If employers could terminate people based on the demands contained in "demand letters," such letters could no longer be considered protected conduct. Cf. Pape v. Dircksen & Talleyrand Inc., 2019 U.S. Dist. Lexis 17717 (E.D.N.Y. 2019).

NHNSI asserts that it could not be seen as having a retaliatory mindset, because it began negotiating a transition plan with Russo after she verbally complained of gender discrimination. NHNSI Opp. 16, 40, 41. In actuality, NHNSI discussed a transition plan with Russo on March 29, 2019 *before* hearing her initial complaint of gender discrimination. RA633:179:12-180:11. Only after NHNSI suggested a transition plan, did Russo verbally complain of discrimination. Id. It

would have been extremely disruptive for NHNSI to revoke its suggestion at this point, because such withdrawal would have been obviously retaliatory, and at that moment, NHNSI had a great need to have Russo continuing to work. RA1302;RA1363;RA1525; Kachmar v. Sungard Data Sys., 109 F.3d 173, 178 (3rd Cir. 1997) (delay in retaliation explained where employer must take time to prepare for employee's departure). Moreover, Russo's complaint of March 29, 2019 was merely verbal and informal. RA0017:77. This additional factoid does nothing to diminish the strong proof that the transition period was curtailed immediately after Russo's attorney raised claims of discrimination, because of her "allegations."

Part of Russo's evidence of retaliatory motive was the fact that NHNSI prevented certain doctors from providing Russo with references. Namely, NHNSI prevented Drs. Jenkins and Batlivala from submitting recommendations. Talbot-Kleeman called Russo a "sneaky little devil" for requesting references during her job search. RA1337-38. Dr. Jenkins testified that when he asked NHNSI permission to give Russo a reference, "I was told that I should wait…and nobody ever got back to me to tell me if I could write one." RA750:67:15-68:12. Dr. Batlivala

testified that Talbot-Kleeman directed him to hold off on responding to a reference request for Russo, and he does not recall ever being permitted to respond. RA782:46:6-47:16; see also RA1340 (Batlivala agreeing to hold off on responding to a reference request service until hearing from NHNSI).

NHNSI argues that it merely delayed the drafting of reference letters. NHNSI Opp. 47. However, the evidence demonstrates that it completely prevented the issuance of some written recommendations, including those from Jenkins and Batlivala. NHNSI attempts to muddy the waters by treating the reference letters as purported adverse actions and asserting that no harm came from its conduct. NHNSI Opp. 47. Rather, Russo is relying on these withheld recommendations (and the claim that she is a "sneaky little devil"), as further evidence of NHNSI's retaliatory motive.

**B. The Accelerated Cessation of Employment was an Adverse Action**

NHNSI further argues that accelerating the demise of the transition period cannot be seen as an adverse action. NHNSI Opp. 42-46. The Alvarez case also disposes of this specious argument. The Eleventh Circuit found that the early termination of a transition period

was an actionable adverse action. It wrote, "The loss of a salary for a period of months, weeks, or days is a 'materially adverse' action which 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Alvarez, 610 F.3d at 1268. The Eleventh Circuit's analysis was pitch-perfect and dispositive. An employer cannot plan to employ someone for a specific period, and then prematurely end that period based on a retaliatory motive.

Similar to the Alvarez case, the accelerated timeline for ceasing Russo's employment relationship is clearly an adverse action, because it involved truncating Russo's employment by two months. "Firing employees because of a statutorily protected trait" counts as an adverse action. Bostock v. Clayton Cnty., 590 U.S. 644, 681 (2020). Any employee taking advantage of a transition period, and relying on it for gainful employment while they look for another job, would surely be chilled from complaining if employers were free to terminate them during this period for those complaints. Alvarez, 610 F.3d at 1268. This case is even more clear than Alvarez's, because soon after Russo's demand letter, NHNSI withdrew from Russo the contemplated independent contractor job, as well.

NHNSI's citation to David v. Winchester Med. Ctr., 759 Fed. Appx. 166, 169 (4th Cir. 2019), is inapposite, as that case did not address an accelerated transition period, at all. The David case addressed settlement negotiations, while NHNSI's offer of a transition period merely represented planned terms and conditions of employment, and were not a part of any settlement discussions.

NHNSI argues that Russo's rejection of its proposal allowed it to terminate the transition period without consequences. NHNSI Opp. 45. A reminder of the timeline sheds light on this fallacious argument. On April 2, 2019, NHNSI prepared a written transition plan. RA1291:16;RA1518;RA1009. Russo made a counterproposal. RA644:184-85;RA642:216. Russo remained employed. On April 11, 2019, NHNSI prepared another written proposal. RA429. On April 29, 2019, Russo, through her lawyer, prepared a counter-proposal and complained of discrimination. RA1323-24. By the next morning, Talbot-Kleeman decided to terminate Russo, writing, "I plan to have Gina done this week." RA1414.

While NHNSI reserves for itself the right to end the transition period based on Russo's counterproposal, it is highly telling that Russo

remained employed after her first counterproposal, but not her second (in which she complained of discrimination). Russo signaled a continuation of the negotiation process with her counterproposal and not its termination. The failure to recognize an adverse action under these circumstances would do serious harm to the purposes underlying the Title VII anti-retaliation provision. The Alvarez case is controlling.

NHNSI asserts that the failure to continue to employ Russo as an independent contractor is not an adverse action, because her continuing to work in that capacity is a "privilege rather than a right and cannot form the basis for an adverse employment action." NHNSI Opp. 46. First, even if one were to accept this characterization of "privilege," Title VII addresses the privileges of employment. Hishon v. King & Spalding, 467 U.S. 69, 74-75 (1984). Title VII's anti-retaliation provision expands coverage to any adverse decision taken against an employee, even if that decision does not directly relate to the terms of employment. Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 63 (2006) (requiring expansive scope to Title VII retaliation provision, because "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or

causing him harm *outside* the workplace"). Thus, any retaliatory decision of the employer falls within the scope of the Title VII anti-retaliation provision, to the extent that it "could well dissuade a reasonable worker" from complaining of discrimination. Id. at 57.

## III. THERE IS AMPLE BASIS FOR INDIVIDUAL LIABILITY

New Hampshire RSA chapter 354-A contains numerous bases for imposing liability on an individual defendant, including where the person engages in "aiding, abetting, inciting, compelling or coercing another or attempting to aid, abet, incite, compel or coerce another to commit an unlawful discriminatory practice." RSA 354-A:7. Here, ample evidence supports the notion that Ahn incited NHNSI to terminate Russo. See Artesi v. Demoulas Super Markets, Inc., 2020 U.S. Dist. Lexis 269940 (D.N.H. June 2, 2020) at 29 (individual liability where the actor "affected" the employer's decision).

Ahn initiated the call for Russo's termination, demanded a vote for her termination, was the sole advocate for her termination, and stated that he, a long-time Partner, would leave the practice if Russo was not fired. RA648-649:12-14;RA685:158:RA629:163,165;RA745:48-49. If this

neither counts as inciting the job action, nor attempting to incite the job action, one questions what ever would.

Ahn's brief focuses on what would constitute "aiding and abetting." Ahn Opp. 14-15. In doing so, it ignores the strongest basis for imposing individual liability in his case – incitement. RSA 354-A:7. The Court should not permit itself to be distracted by a strawman argument.

## CONCLUSION

For the reasons put forth above and in Plaintiff-Appellant's principal brief, Russo requests that the district court's order granting summary judgment on Counts I, II and III be reversed and that the sex discrimination and retaliation claims against NHNSI and the sex discrimination claim against Ahn be remanded for trial. Russo requests that she be awarded reasonable attorneys' fees and costs for work on this appeal, should she be adjudged the prevailing party after trial.

Respectfully submitted by:

GINA RUSSO
Plaintiff-Appellant,

By her attorneys,

/s/ *Kamee Verdrager*
Kamee Verdrager, Esq. (CA01 #101062)
KBV LAW
P.O. Box 90
W. Nottingham, NH 03291
(603) 488-1473 (phone)
kbv@kbvlawpc.com

*/s/ Robert S. Mantell*
Robert S. Mantell (CA01 #31754)
Law Office of Robert S. Mantell
47 Liberty Avenue
Somerville, MA 02144
(617) 470-1033
RMantell@TheEmploymentLawyers.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 30, 2026 a copy of the foregoing document was served upon all parties of record via the CM/ECF system.

/s/ Kamee Verdrager

# Certificate of Compliance With Type-Volume Limit

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by [please select]

☑ this document contains 6,457 words, **or**

☐ this brief uses a monospaced typeface and contains ______ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this document has been prepared in a proportionally spaced typeface using Century Schoolbook in 14 point, **or**

☐ this document has been prepared in a monospaced typeface using ______________________ with ______________.

(s) Kamee Verdrager

Attorney for Gina Russo

Dated: January 30, 2026